UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

IN RE:

SEALED DOCUMENTS

Case No. 21-1375 (m)

## MOTION TO SEAL

TO THE HONORABLE COURT:

COMES NOW the United States of America, by and through the undersigned attorneys, and very respectfully states and prays:

1. The accompanying submission contains a pleading that is self-explanatory, related to the above captioned case.

2. The United States respectfully requests that the pleading be accepted by the Court for filing and appropriate disposition and that it **remain under seal** until further order from this Court.

WHEREFORE, the United States respectfully prays the Court accept and file the mentioned pleading, take appropriate action, and that an order be issued directing it remain under seal until further order by the Court.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 5th day of November 2021.

W. STEPHEN MULDROW
United States Attorney

*s/John Auchter*
John Auchter
Special Assistant United States Attorney
USDC-PR No. G03302
United States Attorney's Office
Torre Chardon, Suite 1201
350 Carlos Chardon Street
San Juan, PR 00918
(787) 766-5656
john.auchter@usdoj.gov

Granted
US MJ Marshal D.
11/5/21

# UNITED STATES DISTRICT COURT
### for the
### District of Puerto Rico

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* One Security DVR, one Apple iPhone, one Samsung phone, one Apple Mac Laptop, one HP Desktop, business records of Shipopo LLC, and one Dell Desktop, all of which are located at FBI San Juan, Hato Rey, Puerto Rico. | ) ) ) ) ) ) | Case No.  21- 1375 (M) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Puerto Rico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 USC 1343 | Wire Fraud | |
| 18 USC 1344 | Bank Fraud | |
| 18 USC 1956 | Money Laundering | |

The application is based on these facts:

See affidavit in support of search warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Marc Smith
*Printed name and title*

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at: 8:16PM

Date: Nov. 5, 2021

_____
*Judge's signature*

City and state: San Juan, PR

United States Magistrate Judge Marshal D. Morgan
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

IN THE MATTER OF THE SEARCH OF: one
Security DVR, one Apple iPhone, one Samsung
phone, one Apple Mac Laptop, one HP
Desktop, business records of Shipopo LLC, and
one Dell Desktop, all of which are located at
FBI San Juan, Hato Rey, Puerto Rico.

Case No.  21- 1375

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Marc Smith, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search one Security DVR, one Apple iPhone, one

Samsung phone, one Apple Mac Laptop, one HP Desktop, business records of Shipopo LLC, and

one Dell Desktop (collectively, the "Subject Evidence"), further described in Attachment A, for

the things described in Attachment B. On October 14, 2021, the Subject Evidence was seized by

the FBI from 23810 Villa Lisa Drive, Richmond, Texas 77406 pursuant to a Search Warrant

issued by the District Court for the Southern District of Texas. Following seizure, the Subject

Evidence was transferred to and is currently located at FBI San Juan, 140 Ave. Carlos Chardon,

Hato Rey, Puerto Rico 00918.

2.      This application seeks authority for a warrant to search for and seize evidence,

fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire

Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud, Bank Fraud), 1956

(Money Laundering and Conspiracy to Commit Money Laundering), and 1957 (Money

Laundering), the offenses under investigation.

     3.     I have been employed as a Special Agent with the Federal Bureau of Investigation

("FBI") since March 2017. I am currently assigned to the FBI San Juan Division Cyber Crimes

Investigation Task Force. I have received training and investigated a variety of federal crimes

involving cyber intrusion and computer fraud. I have experience regarding these federal

violations through my daily investigative responsibilities and extensive training. For example, I

have attended numerous classes and trainings dealing with computer crimes and fraud, including

how computer networks operate, methods employed by criminals to infiltrate computer networks

and commit other crimes, the purpose of the intrusions, and the numerous types of fraudulent

schemes that perpetrators of computer crimes carry out after gaining access to computer

networks (e.g., selling stolen credit card information located on a compromised computer or

surreptitious use of a compromised computer for further intrusions).

     4.     I have conducted numerous complex investigations concerning computer crimes

and fraud, including wire and mail frauds, such as Business Email Compromise schemes,

intrusions (i.e., gaining access to a protected computer or computer network without permission),

denial of service attacks (i.e., attempts to make a website, computer, or device unresponsive), the

use of botnets (i.e., a group of computers controlled without the knowledge of the computers'

owners), and the use of bulletproof servers (i.e., servers controlled by administrators who often

are non-responsive to law enforcement requests and often host illicit content anonymously). I

have extensive experience reviewing records related to computer crime and fraud, including

Internet Protocol ("IP") address logs used by computers on the Internet, network access logs, and

security programs. I also have extensive experience debriefing defendants, witnesses,

informants, and other persons involved in computer crime and fraud. I have personally

conducted and have been involved in numerous investigations that included the execution of

search warrants involving electronic evidence and have been involved in all phases of

investigations, from inception through trial, of computer intrusions as well as of criminal

hackers. I have earned credentials from the Association of Certified Fraud Examiners, the

Information Systems Audit and Control Association, the International Information System

Security Certification Consortium, and the Global Information Assurance Certification. This

affidavit is intended to show only that there is sufficient probable cause for the requested warrant

and does not set forth all of my knowledge about this matter.

## SUMMARY OF PROBABLE CAUSE

5.      Since October 22, 2020, I have been involved in an investigation into the large-

scale laundering of funds derived from various fraud schemes through online vehicle/vehicle

salvage sales that ultimately benefits the members of a network of money mules and fraudsters

located both in and outside of the United States. Those located outside the United States are

often Nigerian or Ghanaian nationals. My investigation kicked off after a Puerto Rico company

was victimized in a business email compromise ("BEC") scheme. Since that time, the investigation has grown to include multiple other districts and agencies.

6.    I have come to learn that the members of the scheme under investigation generally employ the basic following steps (with some variation) to carry out the movement of value procured through fraud to the pockets of members of the suspected conspiracy (or conspiracies):

> a.    "Money mules," directed by "money mule organizers," open bank accounts to receive funds from one or more unfolding fraud scheme(s).
>
> b.    Again directed by money mule organizers, the money mules use such funds to purchase money orders, including postal money orders or cashier's checks, using debit cards or cash withdrawn from their accounts (cashier's checks cannot be purchased with debit cards).
>
> c.    Some of the money orders or cashier's checks are made payable to online vehicle auction websites ("auctioneers").
>
> d.    The money mules, or other persons working on behalf of the schemers, deliver the money orders or cashier's checks to physical locations maintained by the auctioneers.
>
> e.    The money mule organizers direct the money mules delivering payments to auctioneer facilities to specify certain auctioneer account or lot numbers to apply the payments toward.

4

f. After receiving the funds delivered by the money mules, the auctioneers release the vehicles to online purchasers' agents. Thereafter, the vehicles typically are shipped overseas within a matter of days.

g. Once received, the online purchasers arrange to sell the vehicles, pocketing the profits.

7. Investigators have learned that one apparent money mule/money mule organizer, **OLUWASEGUN BAIYEWU ("BAIYEWU"),** used the Subject Evidence to further the conspiracy. This warrant seeks to search the Subject Evidence to obtain evidence of the crimes under investigation; specifically, any devices **BAIYEWU** is using and may have used in the past to communicate with co-conspirators and other money launderers or fraudsters in order to carry out their schemes.

## STATEMENT OF PROBABLE CAUSE

### The Puerto Rico BEC, California Money Mules, and COLLIN ENEH

8. As noted above, this investigation commenced when a company in Puerto Rico was the victim of a BEC. During the BEC, a person involved in the underlying fraud "spoofed" the email of a legitimate third-party vendor used by the victim. Using the spoofed email, a fraudster sent an email requesting that the victim route a wire transfer legitimately intended for the third-party vendor to the bank account of a California-based money mule named

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (rather than to the actual bank account of the

5

third-party vendor). Following the instructions contained in the "spoofed" email sent by the fraudster, the victim wired $112,129.53 to a JP Morgan Chase Bank Account belonging to ███████████████ (a "front" company established solely for the purpose of laundering fraud funds).

9.      After connecting ███████████ to the ███████████████ account through bank records, ███████████, I contacted her to interview her about her role in the above-described transaction. In addition to providing other information, ███████████ consented to a search of her phone and allowed the FBI ███████████ to make a forensic copy of it. During the interview, ███████████ described how she was recruited by a person named MICHAEL CROSBY ("CROSBY"), who directed her to establish ███████████, open bank accounts, and make various financial transactions with funds deposited into the bank accounts she opened.

10.      In reviewing the material provided by ███████████, law enforcement officers discovered a text/chat thread between ███████████ and CROSBY that confirmed ███████████'s story; i.e., CROSBY sent ███████████ text messages directing her to open bank accounts, engage in certain financial transactions, and undertake various other actions to facilitate those transactions. In one exchange on October 26, 2020, the day before the wire transfer made by the Puerto Rico BEC victim, CROSBY instructed ███████████ to go in person to a JP Morgan Chase Branch to unlock online access to the account because "we got a

150k coming so it's important." In another, on October ▓ 2020, CROSBY directed

▓▓▓▓▓▓ to withdraw $74,465 in cash from the $112,129.53 in victim funds that had been

wired into the ▓▓▓▓▓▓▓▓▓ account and to purchase several cashier's checks with that

money. One of the cashier's checks CROSBY directed ▓▓▓▓▓▓ to purchase was made out

to a U.S.-based auctioneer, Copart, for the total amount of $31,136.

    11.    On June 23, 2021, I applied for and obtained a search warrant to search

CROSBY's residence in ▓▓▓▓▓▓▓, and to seize electronic devices, including phones,

found there. During the search, ▓▓▓▓▓▓▓▓▓▓▓▓, law enforcement seized

the primary phone used by CROSBY at the time. Following the search, I interviewed CROSBY

on three occasions and learned that a person named JOSHUA FITTEN ("FITTEN") had

introduced him to a person he nicknamed "Gucci Man Collins" (due to the man's penchant for

wearing designer clothing) who directed him to facilitate the money laundering activities

described above, as well as other laundering activities. In exchange for moving money and

organizing others to move money, CROSBY received 5% of the fraudulent wire transfers

received into mule accounts he set up or arranged to set up. CROSBY told me that he

communicated with "Gucci Man Collins" using the WhatsApp account tied to phone number

+▓▓▓▓▓▓. As described further below, WhatsApp is a fully encrypted communications app

that fraudsters often use to evade law enforcement detection because communications sent using

the app are not stored in any location other than the device used to send or receive the messages.

In my training and experience, I know that money launderers use such apps when coordinating

7

their efforts with other money launderers to make it more difficult for law enforcement to find evidence of their awareness of the source of funds they are laundering.

12.    Following the interview with CROSBY, I examined his chats and WhatsApp threads with ███████████    The communications reveal the following: there were a total of 6,692 messages between the two during the period from February 13, 2020 through June 23, 2021. In those messages, ███████████    provided detailed instructions on what CROSBY should do or recruit others to do in order to move money from various fraud schemes, including the Puerto Rico BEC, for example:

    a.    "Gucci Man Collins" told CROSBY, in advance of the wire transfer sent to the ███████████ account above, that the transfers would originate in Puerto Rico (this information was apparently needed by ███████ to satisfy bank teller questions that would allow her to conduct transactions with the funds within days of the wire's arrival in the account);

    b.    On October 28, 2020, "Gucci Man Collins" instructed CROSBY to have one of the cashier's check made out to Copart, for the amount of $31,126, to be applied to the unique Copart Account # 877801;

8

    c.  CROSBY sent to "Gucci Man Collins" a photo of a sales receipt/bill of sale he

       (CROSBY) obtained when he delivered the cashier's check to Copart:



    d.  "Gucci Man Collins" instructed CROSBY to make payments to on at least three

       other Copart accounts.

    13.    During the course of this investigation, I learned that on August 13, 2020, a grand

jury in the Southern District of New York returned a superseding indictment against a person

named COLLINS ENEH ("ENEH"). The superseding indictment charged ENEH with

conspiracies to commit money laundering and bank fraud, for his role in organizing money

mules in a conspiracy that laundered funds from BECs that victimized entities in Germany,

Malaysia, China, South Korea, the U.S., and Fiji, and a romance scam in Pennsylvania. *See* 1:20-

CR-179 (DLC) (S.D.N.Y.). Also charged in that conspiracy was a person named JOSHUA

FITTEN, who, as described above, CROSBY told me introduced him to "Gucci Man Collins."

Based on conversations with investigators involved in the S.D.N.Y. case, I know that the phone number used by ENEH in communications obtained in the course of that investigation is the same number associated with the WhatsApp account used by "Gucci Man Collins." Apparently, therefore, "Gucci Man Collins" and ENEH are one and the same.

### Copart Data

14.    In response to law enforcement inquiries, Copart provided information regarding the $31,136 cashier's check made out to Copart, which reflects that CROSBY hand-delivered the check to a Copart location in Wilmington, California. The amount was applied toward the Copart user account registered to a Nigerian entity called Emperor Auto Advantage Limited ("Emperor Auto"). Specifically, the $31,136 was applied toward two vehicles purchased by Emperor Auto: a 2014 Land Rover Range Rover (located at the time of the auction in Atlanta, Georgia) and a 2006 Toyota Sienna (located at the time of the auction in Minneapolis, Minnesota). In addition, some of the $31,136 was applied toward storage fees in connection with another vehicle that had been purchased by Emperor Auto (located at the time of auction in Tennessee). Copart provided the following additional account information for the purchaser of record:

    a.   Name: BLOSSOM EGHAGHE

    b.   City/State: Lagos, Nigeria

    c.   Email: emperorautoadvantage@gmail.com

    d.   Phone Number: ▮▮▮▮▮▮▮

10

15.    Records obtained from U.S. Customs and Border Protection reflect that, in November of 2020, these two vehicles were, in fact, shipped to BLOSSOM EGHAGHE in Nigeria. The 2006 Toyota Sienna was listed for sale on a Facebook page that appears to be controlled by a person I believe to be a Nigerian national named ████████████

████████████

16.    According to information provided by Copart concerning the Emperor Auto account, between April 2020 and January 2021, the account was used to purchase 47 vehicles, for a total of $258,532. This $258,532 was paid for by 203 separate payments mostly made in relatively small amounts of between $500 and $1,000—and mostly in the form of money orders—delivered by hand to Copart lots around the country by various actual people who presented identification when delivering the payments. For example, on ████████ 2020, a person presenting an identification document bearing the name "████████" delivered 36 money orders, totaling $20,000, to a Copart location in Georgia. Further relevant to this application, I learned that **BAIYEWU** hand-delivered to Copart, on five separate occasions in 2020, at least 31 money orders, totaling $30,088. Those money orders were applied toward payment to Emperor Auto's Copart account. Finally, I learned from Copart that all of the vehicles purchased using Emperor Auto's Copart account had been shipped to Nigeria within days of purchase.

11

17.     I obtained data from U.S. Customs and Border Protection ("CBP") concerning the vehicles purchased by EGHAGHE/Emperor Auto Advantage. Those records confirm that all of the vehicles purchased by EGHAGHE/Emperor Auto Advantage from Copart were shipped to Nigeria. Moreover, those records reflect that a Texas company controlled by BAIYEWU— Shipopo Autos, located at 11450 Bissonnet St., Suite 77099, in Houston, Texas—is listed in CPB records as the "US Principal (Exporter)" of the 2006 Toyota Sienna paid for by the Copart cashier's check delivered by CROSBY that is described above in Paragraph 14. "Shipopo Autos" or "Segun Baiyewu" (i.e. BAIYEWU) is listed as the "US Principal Exporter" for 17 out of 46 vehicles purchased by EGHAGHE/Emperor Auto Advantage between April 20, 2020 and January 14, 2021. Notably, the payments delivered to Copart by BAIYEWU, which were applied toward 11 vehicles and fees for 5 relisted vehicles, went to pay for only 7 vehicles BAIYEWU shipped, according to CBP records. He also delivered payments toward 2 vehicles that other entities (Wheelzy LLC in Orlando Florida, and Aminu Monsor, in Atlanta, Georgia) shipped. This indicates that BAIYEWU's involvement in the scheme is not limited to his role as an exporter of vehicles.

18.     Based on my training and experience, I know that money orders are frequently purchased by money mules in amounts of between $500 and $1,000.  Money mules obtain or are instructed to obtain instruments in these amounts in an effort to evade reporting requirements and prevent law enforcement detection of laundering activity.  Money orders are attractive to money launderers because identification documents are not required to purchase them, thus they provide

an anonymous way to tender value. The money orders are typically provided by their purchasers
to others who conduct additional transactions with money orders to attenuate the link between
fraud proceeds and the recipient or recipients of the proceeds. In addition, I know and have
observed in this investigation that members of the conspiracy under investigation often "convert"
funds obtained by fraud through a series of transactions into cash in order to obscure the source
of the funds, and then further obscure the relationship between the cash and the fraud by re-
depositing it into different bank accounts. In this case, I learned from a representative of Navy
Federal Credit Union ("Navy Federal") that BAIYEWU has been known to deposit or attempt to
deposit large sums of cash into a Navy Federal bank account he controls. On one occasion, on
November 25, 2020—a month after the Puerto Rico BEC described in this affidavit—
**BAIYEWU** visited a teller at a Navy Federal branch in Sugarland, Texas, in an effort to deposit
$12,735 in cash. The teller informed **BAIYEWU** that he would be required to file a "currency
transaction report" in connection with the deposit. Upon hearing this, **BAIYEWU** asked the
teller to return the cash and cancel the transaction and **BAIYEWU** then left the bank. I suspect
that **BAIYEWU** did so because he wanted to prevent law enforcement from detecting the
transaction because he is involved in the knowing concealment and movement of fraud funds.

### Email Records

19.     Based largely on the facts described above, I applied for and obtained a warrant ▮

▮ . In reviewing the

13

documents and information provided by Google LLC in response to that warrant, I have discovered additional evidence of **BAIYEWU**'s involvement in the larger scheme under investigation:

      a.   correspondence with Nigerian banks (some of them apparently automatically-generated) showing account alerts, such as where a transfer was made from one of Emperor Auto's bank accounts to or from another account or person. One such apparent recipient of funds from Emperor Auto was **BAIYEWU**, who resides in the Subject Premises, as shown in the "snip" below:



The transfer, for 4 million in Nigerian naira, or approximately $9,700 in U.S. dollars, was sent on October 20, 2020, by Emperor Auto to another Guaranty Trust account held by **BAIYEWU**; the transaction remarks indicate that the money was for "[f]urther deposit toward payment for $30k Range Rover."

14

Notably, other suspected money mules, such as the person described in Paragraph 16, "████████" also received bank transfers with remarks indicating the payments were in connection to Copart purchases, for example:



b. emails with Copart and other online vehicle auctioneers reflecting Emperor Autos' bidding and purchase history; and

c. emails concerning shipping and receiving of the vehicles purchased by Emperor Auto via online auctions.

20. The emails show that the process for bidding on and shipping the vehicles is as follows:

a. Emperor Auto enters an online bid (or bids) in a competitive effort to win a desired vehicle;

15

b.  If Emperor Auto wins the auction, the auctioneer sends a follow up email that a certain person or company will pick up (and then, once pickup has occurred, has picked up) the vehicle;

c.  Following that, the Emperor Auto email account receives an email forward from the email account segunbaiyewu@yahoo.com, containing details of shipping arrangements made to transport the vehicle to Nigeria from its purchase location. Google records show that 33 such emails were sent during the period between October 1, 2020 and April 26, 2021. This led investigators to suspect that the person who controls the account segunbaiyewu@yahoo.com is instrumental in facilitating the movement of fraud proceeds, in the form of vehicles purchased from online vehicle auctioneers, to Nigeria. Some of these emails also cc'd an email account apparently controlled by ████████, who sells vehicles in Nigeria via a Facebook page.

21.     United States Postal Inspector Joseph Kelly is investigating targets who appear to be involved in conduct in ████████████████████ During the course of this investigation, and based in large part on information found in the search warrant return provided for ████████████████ described above, we obtained documents and information from Oath Holdings LLC (which provides email accounts with the yahoo.com domain name) concerning the email account segunbaiyewu@yahoo.com.

16

22.    The subscriber details for the account show that the account is registered to:

a.  Full name: segun baiyewu

b.  Registration IP address: 216.139.178.28

c.  Address: 13 Ade crescent, john wales, lagos, NG  23401

d.  Birthdate: 7/30/1985

e.  Recovery email: shipopoautos@gmail.com

f.  Recovery phone number: +13612280030

23.    In addition, investigators found documents showing **BAIYEWU**'s extensive involvement in shipping logistics for vehicles purchased by others, including EGHAGHE. Among other things, for example and with respect to the Puerto Rico BEC, investigators found an email in draft form that appears, in my training and experience and common sense, to reflect notes **BAIYEWU** made to himself germane to his work shipping vehicles in connection with the fraud scheme under investigation. That is, the "note" lists five vehicle identification numbers ("VINs"), two of which are VINs of vehicles purchased with the Puerto Rico fraud funds, as described at length in Paragraphs 10 and 14. Out of those five vehicles, Shipopo Autos, i.e. the Houston company that **BAIYEWU** controls, is the "US Principal (Exporter)" listed in CBP records for four of the vehicles, while the fifth vehicle was also purchased by EGHAGHE but ▮▮▮▮▮▮▮▮ of Atlanta, Georgia, not BAIYEWU or Shipopo Autos, is listed as the "US Principal (Exporter)."  This, combined with the fact that Copart records reflect that BAIYEWU delivered payments that were applied to EGHAGHE's account went toward payment for vehicles

17

BAIYEWU had no role in shipping, *see* Paragraph 17, corroborate my suspicion that BAIYEWU plays a role in moving fraud funds through Copart and is not merely acting in an arms-length capacity as a shipper.

### WhatsApp Records

24.     Based on my training and experience, at the outset of this investigation I suspected that participants in this scheme, like others involved in criminal schemes I have investigated, largely communicate via encrypted messaging applications, like WhatsApp, or text messages. WhatsApp chats and text messages are not typically stored by telecommunication or internet service providers, thus the content of such exchanges are not accessible to law enforcement unless a user stores such communications on his or her device and provides, in response to a search warrant or voluntarily, that device to law enforcement.  My suspicions were confirmed after I received and conducted searches of                                         's and MICHAEL CROSBY's phones and spoke with them both concerning their communications in furtherance of this scheme, as described in Paragraphs 8-12, above.

25.     Meanwhile, my colleagues in the Northern District of New York have obtained and shared with me information obtained from WhatsApp, in response to pen register trap and trace orders, for approximately a dozen phone numbers/WhatsApp accounts of significance in our investigation of mutual targets, including COLLINS ENEH's account, +

26.    While WhatsApp does not maintain (or, therefore, provide to law enforcement) the contents of its users' communications, the company does provide certain information, including the other WhatsApp users a target user contacts and IP address information for the target user's device when any such communication is made. Based on that information, I know that within a substantial number of communications between ENEH and CROSBY, ENEH had knowledge of and provided unique identifiers of BLOSSOM EGHAGHE's Copart account (para. 12). Notably BLOSSOM EGHAGHE's email account is associated with the telephone number + ▮▮▮▮▮▮▮▮; WhatsApp records reflect that EGHAGHE and the user of the WhatsApp account associated with the phone number +13612280030 also have had regular recent communications, for example, nine WhatsApp "chats" during the month of August of 2021. BAIYEWU registered the email account segunbaiyewu@yahoo.com using phone number +13612280030. Accordingly, I suspect that it is more likely than not that ENEH and BAIYEWU have both communicated with and continue to communicate with EGHAGHE, and potentially others, in furtherance of the scheme under investigation. Therefore, I suspect that the Subject Evidence will contain stored evidence of the crimes specified in this application.

## TECHNICAL TERMS

27.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

20

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

28.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.     *Probable cause.*  I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

21

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

30.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how

computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the

innocent from further suspicion.  In my training and experience, information

stored within a computer or storage media (e.g., registry information,

communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the

computer or storage media.  This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner.  Further, computer and storage media activity

can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks

and the internet.  Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation.  Additionally, some information

stored within a computer or electronic storage media may provide crucial

24

evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

25

accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to commit a crime, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence

of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

31.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large

27

volume of information.  Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and

would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site.  The vast array of computer hardware

and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled

environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be

stored in a variety of storage media formats that may require off-site reviewing

with specialized forensic tools.

32.  *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**CONCLUSION**

33.     I submit that this affidavit supports probable cause for a warrant to search the Subject Evidence described in Attachment A and seize the items described in Attachment B.

[remainder of page intentionally left blank]

29

## REQUEST FOR SEALING

34.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____

Marc Smith
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me pursuant to FRCP 4.1 at _____ by telephone, this _____ day of November 2021.

_____

United States Magistrate Judge Marshal D. Morgan
District of Puerto Rico

30

## ATTACHMENT A

*Property to be searched*

The following property to be search was seized by the FBI from **23810 Villa Lisa Drive, Richmond, Texas 77406**, on October 14, 2021, pursuant to a Search Warrant issued by the District Court for the Southern District of Texas:

- one Security DVR,
- one Apple iPhone,
- one Samsung phone,
- one Apple Mac Laptop,
- one HP Desktop,
- business records of Shipopo LLC, and
- one Dell Desktop

  (collectively, the "Subject Evidence").

The Subject Evidence was transferred to and is currently located at FBI San Juan, 140 Ave. Carlos Chardon, Hato Rey, Puerto Rico 00918.

## ATTACHMENT B

*Property to be seized*

1.    All records relating to violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud, Bank Fraud), 1956 (Money Laundering and Conspiracy to Commit Money Laundering), and 1957 (Money Laundering), those violations involving **OLUWASEGUN BAIYEWU** and occurring after **January 1, 2019**, including:

   a.   Records and information, including communications stored on cellular phones or computers, relating to the movement of funds or value derived from fraud from the United States to any other country via online vehicle salvage auction houses;

   b.   Records and information including communications stored on cellular phones or computers, relating to the business email compromise perpetrated on Puerto Rico company Glenn International in October of 2020; and

   c.   Records and information, including communications stored on cellular phones or computers, relating to the identity or location of the suspects OLUWASEGUN BAIYEWU, BLOSSOM EGHAGHE,                          and COLLINS ENEH;

2.    Phones or other electronic devices used to store any evidence described above.

3.      For any phone, computer, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Device"):

        a.  evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the Device user;

        c.  evidence indicating the Device user's state of mind as it relates to the crime under investigation;

        d.  evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

        e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

        f.  evidence of the times the Device was used;

        g.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

      h.  documentation and manuals that may be necessary to access the Device or to

conduct a forensic examination of the Device;

      i.  records of or information about Internet Protocol addresses used by the Device;

      j.  records of or information about the Device's Internet activity, including firewall

logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of

user-typed web addresses;

      k.  contextual information necessary to understand the evidence described in this

attachment.

4.      Routers, modems, and network equipment used to connect any Device to the

Internet.

5.      Real or personal property involved in or property traceable to property involved in

the money laundering offenses under investigation, and any real or personal property that

constitutes or is derived from proceeds traceable such offenses.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico ▼

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*
One Security DVR, one Apple iPhone, one Samsung phone, one
Apple Mac Laptop, one HP Desktop, business records of Shipopo
LLC, and one Dell Desktop, all of which are located at FBI San Juan,
Hato Rey, Puerto Rico.

Case No. 21- 1375 (M)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ Puerto Rico _____
*(identify the person or describe the property to be searched and give its location)*:
    See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
    See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      November 19, 2021      *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____ the duty U.S. Magistrate Judge _____
                                                                                            *(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____

Date and time issued:   NOV. 5, 2021 @ 8:16PM        _____
                                                                                    *Judge's signature*

City and state:    San Juan, PR              USMJ Marshal D. Morgan
                                                                            *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

    _____
*Executing officer's signature*

    _____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The following property to be search was seized by the FBI from **23810 Villa Lisa Drive, Richmond, Texas 77406**, on October 14, 2021, pursuant to a Search Warrant issued by the District Court for the Southern District of Texas:

- one Security DVR,

- one Apple iPhone,

- one Samsung phone,

- one Apple Mac Laptop,

- one HP Desktop,

- business records of Shipopo LLC, and

- one Dell Desktop

  (collectively, the "Subject Evidence").

The Subject Evidence was transferred to and is currently located at FBI San Juan, 140 Ave. Carlos Chardon, Hato Rey, Puerto Rico 00918.

**ATTACHMENT B**

*Property to be seized*

1.      All records relating to violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud, Bank Fraud), 1956 (Money Laundering and Conspiracy to Commit Money Laundering), and 1957 (Money Laundering), those violations involving **OLUWASEGUN BAIYEWU** and occurring after **January 1, 2019**, including:

  a.  Records and information, including communications stored on cellular phones or computers, relating to the movement of funds or value derived from fraud from the United States to any other country via online vehicle salvage auction houses;

  b.  Records and information including communications stored on cellular phones or computers, relating to the business email compromise perpetrated on Puerto Rico company Glenn International in October of 2020; and

  c.  Records and information, including communications stored on cellular phones or computers,  relating to the identity or location of the suspects OLUWASEGUN BAIYEWU, BLOSSOM EGHAGHE, ███████████████████ ███████████ and COLLINS ENEH;

2.      Phones or other electronic devices used to store any evidence described above.

2

3.      For any phone, computer, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Device"):

a.  evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the Device user;

c.  evidence indicating the Device user's state of mind as it relates to the crime under investigation;

d.  evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

f.  evidence of the times the Device was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

      h.  documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

      i.  records of or information about Internet Protocol addresses used by the Device;

      j.  records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      k.  contextual information necessary to understand the evidence described in this attachment.

4.      Routers, modems, and network equipment used to connect any Device to the Internet.

5.      Real or personal property involved in or property traceable to property involved in the money laundering offenses under investigation, and any real or personal property that constitutes or is derived from proceeds traceable such offenses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.