**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>[1] OLUWASEGUN BAIYEWU,<br><br>[3] OLUWASEUN ADELEKAN,<br>[4] TEMITOPE SULEIMAN A/K/A<br>"JONATHAN AKINFEMI,"<br>[5] TEMITOPE OMOTAYO,<br><br>Defendants. | CRIMINAL NO. 21-395 (RAM) |

<u>**GOVERNMENT'S TRIAL BRIEF AND OMNIBUS MOTIONS IN LIMINE**</u>

W. STEPHEN MULDROW
United States Attorney

SETH A. ERBE
Chief, Financial Fraud & Corruption
Linet Olinghouse
Assistant United States Attorney
United States Attorney's Office
District of Puerto Rico
USDC-PR No. G03009
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
(787) 282-1843

Emily Powers
Richard S. Greene IV
Trial Attorneys
Consumer Protection Branch
United States Department of Justice
450 Fifth St., NW, Suite 6400
Washington, DC 20001
(202) 451-7763

Dated: July 3, 2025

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 4

II.   LEGAL BACKGROUND ....................................................................................... 5

III.  SUMMARY OF TRIAL EVIDENCE ..................................................................... 8

   A.  Overview of Money Laundering Methods Used in the Alleged Conspiracy.................... 8
   B.  Background on the Fraud Schemes............................................................................ 10
   C.  Criminal Groups Receive Fraud Funds – Money Laundering Begins.......................... 12
   D.  The Defendants' Relationships and Conspiracy Logistics ......................................... 12
   E.  The Underlying Fraud Victims.................................................................................. 17
   F.  The Entities and Bank Accounts............................................................................... 18

IV.   PRESENTATION OF EVIDENCE......................................................................... 22

V.    MOTIONS *IN LIMINE* – SUBSTANTIVE.............................................................. 28

   A.  Motion to Conditionally Admit Business Records under FRE 902(11)......................... 28
      1.  Preliminary Determinations of Admissibility of Business Records ......................... 29
      2.  The Confrontation Clause is not Implicated ...................................................... 30
   B.  Motion to Introduce Evidence of Adelekan and Omotayo's Joint Involvement with
       Fraud and Money Laundering Prior to the Timeframe of the Alleged Conspiracy......... 31
   C.  Consciousness of Guilt Evidence.............................................................................. 35
   D.  Previous Marriage Evidence .................................................................................... 36
      1.  The Previous Marriage Evidence is Directly Relevant Intrinsic Evidence............... 37
      2.  The Previous Marriage Evidence is Admissible under Rule 404(b)......................... 38
   E.  Motion to Introduce Evidence of Suleiman's Motive to Use an Alias and Knowledge of
       Illicit Source of Funds, and Plan to Use Buying and Shipping Cars as a Defense.......... 39
   F.  Motion to Introduce Defendants' Tax Return Information for the Years 2019, 2020, and
       2021................................................................................................................... 41
      1.  The Tax Return Information is Directly Relevant Intrinsic Evidence...................... 41
      2.  The Tax Return Information is Admissible under Rule 404(b)................................ 44
   G.  Motion to Admit Expert Testimony of Former FBI Special Agent Edgar Koby ........... 44
   H.  Motion to Conditionally Admit Statements by Unindicted Co-Conspirators Pursuant to
       Rule 801(d)(2)(E)................................................................................................. 46
   I.  Motion to Admit Statements by Unidentified Co-Conspirators Perpetrating Romance
       Scams, UI Fraud, and BECs ................................................................................... 47
   J.  Motion to Preclude Cross-Examination Through Use of Law Enforcement Reports ..... 49
   K.  Motion to Allow Presence of Law Enforcement at Counsel Table and to Re-Call Case
       Agent.................................................................................................................. 51
   L.  Motion to Bar Arguments Regarding Possible Consequences of Conviction ................ 53
   M.  Motion to Preclude Argument, Testimony or Evidence Regarding Specific Instances of
       Conduct Offered to Prove That Defendant's Good Character and Negate Criminal Intent
       ........................................................................................................................... 54

N.  Motion To Prohibit Argument, Testimony or Evidence Regarding Improper, Inadmissible, and/or Overly Prejudicial Matters in Front of the Jury, Including Regarding (1) The Government's Charging Decisions; (2) Stipulation Discussions; (3) Plea Discussions; (4) The Government's Calling or Failing to Call Certain Witnesses; and (5) References to the Health, Family Obligations, or Background of Any Defendant ......................................54

    1.  Charging Decisions ................................................................................................55
    2.  Stipulation Discussions .........................................................................................56
    3.  Plea Discussions ...................................................................................................56
    4.  Witnesses Testifying or Not Testifying at Trial ........................................................58
    5.  Family Needs, Employment or Education ................................................................59

O.  Motion to Prohibit Explaining Reasonable Doubt During Closing Argument .................60
P.  Motion to Preclude Irrelevant Argument in Relation to Search Warrant Date .................62
Q.  Motion to Preclude Argument, Testimony or Evidence about Victim Negligence ...........63
R.  Motion to Limit Scope of Cross-Examination of Fact Witness .......................................63

VI.  CONCLUSION ...........................................................................................................66

## I.    <u>INTRODUCTION</u>

OLUWASEGUN BAIYEWU, OLUWASEUN ADELEKAN, TEMITOPE SULEIMAN, and TEMITOPE OMOTAYO, (collectively, the "Defendants") were charged in a one-count superseding indictment on May 31, 2023, alleging a money laundering conspiracy arising under 18 U.S.C. § 1956(h).[1] The Defendants engaged in a wide-ranging conspiracy that was specifically designed to receive and launder illicit proceeds derived from internet-enabled frauds perpetrated on unsuspecting victims—in particular by engaging in complicated and convoluted financial transactions with the funds in order to obscure and attenuate the link between the funds and their source, the nature of the funds as fraud-derived, as well as the identities of those who owned and controlled the funds and perpetrated the frauds. The Defendants and their co-conspirators personally benefited by earning money off the money laundering services they provided, and their actions were key to transferring proceeds back to conspirators and fraudsters located in Nigeria, including in the form of cars purchased from U.S.-based online vehicle auctions houses. The Defendants used their U.S. and Nigerian banking accounts to facilitate unjustifiably complex financial transactions and were instrumental in facilitating the purchase and shipment of the cars using money derived from fraud. As a result of their actions, the Defendants have each been charged with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Jury selection is scheduled to begin on August 4, 2025. Given the multi-defendant trial and the anticipated number of witnesses, the government believes that trial in this matter could last up to seven days. The government submits this trial memorandum to (i) provide a legal overview of the charged crime, (ii) provide a high-level outline of the government's anticipated case-in-chief

---

[1] The Superseding Indictment also charged Ifeoluwa Dudubo; he pleaded guilty on June 24, 2025. D.E. 567.

and its evidence in support, and (iii) move to admit certain evidence. This memorandum will allow the Court to resolve as many evidentiary and other issues as possible prior to trial to minimize disruptions and delay during trial.

## II.    <u>LEGAL BACKGROUND</u>

To obtain a conviction for conspiracy to commit money laundering, the government must establish the following as to each charged defendant:

(1) An agreement was formed between two or more persons;

(2) The defendant knowingly became a member of the conspiracy; and

(3) At the time the defendant joined in the agreement, he knew the purpose of the agreement.

*See* 18 U.S.C. § 1956(h); Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.371(1) (2024) (hereinafter "Pattern Instructions"); Comment, Pattern Instructions § 4.18.1956(h). A money laundering conspiracy contains no overt act requirement. *Whitfield v. United States*, 543 U.S. 209, 214 (2005) (no overt act required); *see also* Pattern Instructions § 4.18.371(1), Comment (2).

Here, the government has alleged two kinds of money laundering conspiracy—so called "concealment," 18 U.S.C. § 1956(a)(1)(B)(i), and "transactional" (or "spending") 18 U.S.C. § 1957. The Defendants' conduct supports both. The elements for each type of money laundering conspiracy are set forth below.

With respect to money laundering conspiracy, the government has to prove that each Defendant agreed with one or more coconspirators to (1) knowingly conduct a financial transaction, (2) involving funds that Defendant knew to be the proceeds of some form of unlawful activity, (3) that were in fact the proceeds of "specified unlawful activity" ("SUA"), and (4) that Defendant knew the transactions were designed in whole or in part to conceal or disguise the

nature, location, source, ownership, or control of the proceeds of such unlawful activity. Pattern Instructions § 4.18.371(1); Comment to Pattern Instructions § 4.18.1956(h). For this form of money laundering, the government has alleged in this case that it involved proceeds of wire fraud, mail fraud, access device fraud, access device fraud conspiracy, and money laundering conspiracy.

The elements of transactional money laundering are: a member of the conspiracy (1) deposited, withdrew, exchanged funds, or attempted to deposit, withdraw, or exchange funds over $10,000 in a financial institution affecting interstate commerce, (2) the conspirator knew that the funds came from some kind of criminal offense, (3) the funds were in fact criminally derived from an SUA, and (4) the SUA took place in the United States. Pattern Instructions § 4.18.1957. For this form of money laundering, the government has alleged in this case that it involved proceeds of wire and mail fraud, as well as money laundering.

The first two elements of wire and mail fraud are: (1) a scheme, substantially as charged in the indictment, to defraud or to obtain money or property by means of false or fraudulent pretenses; and (2) the fraudsters' knowing and willful participation in this scheme with the intent to defraud, with knowledge of its fraudulent nature and with the specific intent to defraud. As to the third element, for wire fraud the government much show that an interstate wire was used in furtherance of the scheme to defraud, and for mail fraud the government must prove the use of the U.S. mail. Pattern Instructions §§ 4.18.1341, 4.18.1343.

The elements of access device fraud are: (1) a fraudster used an access device, (2) without authorization and thereby obtained something of value aggregating at least $1,000 during the one-year period; (3) the fraudsters acted knowingly, willfully and with the intent to defraud; and (4)

the fraudsters' conduct affected interstate or foreign commerce. Pattern Instructions § 4.18.1029.[2] "Access device" is defined in the statute as "any card, plate, code, account number . . . personal identification number . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029(e)(1). "Unauthorized access device" means any access device that is "stolen . . . or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3).

To meet its burden at trial, the government will have to establish the existence of the money laundering conspiracy, by showing Defendants' knowing membership in that conspiracy, and Defendants' knowledge of the purpose for the money laundering conspiracy, that is, concealment money laundering and/or transactional money laundering. To establish Defendants' knowing membership in a conspiracy to commit concealment money laundering, the government must demonstrate a "knowledge of a design to conceal" illicit proceeds. *United States v. Frigerio-Migiano*, 254 F.3d 30, 33 (1st Cir. 2001) (quoting 18 U.S.C. § 1956(a)(1)(B)(i); *see also* Pattern Instructions § 1956(a)(1)(B)(i), Comment (5).

The government must also prove that the illicit proceeds Defendants conspired to launder were, in fact, criminally derived proceeds of an SUA—in this case, wire fraud, mail fraud, access device fraud and money laundering. The government need not prove that Defendants knowingly joined a conspiracy to launder wire fraud proceeds: it is sufficient to demonstrate Defendants' knowledge that the proceeds were derived from some form of unlawful activity. *United States v. McGauley*, 279 F.3d 62, 69 (1st Cir. 2002).

---

[2] The elements of access device fraud conspiracy are essentially the same, except that the government must show there was an agreement by one or more people to perpetrate access device fraud.

III.    <u>**SUMMARY OF TRIAL EVIDENCE**</u>

The government anticipates that it will establish the following facts, among others, during its case-in-chief at trial.

### A.  Overview of Money Laundering Methods Used in the Alleged Conspiracy

There are Nigerian-based criminal organizations that perpetrate fraud scams, such as business email compromise ("BEC") scams, romance scams, and government benefits schemes, on U.S. citizens and State and the U.S. government. Due to the ongoing and widespread nature of Nigerian fraud scam perpetration, there is a strong and constant need to move funds generated through these schemes back to perpetrators in Nigeria: in order to profit from their schemes, fraudsters need to move victims' money out of the United States and into their possession—and, typically, not in the form of U.S. Dollars, but in Nigerian Naira, since the Naira is the currency of Nigeria while U.S. Dollar is not. This generates a supply of black-market U.S. dollars and particularly "anonymized" financial instruments such as cash, money orders, and cashier's checks.

Meanwhile, there is strong demand for salvaged vehicles in Nigeria. U.S.-based online vehicle auction houses, such as Copart, Inc., sell salvaged cars to buyers who ship the vehicles to Nigeria, where they are sold. Salvaged cars do not have substantial value in the U.S. because they are not insurable and many Americans will simply purchase a new car after receiving a check from an auto insurer if a vehicle has been determined to be a "total loss" (that is, its repair costs exceed its Blue Book value). But in Nigeria, there is high demand for "refurbished" salvaged vehicles, and they can be sold there for much more than the U.S. purchase price.

These two markets meet at online auto auctions, like Copart, Inc.—especially because time is of the essence for both. The "owners" of the money are organized fraudsters. They are in Nigeria and want the money sent back to them in Nigeria in a way that does not raise red flags,

because they do not want the fraud detected before they are able to access and profit from their schemes. Victims who become suspicious can recall wires and stop payment on paper checks and other financial instruments, and they can notify law enforcement. Banks can shut down and freeze money if they have a basis to suspect fraud and money laundering. Fraudsters and money launderers also want to move the money quickly because they need the money, they are wary of people stealing from them, and many people along the chain are impatient to get paid. On the U.S. side, launderers are eager to avoid law enforcement, to avoid detection, and to prevent the closure of banking and auto auction accounts so they can keep doing business unimpeded. Obscuring identity is critical, so steps are taken to avoid creating a "paper trail" that could allow law enforcement and financial institutions to discover the identities of key players in the organized network.

On the car-buying side, speed of payment is important because Copart begins imposing storage fees after three days; these fees are incurred on a daily basis thereafter, and if a car is not paid for within a set period the "lot," as the vehicles are referred to, can be reversed and—if enough unpaid storage accrues—an account can be suspended or shut down. Copart also offers a "secured funds" discount when members pay for cars via money orders and cashier's checks because they are generally as good as cash to Copart—unlike wires or credit card payments, where the time it takes to settle a transaction can lead to more uncertainty about whether and when Copart will receive payment. In addition, Nigerian car buyers face real and perceived limits, imposed by Nigerian banks, on how much Naira they can send out of the country in exchange for U.S. Dollars.

As a result of these complementary needs, organized networks for cleaning, moving, and exchanging U.S. Dollars have emerged. In these networks, there are middlemen, sometimes referred to as "money men," that bring the "supply and "demand" together. These are U.S. and

Nigerian counterparts whose primary role is to keep the money and cars moving along so that everyone else along the chain can profit. The use of vehicles to accomplish the transfer of funds overseas is referred to as "trade-based money laundering" because it cleans and moves money by converting fraud proceeds into consumer goods that are intrinsically valuable and can be sold for a profit. In essence, trade-based money laundering is a very convoluted way to do something that should be simple (buy a car); the point of the complexity, at least in part, is to conceal that there is any money laundering conspiracy at all. This gives the money launders plausible deniability that they are involved in anything illegal. Indeed, the use of legitimate markets makes it difficult to detect money laundering in the first instance. The Defendants in this case all play roles in the above-described money laundering method: Baiyewu is alleged to have served as a money broker, while Suleiman, Omotayo, and Adelekan were U.S. Dollar suppliers. Baiyewu also facilitated shipment of the purchased cars—property traceable to and involved in fraud and money laundering.

### B.  Background on the Fraud Schemes

The three primary fraud schemes relevant to this trial are romance fraud schemes, BEC schemes, and pandemic-era unemployment insurance ("UI") fraud scams. Romance fraud is a type of fraudulent conduct in which a perpetrator (or perpetrators) feigns romantic intentions toward a victim. The perpetrator frequently meets the victim through an online dating website or application and adopts a fraudulent or stolen identity in aid of the perpetrator's scheme. The perpetrator spends weeks and months—or even years—cultivating a relationship with the targeted victim to gain the victim's affection and trust. Once the perpetrator gains the victim's trust, they use that goodwill to fraudulently obtain money from that victim or use that victim as an unwitting accomplice in other fraudulent schemes.

A BEC is a type of computer fraud that occurs when an employee of a company is fooled into interacting with an email message that appears to be, but is not, legitimate. One common BEC scheme involves a scammer gaining unauthorized access to an employee's email account. That intruder monitors the employee's email traffic to determine when a large financial transaction is about to take place. After initial payment instructions are conveyed between legitimate parties to the transaction, the intruder sends a follow-up email that appears to be coming from the original legitimate sender but is really coming from the intruder. That email contains a change of plans, instructing that the money be wired instead to an account that is under the criminal organization's control and set up for the purpose of receiving the redirected funds. Once the funds are deposited into a bank account the fraudster controls, an accomplice will typically withdraw the funds quickly in the form of cashiers' checks or money orders. The reason time is of the essence is fraudsters want access to the fraud proceeds before the victim company figures out that they were defrauded and sent money to the wrong bank account. This step is also important for the scammers to avoid detection by law enforcement or banks by withdrawing the money in financial instruments that are difficult to trace.

In pandemic-era UI fraud schemes that defrauded state workforce agencies and the U.S. Government and taxpayers, fraudsters obtained stolen identifying information of regular, unsuspecting people—including multiple "access devices," i.e., victims' names, addresses, birthdates, and social security numbers—and used this stolen information to apply, falsely, for UI benefits in the victims' names and without the victims' consent. The fraudsters requested that the victims' UI benefits be loaded onto reloadable, prepaid debit cards, which were then used to purchase money orders, that in turn were used to pay for costs and fees associated with vehicles purchased as part of the money laundering scheme. Many times, the victims' employers had

already received payroll protection plan funds—so the UI fraud impacted the employers and employees beyond just economic loss, insofar as they had to spend countless hours and much effort to deal with the "red tape" associated with clearing up the false claims impacting their identities and finances.

### C. Criminal Groups Receive Fraud Funds – Money Laundering Begins

Criminal groups that perpetrate fraud often coordinate with members located in the U.S. who open and use bank accounts for the purpose of receiving fraudulently obtained funds. In the case of UI fraud, benefits were loaded onto prepaid debit cards that were mailed to or associated with bank accounts controlled by members of the criminal organization. After receiving the funds (whether into bank accounts or in the form of prepaid debit cards) the initial fraud recipients conducted further transactions with the money—such as, specifically, withdrawing the money as cash, or buying money orders and cashier's checks. In this case, a large percentage of the fraud funds went toward buy money orders that were tendered at Copart to pay for cars that were shipped to Nigeria. During the pandemic, this created a large influx of money orders into the black market for U.S. Dollars. Here, the government does not necessarily know the identities of all of those who first received the fraud funds before moving them along to the money launderer conspirators— although evidence at trial will show that an account at a company called Olad Trading, which Adelekan controlled, did directly receive fraud funds. Regardless, each of the Defendants was involved in making sure money orders and cashier's checks that were bought with fraud funds were tendered at Copart to benefit the Defendants and co-conspirators in Nigeria.

### D. The Defendants' Relationships and Conspiracy Logistics

Defendants are all Nigerian nationals who came to the United States within the past 25 years. During the timeframe of the conspiracy, Defendants Adelekan and Omotayo were residing

in Staten Island, New York; Defendants Suleiman and Baiyewu were residing in the Houton, Texas, area, and Ifeoluwa Dudubo was residing in the Austin, Texas area.

All of the Defendants have longstanding relationships, going back years. Adelekan and Omotayo lived together in various locations in New York City, including when they were on pretrial release for wire fraud and money laundering conspiracy charges brought in the Southern District of New York (S.D.N.Y.) in 2019 and they resided together in an apartment in Staten Island. In the S.D.N.Y. case, Adelekan and Omotayo were alleged to be part of a group of people who perpetrated BEC and investment fraud schemes and laundered money from those schemes through their bank accounts and by buying salvaged automobiles from Copart and another online auto auction house, IAA.

After their arrest in April 2019, Adelekan and Omotayo were released on conditions ordered by the Court in the S.D.N.Y.—including that they refrain from committing any other crimes. Despite that requirement, Adelekan and Omotayo continued to launder money from romance scams and then UI fraud (from new victims—which were not identified in the S.D.N.Y. case). Specifically, two romance/investment scam victims (D.L. and K.C.) were directed by scammers acting as a love interest and friend, respectively, to mail bulk cash and a cashier's check to Adelekan's and Omotayo's shared address in Staten Island, at 19 Clawson Street, and to wire money to an Investors Bank account that Adelekan opened in the name of a "shell" company and used to receive and transact in fraud funds. In June 2020, Adelekan withdrew over $9,400 that had been commingled with romance scam victim funds from the Investors account and purchased cashier's checks that he delivered to Copart to pay for cars purchased using Baiyewu's Copart account, held in the name of "Shipopo Autos," Copart account number 829581. That Investors Bank account also reflected over $140,000 in money order deposits—in an approximately one-

month period in June 2020—that were purchased using debit cards loaded with fraudulently-obtained UI benefits.

Beginning in about July 2020 and continuing through August 2020, Adelekan, Omotayo, and Baiyewu worked together to obtain and tender UI fraud-derived money orders to pay for cars purchased for, among others, two unindicted co-conspirators, identified in the Superseding Indictment as CC-5, who had a Copart account named Emperor Auto Advantage Ltd. (number 877801) and CC-6, who had a Copart account named B-100 Energy Nigeria Ltd (number 39008). Typically, Baiyewu would first receive outreach from the Nigerian customer seeking assistance in securing U.S. Dollars for purchase. Then, Baiyewu would reach out to his money suppliers, including Adelekan or Omotayo. Once he found a supplier with funds (and in the period of July to August of 2020, he did not even need to ask Adelekan and Omotayo—they always had money orders available, so this step was skipped in some instances), Baiyewu provided details of a Copart payment he needed made on his or a customer's behalf. Copart records reflect that, following those coordination and direction texts, Adelekan would go in person and pay using large amounts of money orders, delivered to Copart locations, usually the one in Somerville, New Jersey. Following that, Adelekan or Omotayo would text back a photo of the receipt Copart provided in exchange, and Baiyewu would make or have others make Nigerian Naira transfers to Nigerian bank accounts specified (via text message) by Adelekan or Omotayo as reimbursement for the U.S. Dollars he "bought" from them.

Although the Superseding Indictment alleges a conspiracy that began in or around May 2020, encompassing the romance scam-derived financial transactions that occurred during the timeframe of the conspiracy (2020-2021), as far back as early 2018, Adelekan, Omotayo, Baiyewu—and defendant Suleiman—worked together in a similar fashion described in the

preceding paragraph, to obtain black market U.S. Dollars to pay for cars. In that period, Suleiman's role was primarily to help pay for the U.S. Dollars Baiyewu bought by sending Naira from his (Suleiman's) Nigerian bank accounts to the Nigerian accounts to be reimbursed for the U.S. Dollars Omotayo and Adelekan sold to Baiyewu. Although there was a gap in communications following Adelekan's and Omotayo's arrests in April 2019, and it appears the Defendants grew more cautious in their dealings—including by deleting or using "disappearing" messages when using WhatsApp—their texts, chats and bank and other business records reflect that the Defendants all played substantial roles in moving thousands of dollars a day to Nigeria in a method consistent with trade-based money laundering, and that by 2020 the patterns and practices to do so were well established among the men.

Another of the Defendants in the S.D.N.Y. case, Olalekan Daramola, had a Copart account that was used to buy cars that Adelekan and Omotayo paid for using fraud proceeds derived from the scams alleged there. Baiyewu was friends with Daramola and met defendant Ifeoluwa Dudubo through Daramola after Dudubo arrived in the U.S. in about 2018. In 2018, Dudubo began making money by helping Daramola make payments for cars at Copart and IAA locations near Austin—which was about 60 miles from where Dudubo and Daramola lived. Dudubo, who was working as a food delivery person, would earn about $150 and gas money for each instance of delivering cashier's checks, money orders, and, at times, cash for Daramola. Baiyewu knew that Dudubo delivered payments for Daramola, and at some point asked him if he could also obtain black market U.S. Dollars and deliver them to pay for cars at Copart and IAA for him (Baiyewu). Dudubo agreed and began to do so. During the timeframe of the conspiracy, Dudubo delivered thousands of U.S. Dollars he knew were derived from fraud to pay toward cars purchased using the Shipopo, Emperor Auto, and B-100 Copart accounts.

15

Like in communications between Adelekan, Omotayo, and Baiyewu, the process would begin with Baiyewu receiving a request for help finding U.S. Dollars from a Nigerian customer. Then, he would text to see if Dudubo knew anyone who had U.S. Dollars to sell, and Dudubo would reach out to everyone he knew who was in the business of selling funds. Some of these suppliers Dudubo knew were sourcing money from fraud. Dudubo and Baiyewu would negotiate an exchange rate (typically determined by Dudubo's source), and once they agreed on a price, Baiyewu would text payment instructions to Dudubo on which Copart account and vehicles to pay toward. Dudubo would travel to the source and pick up the funds and then drive approximately 60 miles to Copart or IAA, stand in line to tender the payments, and then drive home. Dudubo would also send a screenshot of the receipt or receipts he got from Copart, and Baiyewu would wire or arrange for someone to wire Naira to an account Dudubo specified to pay for the U.S. Dollars. Baiyewu would usually send screenshots of bank transfer receipts to Dudubo to prove payment had been made to the Nigerian bank account. At times, Dudubo also sold U.S. Dollars directly to Baiyewu (not delivering as Copart payments), including in one instance in about 2020 when Baiyewu bought $40,000 in money orders from Dudubo and sent Suleiman from Houston to Austin to pick it up in person. Dudubo met Suleiman in Austin and took him to his money supplier, where Suleiman took possession of the money orders.

Baiyewu and Suleiman knew one another from Nigeria and were active in socializing at clubs and bars with other Nigerians. Indeed, the two go back many years and are close friends and business partners. They also worked together, from shortly after both came to the United States, to source black market U.S. Dollars to pay for, or (for a commission) help others pay for, cars bought from online vehicle auction houses. Suleiman was one of Baiyewu's Houston-based U.S. Dollar suppliers who, on at least one occasion identified in the Superseding Indictment, sourced

money he used to pay for a car at Copart, using the alias "Jonathan Akinfemi," on Baiyewu's behalf (for Baiyewu's Nigerian customer, CC-7) from UI fraud perpetrated using the identify of victim D.H.

In addition to the charged Defendants, Baiyewu was actively involved in seeking and obtaining black market U.S. Dollars from others—some of whom his communications reflect know one another. Although his communications with Dollar sellers outside of the Houston area concerning the alleged money laundering transactions were made explicit because they had to coordinate over long distances, Baiyewu also had Dollar suppliers in Houston, including in addition to Suleiman, friends known by the nicknames "Dipo," "ID," and "Francis." When buying cash from those people, Baiyewu would meet them in person to obtain the money—usually between $5,000 and $20,000 a day—and would typically either use the cash to buy money orders in batches of two to three at a time from multiple different money order purchase locations, before driving to Copart and IAA to make payments himself, or Baiyewu deposited it into bank accounts he controlled and bought money orders or conducted other transactions with it—including copious peer-to-peer payments to apparent individuals, as well as to businesses involved in shipping and logistics. Indeed, Baiyewu earned money from helping get cars from online auction houses to port—and then to Nigeria. This necessitated payments to legitimate businesses and third-party service providers.

### E.  The Underlying Fraud Victims

The government anticipates eliciting victim testimony about each of the frauds alleged in the Superseding Indictment, although the government notes that it need not prove every transaction described therein to meet its burden at trial. Therefore, in the interest of streamlining the trial and minimizing its length, the government does not plan to call every fraud victim described in the

Superseding Indictment, particularly now that one of the Defendants pleaded guilty and the government does not now need to introduce evidence to establish his liability. Therefore, the government plans to call the following: (i) a witness from Puerto Rico BEC victim company, G.I., (ii) romance/investment scam victim K.C., and (iii) UI fraud victims M.B., D.B., D.H., and G.S. The government is hopeful that the Defendants will also agree to testimony by stipulation for the following witnesses: (i) a witness from victim company A.S., and (ii) other UI fraud victims, such as A.H., L.S. and D.T.  If the Defendants decline to agree to entry of testimony by stipulation (and they have indicated that they will not agree) then the government anticipates that the trial may be lengthened by an additional day.

### F.  The Entities and Bank Accounts

The jury will hear about a number of entities in this case. Two of the companies, Olad Trading (principal: Oluwaseun Adelekan) and Semmyhills Consulting LLC (principal: Temitope Suleiman), appear to have been used as "shell" and "front" companies in that they do not appear to have conducted much (or any) legitimate business, and they were used in part as a means to obscure and hide the money laundering operations alleged in the Superseding Indictment. The jury will also hear about Baiyewu's Shipopo entities; that is, Shipopo Autos and Shipopo LLC—both of which Baiyewu used to facilitate the purchase and shipment of automobiles to Nigeria, by establishing his Copart account under the name of Shipopo Autos and using both companies to make payments to Copart and IAA and to facilitate transport and export of cars to Nigeria.

While the money laundering transactions alleged are largely not bank transactions, proving that the conspiracy involved proceeds of wire and mail fraud and some of the alleged money laundering transactions will necessitate seeking admission of bank records. Specifically, the

government anticipates relying in its case-in-chief on the following bank accounts controlled by

the Defendants:

| Source/Provider | Records |
|---|---|
| Investors Bank | Financial records relating to account ending in 7821, held in the name of Olad Trading |
| Investors Bank | Financial records relating to account ending in 8256, held in the name of Olad Trading |
| Edward Jones | Financial records relating to accounts ending in 6311 and 3911, held in the name of D.L. TTEE |
| Edward Jones | Financial records relating to account ending in 2313, held in the name of S.L. Irrevocable Trust |
| Edward Jones | Financial records relating to accounts ending in 5914, 6111, and 8513, held in the name of D.L. |
| Union Bank | Financial records relating to account ending in 1845, held in the name of the D.L. and S.L. Living Trust |
| Union Bank | Financial records relating to account ending in 5685, held in the name of the D. & S. L. Living Trust S.L. Irrevocable Div. |
| Union Bank | Financial records relating to account ending in 5800, held in the name of L.'s Mountainscapes, Inc. |
| Union Bank | Financial records relating to account ending in 7690, held in the name of D.L. |
| Navy Federal Credit Union | Financial records relating to accounts ending in 0257, 2158, 7924, and 1267, held in the name of Oluwasegun L. Baiyewu |
| Navy Federal Credit Union | Financial records relating to accounts ending in 9191 and 9783, held in the name of Shipopo LLC |

The government also intends to introduce victims' and some Copart financial records and other

business records to prove each alleged instance of money laundering and fraud proceeds,

including:

| Source/Provider | Records |
|---|---|
| Illinois Department of Employment Security | Unemployment claim and payment records related to individual consumers identified as  G.A., V.D., W.C., T.M., F.N., M.L., A.D., M.H., G.L., W.C., D.S., S.B., B.L., L.S., J.C., R.C., S.L., V.V., L.J., W.W., N.J., D.P., Z.R., J.G., D.K., J.P., F.A., D.O., L.O., T.Q., V.C., L.T., D.E., E.P., M.G., M.P., F.C., C.D., J.M., J.D., R.C., J.D., W.D., A.G., M.E., J.E., J.S., A.C., J.W., N.P., P.Z., V.E., J.M., S.H., T.Y., A.M., P.F., W.B., L.B., A.B., J.B., H.B., J.S., A.O., N.R., A.D., F.A., R.P., E.M., V.P., O.G., T.G., M.J., D.G., V.L., |

| Source/Provider | Records |
|---|---|
| | B.O., C.C., D.P., G.A., A.H., D.C., W.W., H.H., J.C., Z.L., K.Z., L.O., M.B., R.T., E.Z., K.M., R.R., and G.S. |
| Nevada Department of Employment, Training, & Rehabilitation | Unemployment insurance claim and payment records related to individual consumers identified as A.H., D.B., D.T., M.B., S.C., S.L., S.Lo., and D.H. |
| Washington State Employment Security Division | Unemployment insurance claim and payment records related to individual consumers identified as C.M. and G.S. |
| MoneyGram | Purchase records related to money order nos. R208838759790 and R209514368162 |
| Walmart | Purchase records related to money order nos. R208838759790 and R209514368162 |
| Bank of America, N.A. | Financial records relating to debit card ending in 1823, held in the name of D.H. |
| Bank of America N.A. | Financial records relating to debit card ending in 1817, held in the name of A.H. |
| Bank of America, N.A. | Financial records relating to debit card ending in 5387, held in the name of D.B. |
| Bank of America, N.A. | Financial records relating to debit card ending in 2972, held in the name of D.T. |
| Bank of America, N.A. | Financial records relating to debit card ending in 1205, held in the name of M.B. |
| Bank of America, N.A. | Financial records relating to debit card ending in 4665, held in the name of S.C. |
| Bank of America, N.A. | Financial records relating to debit card ending in 9053, held in the name of S.L. |
| Bank of America, N.A. | Financial records relating to debit card ending in 1460, held in the name of S.Lo. |
| Green Dot Bank | Financial records relating to debit card ending in 5041, held in the name of J.R. |
| Green Dot Bank | Financial records relating to debit card ending in 7201, held in the name of A.O. |
| Green Dot Bank | Financial records relating to debit card ending in 2153, held in the name of R.C. |
| Green Dot Bank | Financial records relating to debit cards ending in:<br>• 1128, held in the name of G.A.<br>• 9684, held in the name of V.D.<br>• 9015, held in the name of G.L.<br>• 0013, held in the name of A.B.<br>• 0039, held in the name of W.C.<br>• 2603, held in the name of V.P.<br>• 1376, held in the name of T.M.<br>• 2611, held in the name of F.N. |

| Source/Provider | Records |
| --- | --- |
| | • 7530, held in the name of V.L. |
| | • 1951, held in the name of M.H. |
| | • 9676, held in the name of B.O. |
| | • 8366, held in the name of C.C. |
| | • 8358, held in the name of D.S. |
| | • 8422, held in the name of S.B. |
| | • 4228, held in the name of D.P. |
| | • 3766, held in the name of G.A. |
| | • 2670, held in the name of L.S. |
| | • 7996, held in the name of R.C. |
| | • 2198, held in the name of Z.R. |
| | • 5715, held in the name of V.V. |
| | • 6267, held in the name of L.J. |
| | • 6275, held in the name of A.H. |
| | • 1780, held in the name of D.C. |
| | • 5852, held in the name of W.W. |
| | • 5779, held in the name of W.W. |
| | • 5795, held in the name of D.P. |
| | • 5886, held in the name of H.H. |
| | • 5787, held in the name of J.C. |
| | • 5803, held in the name of Z.L. |
| | • 5860, held in the name of K.Z. |
| | • 2172, held in the name of L.O. |
| | • 0912, held in the name of D.O. |
| | • 0862, held in the name of L.O. |
| | • 3078, held in the name of L.T. |
| | • 3052, held in the name of M.B. |
| | • 0920, held in the name of R.T. |
| | • 5003, held in the name of E.Z. |
| | • 8323, held in the name of K.M. |
| | • 8307, held in the name of R.R. |
| | • 8299, held in the name of G.S. |
| Copart records | Accounts 877801, 39008, 829581 |
| Bank of America, N.A. | Financial records relating to accounts ending in: |
| | • 4215, held in the name of Copart, Inc. |
| | • 6591, held in the name of Copart of Connecticut, Inc. |
| | • 0048, held in the name of Houston Copart Salvage Auto Auctions Limited Partn, and |
| | • 6657, held in the name of Copart of Connecticut, Inc. |

IV.    **PRESENTATION OF EVIDENCE**

Below, the government describes in broad strokes a non-exclusive list of the primary categories of evidence it anticipates presenting at trial to meet its burden of proof in this case.

*Witnesses.* The government anticipates calling between 15 and 20 witnesses at trial. Those witnesses include one cooperating witness, one investment/romance scam victim, a representative of the Puerto Rico BEC victim (whose testimony will help establish venue), four UI fraud victims, Defendant Baiyewu's ex-wife, two case agents, one witness from Copart (who will testify about what Copart is, how auctions work, explain the data Copart keeps about its members and auctions, and establish that Copart is an international company with an impact in interstate and foreign commerce), and one expert witness who will testify about the structure and methods transnational criminal organizations commonly use in these types of fraud schemes. Because Defendants have indicated they will not agree to entry of stipulated testimony as to other fraud victims identified in the Superseding Indictment, to admission of certain records, or to the truth and accuracy of cellphone extractions gathered in this case, the government anticipates that it may need to call an additional 10 to 15 witnesses; if so, this will undoubtedly increase the length of the trial.

*Electronic Messages.* The government intends to introduce electronic messages, such as emails, text messages, and WhatsApp messages. The government anticipates introducing three broad categories of electronic messages. First are text messages and WhatsApp messages the government obtained that are between the charged Defendants—to include iMessages and WhatsApp chats—from the following three items Gold iPhone XS (SN C39XW2Q7KPFW) seized from 19 Clawson Avenue on 11/20/2020, belonging to Temitope Omotayo; Red iPhone 11 (SN C7CC5NE4N72L) seized from 19 Clawson Avenue on 11/20/2020, belonging to Adelekan; and

iPhone SX Max (SN GR6DQ0L7KPHJ) seized from 23810 Villa Lisa Dr. on 10/14/2021, belonging to Baiyewu. That is, all chats and texts on those phones between:

- Baiyewu and Omotayo

- Baiyewu and Adelekan

- Baiyewu and Suleiman

- Baiyewu and Dudubo

The second category is communications between Defendants and uncharged members of the conspiracy or between uncharged members of the conspiracy and the underlying fraud, such as:

- Baiyewu and CC-5 (Blossom Eghaghe)

- Baiyewu and CC-6 (Forster Ene)

- Baiyewu and CC-7 (contact named "Olowopapa Autos")

- Michael Crosby (CC-4)[3] and money mule Angelica Rodriguez, who were responsible for receiving and moving the money obtained from the Puerto Rico BEC

- Michael Crosby and his Nigerian handler, a contact named "Gucci Man Collins" (CC-3)

The Crosby and "Gucci Man Collins" messages were extracted from an iPhone 12 Pro Max (SN G0NFJCK80D3Y2052) seized from Lockwood Circle, Corona, CA on 6/24/2021, belonging to Crosby, and the Crosby and Rodriguez messages were extracted from a phone belonging to her she agreed to allow the FBI to search, an LG Stylo 5 phone (SN 003CQZP1593261).

The third category of communications are those between the Defendants and other, uncharged people where the communications bear on the Defendants' knowledge and intent vis a vis the charged money laundering conspiracy. These will include, for example, communications

---

[3] In 2023, Michael Crosby pleaded guilty for his role in the scheme in a case in the Southern District of California. *See* 23-cr-134 (C.D. Cal.).

between Baiyewu and other, uncharged U.S. Dollar suppliers and other money men he reached out to during the timeframe of the conspiracy in an effort to secure U.S. Dollars, in order to assist CC-5, CC-6, and CC-7 and to buy cars for others using his Shipopo Copart account, including those with the contact names:

- o "Chidi Ishola,"
- o "Akeem Anifowose"
- o "Niyo Baba Unilag Yanki"
- o "Kore"
- o "Ishola 4"
- o "Seyis Guy Dolly Houston"
- o "Somi"
- o "Femi Houston"
- o "Fowler Houston"
- o "Maag Houston"
- o "Yisa Dipo"
- o "Adeniyi Oluolokun"
- o Contact with numbers (240) 755-4917, (346) 401-8754
- o "Jibola Yanki"
- o "Okedele Semiu 2"
- o "Francis Dipo Houston"
- o "Shetemi 2"
- o "Iaai Guy"

The government will also seek to introduce communications between Baiyewu and several contacts, and Adelekan and two contacts, that are probative of the Defendants' relationships with one another and Ifeoluwa Dudubo, knowledge that they were involved in a money laundering conspiracy and that the source of funds they were transacting in were from some form of illegal activity:

- o Baiyewu and "Gifty Sean"

- o Baiyewu and "Lakeside Austin"

- o Baiyewu and "Pretty Don Jazzi"

- o Adelekan and "Victor NJ"

- o Adelekan and "Pappi Ng"

Those messages were extracted using forensically sound and documented practices, from phones obtained using federal search warrants or on consent, from Michael Crosby, Angelica Rodriguez, Adelekan, Omotayo, and Baiyewu, and from Baiyewu's Yahoo account and CC-5's Gmail account, both obtained using federal search warrants. The government has requested that the Defendants stipulate that the above-described communications reflect "true and accurate" copies of the information on the phones and provided by Yahoo and Google; however, Defendants object. Therefore, the government anticipates it will have to call two to four witnesses to introduce this evidence, which will likely add time to the trial.

The government will also seek to introduce emails and messages obtained from victims that were sent by unidentified members of the criminal organizations that perpetrated the BEC, romance, and UI fraud schemes. The Defendants have indicated they will not stipulate to the admissibility of the emails obtained from the victims. Calling an additional one to two witnesses to establish the admissibility of the fraud emails will likely add time to the trial.

25

All of the above-described communications will corroborate and/or explain witness testimony. They will also help establish the existence of the money laundering conspiracy, Defendants' knowledge of the conspiracy's purposes, and Defendants' knowledge of the source of the money with which they transacted.

*Financial Records*. The government intends to introduce financial records from accounts the Defendants controlled, as well as victims' bank records that document the alleged money laundering transactions described in the Superseding Indictment. The financial records will show when accounts were opened, who opened them, and who controlled them. The records will also show the pattern of activity in those accounts, including the sources of funds and details of deposits and withdrawals. The government anticipates introducing records from some, or all, of the financial records referenced in Attachment A.

*Shipping Records*. The government intends to introduce certified shipping/export records obtained from United States Customs and Border Patrol that will identify vehicles by their relevant vehicle identification numbers ("VINs") that were ultimately shipped to Nigeria during the conspiracy. As certified government records, these shipping records are self-authenticating under Federal Rule of Evidence ("FRE") 902(4).

*Tax Records*. The government intends to introduce certified federal tax return information, or certification of a lack of such records, for the Defendants and, where applicable, their companies. Such records are self-authenticating under FRE 902(1), (2), (4) and (10). *See also* 26 U.S.C. § 6064.

*Copart Account Records*. The government intends to call a witness from Copart to introduce the data associated with the members accounts held by Baiyewu (Shipopo), CC-5 (Emperor Auto), and CC-6 (B-100). These records reflect the payment and lot details for each

vehicle purchased through Copart, including information about who controls the account, their contact information, the name of the person delivering payments in person (where applicable), the identification number presented by the person, the Copart "yard" where the payment was made, the total amount of a payment made in a specific payment instance, the amounts of each individual financial instrument making up the total amount paid in a specific payment instance, the Copart bank account and number any specific payment was deposited into, and vehicle information for lots purchased (VIN, vehicle type, model, year, color).

*Other Miscellaneous Business Records.* The government intends to introduce additional records through business record certifications, including but not limited to (i) phone and internet subscriber records, (ii) money order purchase data, (iii) Copart records, and (iv) form-of-payment information for U.S. Postal Money orders, pulled from a U.S. Postal Service database in queries conducted by Inspector Bracken. The business records the government anticipates introducing are referenced in Attachment A.

*Rule 1006 and Rule 611(a) Summary Charts.* The government plans to use a variety of summary charts and exhibits at trial, including but not limited to: (i) summary charts of financial records, (ii) summary charts of Copart account records, (iii) summary charts of Defendants' federal tax return information, (iv) exhibits isolating pertinent text and WhatsApp messages, (v) visual representations of the path of money flow from victims to Defendants, their co-conspirators, and members of the criminal fraud organization, and (vi) a chart explaining Nigerian pidgin terms commonly occurring in the Defendants' communications. Such evidence is properly admitted pursuant to FRE 1006 and 611(a). Under FRE 1006, a "proponent may use a summary, chart or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court"); *see also United States v. Milkiewicz*, 470 F.3d 390, 396–97 (1st

27

Cir. 2006) (permitting use of summary testimony and charts to illuminate complex evidence to jury). Under FRE 611(a), a district court also may allow use of a chart or other summary tool as per the court's control over the mode of presenting evidence, but in that instance, the chart is used as pedagogical device and must be linked to evidence previously admitted; such a chart itself usually is not admitted into evidence. *Milkiewicz*, 470 F.3 397 (quotations omitted).

## V.    __MOTIONS *IN LIMINE* – SUBSTANTIVE__

Motions *in limine* allow for the Court to rule, pre-trial, on whether to exclude or to include particular pieces of evidence, thus streamlining the presentation of evidence and avoiding unnecessary delays. *See*, *e.g.*, *United States v. Grullon*, 996 F.3d 21, 28 (1st Cir. 2021). The Court has broad discretion with respect to the ordering and presentation of proof and the handling of evidentiary questions. *United States v. Holmquist*, 36 F.3d 154, 163 (1st Cir. 1994) (citing FRE 104(c) stating that hearings on preliminary matters other than the admissibility of confessions may be conducted out of the hearing of the jury "when the interests of justice require").

### A.  Motion to Conditionally Admit Business Records under FRE 902(11)

Prior to trial, and for purposes of minimizing the significant number of records custodian witnesses at trial, the government requests that the Court make the preliminary determination that the foundational prerequisites for admissibility for a variety of business records are satisfied based on the attached Certificates of Authenticity, cumulatively attached as Attachment A. Such a determination is permissible pursuant to FRE 104(b), 803(6), and 902(11). Even with such a ruling, Defendants would still be permitted to object to the relevance of the corresponding exhibits at trial.

The trial exhibits in question are financial records, shipping records, DMV records, and phone and internet service subscriber records. The Certificates of Authenticity contained within Attachment A, executed by the various custodians of business records, authenticate those records

within the requirements of Rule 902(11). With those certificates, the government submits that the corresponding records are authentic and, if relevant, admissible.

### 1. Preliminary Determinations of Admissibility of Business Records

FRE 803(6), which is commonly referred to as the business records exception, provides that records of a regularly conducted activity are not excluded by the hearsay rule if they were (1) made at or near the time by, or from information transmitted by, a person with knowledge, (2) kept in the course of a regularly conducted business activity, and (3) if it was the regular practice of that business activity to make the record, as shown by either the testimony of the custodian or other qualified witness, or by a certification that complies with Rule 902(11). *See* FRE 803(6). The term "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. FRE 803(6)(B); *see also United States v. Cameron*, 699 F.3d 621, 641 (1st Cir. 2012) ("the requirements outlined by the Federal Rules of Evidence for business records [are]: (1) they were made at or near the time of the event; (2) kept in the regular course of business; and (3) created in the regular course of business.").

As set forth in FRE 104, the Court must make preliminary determinations regarding whether evidence is admissible, including whether documents fall within FRE 803(6). "The determination of whether a foundation has been properly laid for application of [FRE 803(6)], and whether the circumstances indicate untrustworthiness, is within the discretion of the court." *United States v. Patterson*, 644 F.2d 890, 900-01 (1st Cir. 1981). The prerequisites for admissibility under Rule 803(6)—or any other rule of evidence— must be established to the Court by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

As provided for in FRE 902(11), records that are admissible pursuant to FRE 803(6) are self-authenticating if accompanied by an appropriate certification. *United States v. Carmona-*

*Bernacet*, 663 F. Supp. 3d 188, 198 (D.P.R. 2023). Thus, if the records are certified in accordance with FRE 902(11), meaning the "record . . . meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian," further evidence of authenticity (i.e., testimony by records custodians) is not required. A party intending to offer a record into evidence under this provision must provide written notice of that intention to all adverse parties and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them. FRE 902(11).

Here, the attached certificates attest to the foundational requirements cited in those rules with respect to the government exhibits at issue.[4] The government has provided (or is now providing) copies of those certificates to Defendants.

### 2. The Confrontation Clause is not Implicated

The admissibility of business records under Rules 803(6) and 902(11), and the procedure set forth in Rule 104 for determination of the preliminary questions regarding admissibility, are unaffected by the Confrontation Clause of the U.S. Constitution and the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). Post-*Crawford*, courts have routinely held that a certification under Rule 902(11) does not violate the Confrontation Clause. *Tran v. Roden*, 847 F.3d 44, 51 (1st Cir. 2017) (courts do not label business records as testimonial as long as they are not created for the purpose of prosecution); *see also Crawford*, 541 U.S. at 55–56 (business records are non-testimonial "by their nature"); *United States v. Huete-Sandoval*, 681 F. Supp. 2d 136, 138-39 (D.P.R. 2010) (holding that "the business records exception to hearsay is patently non-testimonial").

---

[4] The government reserves the right to file any certificates not yet attached by the pretrial conference.

Because the records at issue here were created in the regular course of business, not in anticipation of litigation, this evidence is not testimonial, and the Confrontation Clause is not a basis for barring admission. For those reasons, the government requests that the Court find that the records associated with the attached certificates are authentic and presumptively admissible.

### B. Motion to Introduce Evidence of Adelekan and Omotayo's Joint Involvement with Fraud and Money Laundering Prior to the Timeframe of the Alleged Conspiracy

The government requests a pre-trial ruling that it may introduce other-acts evidence of Adelekan and Omotayo's joint involvement in wire fraud and money laundering conspiracies in 2017 through April 2019, which involved proceeds of BEC and investment fraud scams. The government intends to introduce certified court records concerning the Defendants' indictment on those charges, and Court instruction pertaining to conditions of pretrial release; information about the Defendants' involvement in those schemes is relevant to showing that, in the conspiracy (which charges very similar conduct to that at issue in this case), Defendants were on notice that what they were doing was against the law.

Rule 404(b) prohibits a party from introducing evidence of a person's other crimes, wrongs or acts ("other acts evidence") for the purpose of proving that person's character or for proving "that on a particular occasion the person acted in accordance with the character." FRE 404(b)(1). So long as the moving party offers the other-acts evidence for a reason that is "probative of a material issue other than character," however, Rule 404(b) will not automatically bar such evidence. *Huddleston v. United States*, 485 U.S. 681, 686 (1988).

The admissibility of extrinsic acts evidence is governed by a two-step analysis. As a first step, the court must determine whether the evidence has some special probative value that would show intent, preparation, knowledge, or absence of mistake. As a second step, the court must

31

balance the evidence's probative value against the prejudice to the defendant. *United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1150–1151 (1st Cir.), *cert. denied*, 502 U.S. 809 (1991); *United States v. Oppon*, 863 F.2d 141, 146 (1st Cir. 1988); *United States v. Tkhilaishvili*, 926 F.3d 1, 15 (1st Cir. 2019). Thus, prior bad act evidence of extrinsic acts is admissible under FRE 404(b) subject only to the limitation of FRE 403 that it should be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. FRE 403; *United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir. 1984).

The language of the rule suggests that the trial court should first consider whether or not there is probative value in the proposed evidence. Here, the government seeks to introduce witness testimony and court records to show that beginning in 2017 and continuing until 2019, Adelekan and Omotayo were involved in perpetrating a wire fraud conspiracy and money laundering conspiracy very similar in nature to the one charged here—including the movement of funds to Nigeria in the form of salvaged vehicles—and that they were indicted by a federal grand jury four times, and, in April 2019, arrested on those charges.

***Non-Propensity Purposes.*** Adelekan's and Omotayo's past relationship, which involved engaging in fraud and money laundering schemes together, provides important contextual information for the jury to understand the ongoing relationship between the two of them and the basis for the mutual trust that existed. Other-acts evidence is regularly admitted to demonstrate an ongoing relationship between coconspirators. *See United States v. Green*, 698 F.3d 48, 55 (1st Cir. 2012) (The First Circuit has "repeatedly held that, in a conspiracy case, evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and more specifically, to help the jury understand the basis for the co-conspirators'

relations of mutual trust.") (quotations omitted); *United States v. Encarnacion*, 26 F.4th 490, 506–07 (1st Cir. 2022) (prior acts evidence properly admitted to explain background and formation of relationship of co-conspirators). Evidence showing a prior relationship involving "criminal activities . . . strengthens the inference of loyalty and mutual trust" that exists between co-conspirators. *United States v. Weadick*, 15 F.4th 1, 18 (1st Cir. 2021).

Additionally, Adelekan's and Omotayo's past involvement in fraudulent scams will show their, and the other Defendants' (to the extent the other Defendants were aware of the case against them in the SDNY), knowledge of the criminal nature of the conspiracy at issue in this case. *See* FRE 404(b)(2).

*Relevance*. The proffered evidence is directly relevant to the non-propensity purposes identified above. The chain of inferences connecting Adelekan's and Omotayo's past fraud and money laundering activity to the identified purposes does not require the jury to make any forbidden "propensity inference." *See United States v. García-Sierra*, 994 F.3d 17, 29–31 (1st Cir. 2021).

*Rule 403 Analysis.* The evidence described above is highly probative of the nature of the relationship between Adelekan and Omotayo and helps "the jury understand the basis for the [Defendants'] relationship of mutual trust." *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir. 1999) (citations omitted). Evidence of other criminal conduct has been found "specially probative" when it tends to prove one or more of the elements of the crime of conspiracy. *See United States v. Scelzo,* 810 F.2d 2, 4 (1st Cir. 1987); *United States v. Rodriguez*, 215 F.3d 110, 119 (1st Cir. 2000), citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 404.22 [5] [b][ii] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 2000) (collecting cases admitting 404(b) evidence in conspiracy cases). In a conspiracy prosecution, it is

essential for the government to prove the defendant's knowledge of and voluntary participation in the conspiracy. In particular, the government's evidence must overcome the possibility that a particular defendant's association with criminal co-conspirators was wholly innocent or that, if he was with them at the scene of criminal activity, he was "merely present," without guilty knowledge or intent. *Rodriguez*, 215 F.3d at 119.

The evidence is also probative of Adelekan's and Omotayo's knowledge of the charged conspiracy they entered into in 2020 through 2021. Likewise, to the extent the evidence reflects that the other Defendants knew of their indictment and arrest, their criminal conduct is probative of the other Defendants' mental states when entering into and carrying on a conspiracy with them.

The risk of prejudice or confusion, meanwhile, is minimal. None of the Defendants is charged here with committing or participating in the underlying fraud that generated the fraud proceeds that the Defendants laundered. To the extent any Defendant argues at trial is that he had no knowledge of the criminal purposes underlying the conspiracy, the above evidence is highly probative to rebut that contention. Although the government acknowledges that there is some quantum of inherent prejudice to its proffered Rule 404(b) evidence, there is no basis to conclude that any such prejudice would substantially outweigh the evidence's probative value. *See Oppon*, 863 F.2d at 147.

While this evidence may be prejudicial to Adelekan and Omotayo, that prejudice does not substantially outweigh its probative value. *See, e.g., Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir. 1987) (quotation omitted) ("The question [under Rule 403] is one of unfair prejudice—not of prejudice alone"). In a situation such as the present one, it is appropriate to place the evidence before the jury, and let it determine what weight, if any, it wishes to accord the evidence. *United States v. Walsh*, 928 F.2d 7, 10 (1st Cir. 1991); *United States v. Mateos-Sanchez*, 864 F.2d 232,

235 (1st Cir. 1998). Further, when this evidence is admitted, the possibility of prejudice can be minimized by specifically instructing the jury on the limited purpose of the 404(b) proof. *García-Sierra*, 994 F.3d at 34.

These evidentiary determinations are committed to the trial court's sound discretion. *United States v. Hernandez-Bermudez*, 857 F.2d 50, 53 (1st Cir. 1988). "'Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" *Pinkham v. Burgess*, 933 F.2d 1066, 1071 (1st Cir. 1991). In applying FRE 403's balancing test, "the Court should pay particular attention to the similarity of the other acts with the charged offense, as well as the temporal proximity between them [and] "a high degree of similarity . . . strongly favor admissibility." *Oppon*, 863 F.2d at 147.

### C.  Consciousness of Guilt Evidence

At trial, the Government intends to introduce consciousness of guilt evidence, in the form of (1) body worn camera footage recorded by a Houston Police Officer stationed at the rear of the home, that Baiyewu fled out the back window of his house when search and arrest warrants were executed at his home on October 14, 2021, and that (2) Adelekan placed his phone on top of the refrigerator during the November 18, 2020 search warrant conducted on his home in order to try to hide it from law enforcement officers conducting the search. In addition to being directly relevant to the charged offense, in the alternative, these statements and actions demonstrate Baiyewu's and Adelekan's consciousness of guilt of the charged offenses and are thus properly admissible under Rule 404(b). *See, e.g., United States v. Mangual-Santiago*, 562 F.3d 411, 427 (1st Cir. 2009) (evidence that defendant opened account under false name while a fugitive from justice showed effort to conceal identity and was properly admitted under Rule 404(b) to show

consciousness of guilt); *United States v. Levy-Cordero*, 67 F.3d 1002, 1011 (1st Cir. 1995) (evidence that defendant had false documentation on his person was properly admitted under Rule 404(b) to show consciousness of guilt). Therefore, the evidence is admissible for proper non-propensity purposes under Rule 404(b), including intent, knowledge, absence of mistake, and consciousness of guilt.

### D.  Previous Marriage Evidence

At trial, the Government may introduce testimony from Kelsey Williams, Baiyewu's ex-wife, regarding what she heard and saw Baiyewu and his confederates, including Suleiman, do while married to him. The Previous Marriage Evidence may include:

- Baiyewu lied to Ms. Williams about what he did to earn money during the first year of their relationship, claiming that he was an engineer at a Houston, Texas-based business called Schlumberger, when in reality he never worked at the company. Ms. Williams discovered Baiyewu was lying about his employment when she attempted to file joint taxes in 2020 for the 2019 tax year and Baiyewu failed to produce a W-2 tax form from Schlumberger. Baiyewu admitted to Ms. Williams that he lied about working at Schlumberger when Ms. Williams confronted him. Baiyewu lied again and told Ms. Williams that he could not produce a W-2 because he had worked under his brother's name. Eventually, Baiyewu revealed that he never actually worked at Schlumberger, but instead made money by buying and selling cars from auction sites like Copart.

- Despite having no job, Baiyewu seemed to always have enough money to support Ms. Williams and her minor son, including renting a pricey home even when he could have afforded to buy one.

- Baiyewu did not report income in 2019, even though he had a source of income that he used to support himself, Ms. Williams and her child (i.e. his money laundering business).

- After Baiyewu began to openly conduct his business in front of her, Ms. Williams witnessed Baiyewu obtain large amounts of cash from people in Houston area who she knew as "Dipo," "ID," "Francis," and "Semiu" (Suleiman's nickname).

- Baiyewu would regularly operate in cash, approximately $5,000 to $20,000 daily, and buy money orders with it. He would go to several money order purchase locations to buy money orders in groups of two or three, and then once he amassed what he needed to pay for cars, he would drive to Copart to deliver and tender them.

- Baiyewu would typically keep large amounts of cash in the console of his truck and in an unlocked drawer in his house.

- On at least one occasion, Baiyewu brought home over $100,000 in cash, which surprised Ms. Williams and made her suspicious about the source of the money. When asked, Baiyewu became defensive and claimed it was for a car, which did not make sense to Ms. Williams, since most cars that Baiyewu bought were low value. She became concerned he was involving her in something untoward that she did not want a part of and left him shortly thereafter.

### 1. The Previous Marriage Evidence is Directly Relevant Intrinsic Evidence

Intrinsic evidence that is directly relevant to the crime charged is not "other-acts" evidence susceptible to a Rule 404(b) analysis. *United States v. Ramirez-Frechnel*, 23 F.4th 69, 76 (1st Cir. 2022). Further, "uncharged acts that illuminate the chronology of events leading to the acts charged in an indictment, or that inform the jury concerning the circumstances surrounding the commission of the charged crime are generally admissible." *Carmona-Bernacet*, 663 F. Supp. 3d at 180,

quoting 1 Weinstein's Evidence Manual § 7.01 (2021); *see also United States v. Pina-Nieves*, 577 F. Supp. 3d 1, 4 (D.P.R. 2021) (same). In *United States v. Robles-Álvarez*, 874 F.3d 46, 50-51 (1st Cir. 2017), a conspiracy case, the First Circuit, first noting that intrinsic evidence does not "trigger" FRE 404(b) because it is necessary to prove events related to the charged crime, found no abuse of discretion in the district court's admission of intrinsic evidence to prove "how the various co-conspirators came together."

The above-described testimony is highly probative and relevant to show that Baiyewu was aware he was involved in something illegal, as he otherwise had no reason to lie or keep his profession from his wife. His daily handling of large amounts of cash is probative and relevant regarding his efforts to transact in methods used to avoid reporting requirements, evade law enforcement detection, and to introduce layers of anonymity that serve to attenuate the link between the source of the funds, their nature, and the identities of those involved in fraud and money laundering. This testimony is directly relevant and helps prove that Baiyewu more likely than not engaged in the charged conduct.

## 2. The Previous Marriage Evidence is Admissible under Rule 404(b)

Additionally, the government provides notice that this evidence is also admissible for proper non-propensity purposes under Rule 404(b).

*Non-Propensity Purpose.* The government will offer the tax return information for the proper non-propensity purposes of demonstrating Baiyewu's intent, preparation, plan, knowledge, and absence of mistake. Specifically, the facts described above shed light on Baiyewu's day-to-day business activities and methods and show that his business patterns were consistent and intentional.

*Relevance.* As discussed above, Baiyewu's knowledge of and intention to enter into a money laundering conspiracy—including his patternistic use of high volumes of bulk cash, which he then converted through substantial effort into money orders and car payments—reflects his (i) highly intentional involvement in the conspiracy, and (ii) his knowledge that the money he used to buy cars was from some sort of unlawful activity, as indicated by its lack of a paper trail. Moreover, the fact that he lied to his wife about what he did for over a year of their relationship and into their marriage and actively concealed his car buying business from her is probative of his knowledge that he was involved in something illegal.

*Rule 403 Analysis.* The proffered evidence is not substantially more prejudicial than probative. Ms. Williams will simply report her observance of facts that occurred during her marriage to and experience with Baiyewu and he will have a chance to rebut that evidence. Accordingly, if challenged on its direct relevance, the government submits that FRE 404(b) supports the admissibility of the above-described "Previous Marriage Evidence."

### E. Motion to Introduce Evidence of Suleiman's Motive to Use an Alias and Knowledge of Illicit Source of Funds, and Plan to Use Buying and Shipping Cars as a Defense

The government seeks to introduce a limited set of evidence relevant to Suleiman's motive to use the alias "Jonathan Akinfemi" following his arrest on charge of theft more or equal to $750 and less than $2,500 in Harris County, Texas (Pasadena, TX. Case No.: 230560801010), as well as his plan to use the defense of "buying and shipping cars" if caught in the act. Specifically, the government plans to elicit witness testimony and present a recorded telephone call[5] wherein Suleiman admitted to a woman he recruited to be a money mule that he was responsible for establishing a Gmail account, "centuryhomes0@gmail.com," that was used to perpetrate a

---

[5] This file, titled "Brock 01 16 2020 0926," was produced to Defendants in discovery.

Craigslist rental scam. On the call, Suleiman can be heard saying (when asked why he opened the email account) that it was for shipping cars. The testimony would also go to prove that Suleiman directed the money mule he recruited to use her accounts and allow him to use her accounts to send money to others. The government also seeks approval to show the jury emails provided to the Pasadena, Texas Police Department by a fraud victim reflecting that the email "centuryhomes0@gmail.com" was in fact used to trick at least one person into sending money to the money mule whose accounts were used to move the money to Suleiman and his associates.[6]

The government anticipates that Suleiman will argue that he is not and has not knowingly been involved in money laundering or fraud, and that he is not "Jonathan Akinfemi" and that he was innocently involved in buying and shipping cars. The above-described evidence is directly relevant to the question of why, during the timeframe of the conspiracy—after his arrest in Harris County—Suleiman began to use an alias when making fraud-derived payments at Copart. Specifically, the government will use this evidence to show that he wanted to attenuate the link between his own identity and the source and control of the funds. Additionally, the information described above is relevant to whether, when Suleiman entered the charged conspiracy, he knew based on his past experience in fraud and money laundering, that he was engaging in something illegal with illicit proceeds, and that his plan was to say his activity was justified by legitimate business activity.

In the alternative, the evidence is properly admissible as "other acts" evidence under Rule 404(b).

---

[6] This file, titled "emails_20000529)," was produced to Defendants in discovery.

*Relevance.* As explained above, Suleiman's awareness of his own personal involvement in fraud and money laundering is relevant to whether, when he joined the conspiracy alleged, he knew the illegal object and illicit source of the funds involved.

*Non-Propensity Purpose.* The government only seeks to introduce a limited amount of evidence relating to this topic: one snippet of a recorded call; one document containing the email exchanges between the fraud victim there and centuryhomes0@gmail.com; and brief testimony by two witnesses. This evidence will be presented not to try *that* case, but to show the minimum proof needed to establish Suleiman's personal involvement in the fraud and money launder there. This will prove Suleiman's intent, knowledge, and absence of mistake in this case. The government acknowledges that there is likely some prejudice involved in allowing in this evidence; however, not such prejudice that it will overwhelm its value to the jury.

### F.   Motion to Introduce Defendants' Tax Return Information for the Years 2019, 2020, and 2021

#### 1.   The Tax Return Information is Directly Relevant Intrinsic Evidence

Intrinsic evidence that is directly relevant to the crime charged is not "other-acts" evidence susceptible to a Rule 404(b) analysis, *see Ramirez-Frechnel*, 23 F.4th at 76, and "uncharged acts that illuminate the chronology of events leading to the acts charged in an indictment, or that inform the jury concerning the circumstances surrounding the commission of the charged crime are generally admissible." *Carmona-Bernacet*, 663 F. Supp. 3d at 180; *see Pina-Nieves*, 577 F. Supp. at 4; *see also Robles-Álvarez*, 874 F.3d at 50-51 (in a conspiracy case, affirming admission of intrinsic evidence to prove "how the various co-conspirators came together").

In *United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005), a fraud case, the district court found that the defendant's tax return was intertwined with the crime, because his tax return reported some of the income—but not all—that he received from the fraudulent scheme, which,

41

the court found, suggested the defendant had knowledge of the fraud scheme. *Id*. The Court found no abuse of discretion in the district court allowing admission of the evidence as intrinsic to the crime, not governed by FRE 404(b). *Epstein*, 426 F.3d at 439 ("The judge did not abuse his discretion in finding the tax return to be part and parcel of the crime and properly allowed the evidence as intrinsic to the crime and not governed by Rule 404(b).").

The tax information here satisfies the First Circuit's criteria for intrinsic evidence. First, the tax information directly proves the charged money laundering conspiracy. To sustain a conviction for money laundering conspiracy, the government must prove "knowledge of a design to conceal" the illicit proceeds. *United States v. Richardson*, 658 F.3d 333, 342 (3d Cir. 2011). The tax information, and evidence of Defendants' failure to file tax returns for certain years, provide direct evidence of that knowledge. The tax information will show, for example, that no defendant other than Suleiman filed any substantial federal income tax return for 2019-2021, despite spending hundreds of thousands of dollars on buying salvaged cars from Copart and IAA that were shipped—at a cost—to the benefit of the recipients of the vehicles in Nigeria.

Defendants' failure to accurately disclose their receipt of such large sums of money is direct evidence of their participation in the money laundering conspiracy and knowledge of the conspiracy's purpose to conceal the illicit proceeds. *See Robles-Álvarez*, 874 at 50-51; *Epstein*, 426 F.3d at 439; *see also United States v. Mitchell*, 613 F.3d 862, 866 (8th Cir. 2010) ("Failure to file tax returns is relevant to the existence of, and a defendant's participation in, a money laundering conspiracy."); *United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003) (appropriate in narcotics prosecution to admit tax information, coupled with admission of unexplained cash, to support argument defendant had no legitimate source of cash); *United States v. Barrett*, 153 F. Supp. 3d 552, 567-68 (E.D.N.Y. 2015) ("Failure to report significant sums of money in tax filings

can be direct evidence of and is relevant to defendant's participation in, money laundering."); *United States v. Johnson*, 262 F.R.D. 410, 415-16 (D. Del. 2009) (admitting tax information in fraud case as intrinsic evidence and explaining "an alleged pattern of concealing income, demonstrated by the tax return evidence as a whole" is directly probative of the defendant's "requisite fraudulent intent"). In other words, Defendants' failure to disclose their receipt of illicit proceeds is direct evidence that they knew those proceeds derived from unlawful activity.

Second, Defendants' tax filings (or lack thereof) are acts or omissions made contemporaneously with the charged offense that served to facilitate the money laundering conspiracy. Defendants Adelekan, Suleiman, and Baiyewu all formed at least one business entity ostensibly to facilitate "legitimate" business. Yet, despite taking the steps to obtain tax identification numbers, open business bank accounts, and other actions, Defendants neglected to disclose the hundreds of thousands of dollars flowing through their hands. All of this is direct proof of their knowledge of the design to conceal, and it also facilitated the money laundering by hiding from the government the sum of money flowing through their accounts for which there was no legitimate source. *See, e.g.*, *United States v. Staton*, 605 F. App'x 110, 116 (3d Cir. 2015) ("Because . . . nonfilings constitute contemporaneous acts that facilitated the commission of the fraudulent scheme, the evidence is intrinsic[.]"). Given the Defendants had no identified employment to justify the sums they paid to Copart and IAA, their failure to file taxes (or their substantial underreporting) facilitated the money laundering efforts by concealing the proceeds from the government. Defendants' tax return information is therefore admissible at trial as intrinsic evidence of the charged money laundering conspiracy.

### 2.   The Tax Return Information is Admissible under Rule 404(b)

Even were the Court to determine that the tax return information was "other-acts" evidence—and not intrinsic evidence—it should still be admitted under Rule 404(b).

*Non-Propensity Purpose.* The government will offer the tax return information for the proper non-propensity purposes of demonstrating Defendants' intent and knowledge. Defendants' failure to disclose the money flowing through their accounts is probative of their intent to open bank accounts and incorporate entities for the purpose of facilitating money laundering activity. The tax return information is also, as discussed above, probative of their knowledge that the funds coming into their accounts derived from unlawful activity.

*Relevance.* As discussed above, Defendants' tax return information and failure to file taxes is directly relevant to the efforts to conceal their activity, and thus to their knowledge that they had entered a money laundering conspiracy.

*Rule 403 Analysis.* The government anticipates that Defendants' primary defense will be a lack of knowledge that the funds flowing into their respective accounts derived from criminal activity. Showing Defendants' efforts to conceal from the government through their tax filings, or lack thereof, the fact that they were receiving those proceeds is therefore highly probative of Defendants' knowledge. Any prejudice to Defendants is also lessened by the divergence between the proffered evidence (evidence of false tax filings or failure to file taxes) and the crime charged (money laundering conspiracy). The proffered evidence is not substantially more prejudicial than probative.

### G.  Motion to Admit Expert Testimony of Former FBI Special Agent Edgar Koby

The government moves to admit the expert testimony of FBI Special Agent Edgar Koby under Rule 702. Agent Koby will testify as an expert in Nigerian transnational criminal organizations ("TCOs") engaged in fraud and money laundering schemes. He will testify based on his more than 20

years of experience investigating different West African TCOs about the structure of such organizations and how they operate. His specialized knowledge in an area in which the common person is not familiar will help the trier of fact understand the evidence presented in this case. The government is preparing its disclosure to Defendants in accordance with Fed. R. Crim. P. 16(a)(1)(G).

As with traditional scientific expert testimony, courts perform a "gatekeeping role" with respect to proffered nonexpert testimony to ensure it is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "In nonscientific cases, however, the 'relevant reliability concerns may focus upon personal knowledge or experience.'" *Knecht v. JAKKS Pacific, Inc.*, No. 4:17-CV-2267), 2021 WL 3722854, at *7 (M.D. Pa., Aug. 23, 2021) (quoting *Kumho*, 526 U.S. at 150). Courts for decades have allowed law enforcement expert testimony on the structure and methods of particular types of criminal organizations. *See, e.g.*, *United States v. Sandoval*, 6 F.4th 63, 83–84 (1st Cir. 2021) (allowing expert testimony on topics such as the structure of a transnational criminal organization and how it functioned); *United States v. Matera*, 489 F.3d 115, 121–22 (2d Cir. 2007) (noting longstanding acceptance of expert testimony "in organized crime cases to help explain the operation, structure, membership, and terminology of organized crime families") (citations and quotations omitted); *see also United States v. Pungitore*, 910 F.2d 1084, 1149 (3d Cir. 1990) (noting how expert testimony on useful background information as to the structure of organized crime families satisfied the "helpfulness requirement of Rule 702").

The structure, inter-organizational relationships, and methods of West African TCOs is specialized knowledge not within the purview of the average juror. Agent Koby was a Special Agent with the FBI for over 20 years, nearly all of which were spent investigating West African TCOs. Those investigations, in turn, have nearly all involved West African TCOs that engage in fraud schemes and that operate money laundering networks based in the United States to launder the fraud proceeds and help facilitate repatriating the money back to West Africa. He will testify

that a common structure across West African TCOs is to have (i) criminal leaders and organizers based in West Africa, (ii) "handlers," typically based overseas, that perpetrate the underlying fraud, and (iii) witting and unwitting individuals in the United States who open business entities and/or bank accounts to receive and launder the fraud proceeds.

Agent Koby will testify as to common methods and practices of the United States-based members of the West African TCOs who launder the fraud proceeds for the TCOs and facilitate repatriating the money back to West Africa—including through trade-based money laundering methods, like the purchase of salvaged automobiles through online vehicle auction houses. The government will be careful not to invade the Court's province in presenting legal instructions to the jury but rather will explain what are otherwise foreign concepts to most jurors and will therefore aid their deliberations in the case.

Agent Koby will not be asked for his opinions about whether any specific conduct by the Defendants constituted money laundering, or his opinion about whether the evidence presented at trial suggests that any of the Defendants knew they entered a money laundering conspiracy. In fact, Agent Koby has not been presented with any facts particular to this case. His testimony will be based on his personal experience investigating West African TCOs.

### H. Motion to Conditionally Admit Statements by Unindicted Co-Conspirators Pursuant to Rule 801(d)(2)(E)

The government anticipates introducing text messages and WhatsApp messages between unindicted co-conspirators designated as CC-1 through CC-7 that show (i) requests for Baiyewu's assistance in buying U.S. Dollars, bidding on, shipping, and transporting cars to Nigeria, and exchanging currency; and (ii) coordination between money men and money launderers to facilitate transactions with the fraud funds identified in the Superseding Indictment.

46

Rule 801(d)(2)(E) provides that an out-of-court statement made by a "party's coconspirator during and in furtherance of the conspiracy" is not hearsay if it is "offered against [that] opposing party." A co-conspirator's out-of-court statement is therefore admissible so long as the proponent of the statement can prove by a preponderance of the evidence that "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Turner*, 718 F.3d 226, 231 (3d Cir. 2013). The government can "rely on the co-conspirator's statements themselves" so long as "they are corroborated by independent evidence." *Id*. A district court can conditionally admit evidence under Rule 801(d)(2)(E), so long as the government has met the Rule's requirements by the close of evidence at trial. *United States v. Bradshaw*, 281 F.3d 278, 283 (1st Cir. 2002).

Here, the statements will establish the Defendants' membership in the money laundering conspiracy. Moreover, they will be corroborated by contemporaneous text/WhatsApp messages between indicted co-conspirators and WhatsApp messages, as well as banking and shipping records.  Last, each of the statements described above occurred during and in furtherance of the charged money laundering conspiracy. Accordingly, the Court should conditionally allow the government to introduce text and WhatsApp messages between the indicted and unindicted co-conspirators identified in the Superseding Indictment.

## I.  Motion to Admit Statements by Unidentified Co-Conspirators Perpetrating Romance Scams, UI Fraud, and BECs

The government requests a pretrial ruling that it may introduce statements made by unidentified co-conspirators to the individuals victimized by the criminal organization through romance scams, UI fraud, and BECs. For the romance fraud victims, that will take the form of testimony and documentary (text messages, emails, photographs) evidence about the purported

identity of the victims' "online relationship" as well as the ruses provided by the "online relationship" to obtain money from the victims. For the BEC victims, that evidence will consist of emails sent by the unidentified co-conspirators in furtherance of the BEC schemes. For the UI fraud, this evidence will consist of the details of falsely submitted UI claims. This category of evidence is admissible for three distinct reasons: (i) it is not hearsay because the statements themselves are factually untrue and will not be offered for the truth of the matter asserted, (ii) it is not hearsay because it will be offered to show the effect on the listener (the victims), and (iii) it is not hearsay because the statements are each statements by a co-conspirator in furtherance of the conspiracy.

Hearsay is an out of court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." FRE 801(c). "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." *Anderson v. United States*, 417 U.S. 211, 219 (1974). The evidence here will demonstrate that the unidentified co-conspirators with whom the romance fraud victims were communicating over the internet were not the individuals that they purported to be and that their requests for money were based in lies. Similarly, when unidentified co-conspirators used spoofed and compromised email addresses to update payment instructions in furtherance of the BEC schemes, they were misrepresenting who the actual recipient of the funds would be. The statements, in other words, were not true and cannot constitute hearsay.

In addition, this category of evidence is not hearsay because all such statements will be offered to show their effect on the intended victim, that is, that the statements caused the victims to send money to members of the criminal organization who provided it to the Defendants to further launder. *United States v. Cruz-Diaz*, 550 F.3d 169, 176 (1st Cir. 2008) (explaining that out-

of-court statements offered not to prove the truth of the matter asserted but offered to show effect on the listener are not hearsay), citing *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir.2001) (a statement offered to show the effect of the words spoken on the listener, e.g., to supply a motive for the listener's action, is not hearsay) (quotations and citation omitted).

Last, all statements made to victims in furtherance of the romance fraud and BEC schemes are "statements made by the party's coconspirator during and in furtherance of the conspiracy." FRE 801(d)(2)(E). The evidence at trial will satisfy FRE 801(d)(2)(E)'s requirements. The unidentified co-conspirators, through their statements, each participated in a fraud that resulted in a victim's money getting fed into the money laundering mill operated by the Defendants. Typically, that unidentified co-conspirator provided instructions to the relevant victim with specific instructions for how to get that money into the hands of the criminal organization, such as through a wire transfer to a bank account, or cash or a cashier's check mailed to an address associated with a named defendant. Accordingly, the Court should conditionally admit the statements of unidentified co-conspirators made in furtherance of the romance scams, UI fraud, and BEC schemes.

### J. Motion to Preclude Cross-Examination Through Use of Law Enforcement Reports

FRE 613 allows a party to examine a witness "about the witness's prior statement" for purposes of impeachment. Central to that rule is the requirement that the prior statement be a statement of that witness. Further, the Jencks Act permits a defendant to use, at trial, prior statements of a witness called by the government, provided the statement relates to the witness' testimony. 18 U.S.C. § 3500(b). For a statement to qualify as a prior statement of the witness, it must have been recorded, transcribed, or "made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). As the Supreme Court stated, it would be "grossly

unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo v. United States*, 360 U.S. 343, 350 (1959). In *United States v. Matta-Quinones*, No. 23-1132, 2025 WL 1622228, at *14 (1st Cir. June 9, 2025), the First Circuit, citing approvingly to other circuit court decisions, including *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993), found that a proponent of using a law enforcement interview report to impeach a witness must "show that the document is a substantially verbatim transcription, in the witness's own words, or signed, adopted, or subscribed by the witness." As a result, an interview report has no impeachment value "unless the witness has subscribed to or otherwise adopted the statement as his own." *Saget*, 991 F.2d at 710.

At trial, the government intends to call witnesses who were interviewed during the investigation that resulted in the Defendants' indictment. During discovery in this matter, the government produced to the Defendants reports written by federal law enforcement agents, which are summaries and impressions from such interviews. The law enforcement reports are prior statements by the drafting agent; they are not prior statements of the interviewee, nor have they been adopted or approved by the witnesses. Rather, the reports contain the summarized recollections of law enforcement agents regarding the witness interviews those agents conducted. *Cf. United States v. Jordan*, 316 F.3d 1215, 1255 (11th Cir. 2003).

Because the law enforcement reports are not the witness' statements, Defendants should be precluded from introducing the contents of the report to impeach an interviewed witness based on inconsistent statements from a prior interview. *Matta-Quinones*, 2025 WL 1622228, at *14 ("if [defendant] wants to introduce . . . [a] Form 302 as an exhibit, he will have to lay a foundation by showing that the Form 302 reflected [the witness's] own words or that [the witness] signed,

adopted or subscribed to the statement."); *see also United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) (law enforcement reports "reflect only that note-taker's summary characterization of a witness's prior statement, . . . are irrelevant as an impeaching prior inconsistent statement, and thus [are] inadmissible."); *United States v. Stadtmauer*, 620 F.3d 238, 267, n. 35 (3d Cir. 2010) (noting that "[s]everal of our sister circuits have affirmed the exclusion, under Rule 613, of interview memoranda prepared by law enforcement that the witness had not adopted") (citing *United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995); *Saget*, 991 F.2d at 710; *Almonte*, 956 F.2d at 29).

Likewise, the Defendants should be prohibited from suggesting to the jury that the reports are statements of the interviewed witnesses. To permit the Defendants to do otherwise would allow them to introduce hearsay statements of the persons who drafted the interview reports, and thereby contravene the limitations imposed under the Jencks Act. As the Supreme Court has admonished, to do so would "be grossly unfair." *Palermo*, 360 U.S. at 350. Accordingly, the Defendants should be precluded from introducing such interview reports as prior inconsistent statements at trial.[7] In addition, Defendants should be precluded from showing and/or reading aloud from the reports to witnesses or offering the reports into evidence during cross-examination.

### K. Motion to Allow Presence of Law Enforcement at Counsel Table and to Re-Call Case Agent

First, the government seeks to have United States Postal Inspection Service Inspector Sam Bracken—a case agent involved in this money laundering investigation from its inception—present at counsel table throughout the trial. This practice is proper and routinely allowed. *United States v. Machor*, 879 F.2d 945, 953 (1st Cir.1989), *cert. denied*, 493 U.S. 1081 (1990); *see, e.g.*,

---

[7] The government does not seek to preclude a defendant from using an interview report to attempt to refresh a witness's recollection, or from calling a law enforcement agent to attempt to contradict a witness's testimony. *See* FRE 612, 607.

*United States v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990) (collecting cases that have approved of the practice). Moreover, the Court may allow a witness, such as Inspector Bracken, to remain present throughout trial when the witness's presence is essential to the presentation of the party's case. FRE 615(c); *Gov't of V.I. v. Edinborough*, 625 F.2d 472, 475 (3d Cir. 1980). Given his role as a case agent on this case from its inception over three years ago, Inspector Bracken has reviewed thousands of pages of bank records, shipping records, and business records over the course of the investigation. His knowledge of those records, and ability to advise counsel during trial, is essential to the government's presentation of its case.

Second, the government requests the ability to recall case agent Bracken. The decision to allow the government to recall a government witness is firmly within the discretion of the district court. *See* FRE 611(a). Courts regularly allow the government to recall law enforcement witnesses so that it can present its case-in-chief in a coherent and chronological fashion. *See*, *e.g.*, *United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases that have approved of the practice and citing the authority of FRE 611(a)); *see also United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness has consulted with the prosecutor in the interim."); *United States v. Rodgers*, 2014 WL 3735585 at *2 (W.D. Pa. July 28, 2014) (permitting recall of certain law enforcement witnesses so the government may present its evidence chronologically); *United States v. Dimora*, 843 F. Supp. 2d 799, 822–23 (N.D. Ohio 2012) (approving the practice where it would promote a clear and orderly trial and assist the jury in understanding the evidence).

Here, the government anticipates having to call Inspector Bracken to the witness stand two times. Inspector Bracken will first provide an overview and summary of the case—to include how the investigation began, who was involved, and what investigative techniques were used. The

government will also establish the relevance of numerous pieces of evidence, and introduce certain summary charts, through Inspector Bracken's initial testimony. The use of such overview testimony is proper. *See, e.g.*, *United States v. Lacerda*, 958 F.3d 196, 208 (3d Cir 2020) (affirming use of so-called overview testimony). The government then anticipates calling Inspector Bracken to the stand as its second-to-last witness, to introduce remaining evidence and summary charts, discuss the importance of certain pieces of evidence to the government's investigation, and generally allow for the government to present its evidence in a more chronological and coherent fashion. Defendants retain the ability to cross-examine the witness each time he appears on the witness stand and will suffer no prejudice from this procedure. Accordingly, the Court should allow the government to recall Inspector Bracken to the witness stand during its case-in-chief.

### L.  Motion to Bar Arguments Regarding Possible Consequences of Conviction

The government moves the Court to preclude Defendants and defense counsel from introducing evidence, making argument, or otherwise mentioning the potential penalties faced upon conviction. Argument and evidence concerning punishment are improper. The potential penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed"). Mentioning the potential penalties faced by a defendant would only serve the improper purpose of seeking jury nullification. *See, e.g.*, *United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir. 1982) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."). Accordingly, the defense should not be allowed to mention or introduce evidence about any of the range of penalties faced by any of the Defendants upon conviction.

**M. Motion to Preclude Argument, Testimony or Evidence Regarding Specific Instances of Conduct Offered to Prove That Defendant's Good Character and Negate Criminal Intent**

While the jury is present, Defendants and defense counsel should be precluded from introducing any evidence, making any statement, or asking any questions regarding any specific acts of the defendant's prior good conduct. Testimony as to multiple instances of good conduct violates FRE 405(a). *Gov't of Virgin Islands v. Grant*, 775 F.2d 508, 512 (3d Cir. 1985).

Further, FRE 404(a)(1) states that evidence of a person's character is not admissible for the purpose of proving a person's actions on a particular occasion except when "evidence of a pertinent trait of character [is] offered by an accused or by the prosecution to rebut the same." Thus, a character witness may not offer specific instances of conduct by the defendant which would tend to support the reputation of the defendant.

Consequently, the United States moves in limine to prohibit any defendant from introducing testimony from any character witness regarding: (a) any specific instances of that defendant's conduct, and (b) that defendant's propensity to be involved in money launder schemes.

**N. Motion To Prohibit Argument, Testimony or Evidence Regarding Improper, Inadmissible, and/or Overly Prejudicial Matters in Front of the Jury, Including Regarding (1) The Government's Charging Decisions; (2) Stipulation Discussions; (3) Plea Discussions; (4) The Government's Calling or Failing to Call Certain Witnesses; and (5) References to the Health, Family Obligations, or Background of Any Defendant**

The government moves this Court to preclude the defendant from attempting to elicit jury nullification by raising improper, inadmissible, and/or overly prejudicial matters in front of the jury. The jury's "duty is to apply the law as interpreted by the court…." *United States v. Appolon*, 695 F.3d 44, 65 (1st Cir. 2012). "Neither the court nor counsel should encourage jurors to exercise their power to nullify." *United States v. Bunchan*, 626 F.3d 29, 34 (1st Cir. 2010); *see also United States v. Gonzalez-Perez*, 778 F.3d 3, 18–19 (1st Cir. 2015), *cert. denied*, 575 U.S. 991 (2015)

(same). A defendant may not suggest in any way that the jury should acquit even if it finds that the government has met its burden of proof. *See, e.g., United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012); *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) ("Jury nullification is not to be positively sanctioned by [jury] instructions, but is to be viewed as an aberration under our system.") (quotation and citation omitted).

While the government is unable to anticipate each form of jury nullification argument or evidence that the defendant may seek to interject into this trial, the government notes the following examples and requests an order against the introduction of such evidence and argument before the jury:

### 1. Charging Decisions

The government moves to preclude the Defendants from arguing or presenting evidence regarding the government's charging decisions in this case. The Supreme Court has held that "the Government retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (internal citations and quotations omitted); *see also United States v. Bernal-Rojas*, 933 F.2d 97, 99 (1st Cir. 1991) (prosecutorial discretion generally "is shielded from intense judicial review"). Any argument or evidence regarding the government's charging decisions here would amount to an improper request for jury nullification. *See, e.g., Scarpa v. Dubois*, 38 F.3d 1, 11 (1st Cir. 1994); *United States v. Alston*, 112 F.3d 32, 36 (1st Cir. 1997) (it is improper for a defendant or his counsel to suggest in any way that the jury should acquit the defendant even if it finds the government has met its burden of proof).

It would be wholly improper for a defendant to present evidence or argument about the reasons for his prosecution, including that he is the subject of a selective prosecution. Such argument or evidence is irrelevant under FRE 401. Moreover, it would be confusing, unfair and

misleading, contrary to FRE 403. Raising the timing of charges or which charges are brought also invites unnecessary confusion to the jury, misleading of the jury, undue delay, and is a waste of time. FRE 403. Raising the charging decisions in this case invites testimony and evidence regarding issues and events that are not relevant for the jury to decide and should therefore be prohibited.

### 2. Stipulation Discussions

While the jury is present, Defendants and defense counsel should be precluded from introducing any evidence, making any statement, or asking any questions regarding any defendant volunteering, offering, or in any manner agreeing to stipulate certain facts, unless a stipulation has been agreed upon by the parties and approved by the Court. *See* FRE 401, 402 and 403; *see also United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008) (government need not accept a defendant's attempt to use a stipulation to overcome the right of the government to make a full presentation of the crime currently charged) (citation and quotations omitted); *cf. Old Chief v. United States*, 519 U.S. 172, 183, (1997) ("[A] defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense.") (citation omitted).

### 3. Plea Discussions

While the jury is present, Defendants and defense counsel should be precluded from introducing any evidence, making any statement, or asking any questions regarding the occurrence and/or substance of any plea negotiations that may or may not have taken place in relation to this matter. Any such references would be highly prejudicial and are not proper concerns for the jury. S*ee* FRE 401, 402 and 403; *see also* FRE 410.

Under the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to

make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FRE 401. If the evidence does not meet these requirements, it "is not admissible." FRE 402. Even if evidence meets the threshold for relevance under FRE 401, FRE 403 provides that the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. FRE 403.

Plea negotiations have no bearing on the factual determinations required of the jury. Whether the defendant engaged in discussions regarding a plea does not make it more or less likely that he committed the charged offense. Thus, such evidence is wholly irrelevant under Rule 401 and should be excluded. *See, e.g., Rivera-Marrero v. Presbyterian Cmty. Hosp.*, 255 F. Supp. 3d 290, 292 (D.P.R. 2017) ("Proffered evidence is not relevant if it does not prove or disprove a matter at issue or does not assist the trier of fact in determining any facts necessary to its decision.") (quotations and citation omitted).

Furthermore, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." FRE 403. "Evidence is unfairly prejudicial if it invites the jury to render a verdict on an improper emotional basis." *United States v. Rodriguez,* 525 F.3d 85, 98 (1st Cir. 2008) (quotations and citation omitted). Unfair prejudice under FRE 403 is "prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law as to the facts as found." *See United States v. Starnes*, 583 F.3d 196, 215 (3rd Cir. 2009) (quotations and citation omitted).

Even if the Court were to find some minimal relevance, evidence of plea discussions presents a significant risk of confusing or misleading the jury. The jury's role is to determine the defendant's guilt or innocence based on admissible evidence related to the offense charged, not to

speculate on why plea discussions occurred, whether a plea was offered, or whether the Defendant considered resolving the case through negotiations. Introducing such matters at trial would improperly shift the jury's focus from the actual evidence to extraneous considerations.

### 4. Witnesses Testifying or Not Testifying at Trial

This Court has discretion to prohibit argument by either side concerning missing witnesses not under the control of either side. As the Court knows, the missing witness instruction, and any argument to the effect, should only be given and allowed where "the witness is either actually unavailable to the party seeking the instruction or so obviously partial to the other side that the witness though technically available is deemed to be legally unavailable." *Latin Am. Music Co. v. Am. Soc. of Composers Authors & Publishers*, 593 F.3d 95, 102 (1st Cir. 2010) (*citing United States v. Perez,* 299 F.3d 1, 3 (1st Cir. 2002) (internal quotation omitted). When a witness is equally available to both sides but either party does not call him/her, the preferred practice is to preclude the missing witness argument rather than to leave the jury free to speculate about non-evidence. If the government has no special access or leverage over a witness, there is no reason to allow missing witness argument of instruction. *United States v. Pagan-Santini*, 451 F.3d 258, 267 (1st Cir. 2006). Therefore, the government requests that the Court prohibit the defendant from introducing evidence about or arguing any relevant inference from the fact that potential witnesses did not testify.

Alternatively, if the Court allows defendant to introduce evidence or make any such argument, the government seeks permission to respond to this argument. If the defense makes this argument to the jury, the Court should allow the prosecution to respond by pointing out that the defense has the same subpoena power as the government. *United States v. Sblendorio*, 830 F.2d 1382, 1392–93 (7th Cir. 1987). In *Sblendorio*, defense counsel for two Defendants commented during closing

argument that the government did not call two individuals to testify. *Id*. at 1390. In rebuttal, the prosecutor replied, "You heard every defense attorney ask about, 'Where is this witness[?] . . . They don't have to prove anything, but they have subpoena power just like the government.'" *Id*. at 1390–91. On appeal, the Seventh Circuit held that it was permissible for the prosecutor to comment on the defendant's failure to call witnesses as long as the comments did not invite inferences based on the privilege against compulsory self-incrimination. *Id*. The court explained that "[t]he jury is entitled to know that the defendant may compel people to testify; this legitimately affects the jury's assessment of the evidence." *Id*. at 1393–94. The court concluded that once the issue had been submitted to the jury, the government was permitted to respond. *Id*. at 1394; *see also United States v. King*, 150 F.3d 644, 649 (7th Cir. 1998) (holding that the prosecutor's reference during closing argument to the defendant's opportunity to call government agents "where the defendant himself has broached the subject of missing witnesses by asking the jury to in a sense penalize the government for its failure to produce the [witnesses]," was "clearly" proper); *United States v. Aldaco*, 201 F.3d 979, 988 (7th Cir. 2000) ("[I]t was not improper for the prosecutor to make clear to the jury that the defendant, like the government, has the power to subpoena any witness or witnesses relevant to the case after [the defendant's] counsel had opened the door to this reply argument by the prosecution.").

### 5. Family Needs, Employment or Education

While the jury is present, Defendants and defense counsel should be precluded from introducing any evidence, making any statement, or asking any questions regarding a defendant's current age, family circumstances, education, finances, or other non-pertinent aspects of the defendant's personal background. Such evidence could improperly arouse the sympathy of the jury, and it should be excluded under FRE 401, 402, and 403.

To that end, the United States expressly requests that Defendants be precluded from resorting to a common, yet entirely objectionable, defense tactic of "introducing" the defendant to the jury through the use of exhibits (e.g., family photographs), testimony, or other references regarding the defendant's age, family circumstances, finances, or other non-pertinent aspects of the defendant's personal background.

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 402 states the evidence "which is not relevant is not admissible." Therefore, testimony about a defendant's age, family, finances, or personal background are of no consequence to the determination of any essential facts in this case and are patently irrelevant.

Moreover, the introduction of such evidence would violate FRE 403. That rule allows a court to exclude relevant evidence where the danger of unfair prejudice or confusion of the issues outweighs the probative value of such evidence. Further, the admission of such evidence would tend "to induc[e] decisions on a purely emotional basis" in violation of Rule 403. *See* FRE 403 Advisory Committee Notes.

### O.  Motion to Prohibit Explaining Reasonable Doubt During Closing Argument

The government moves the Court to order the defense to not attempt to define the term "reasonable doubt." The First Circuit has "repeatedly noted 'that reasonable doubt does not require definition.'" *United States v. Herman*, 848 F.3d 55, 57 (1st Cir. 2017), *cert. denied*, 581 U.S. 927 (2017) (quoting *United States v. Rodríguez-Cardona*, 924 F.2d 1148, 1160 (1st Cir. 1991)). The First Circuit has, therefore, "warned against attempts to define reasonable doubt noting that such attempts often result in further obfuscation of the concept." *United States v. Van Anh*, 523 F.3d 43,

58-59 (1st Cir. 2008) (quotations and citation omitted).

"Reasonable doubt is a fundamental concept that does not easily lend itself to refinement or definition." *United States v. Vavlitis*, 9 F.3d 206, 212 (1st Cir. 1993); *see also United States v. Cassiere*, 4 F.3d 1006, 1024 (1st Cir. 1993) ("[A]n instruction which uses the words reasonable doubt without further definition adequately apprises the jury of the proper burden of proof.") (quoting *United States v. Olmstead*, 832 F.2d 642, 646 (1st Cir. 1987)); *accord United States v. Taylor*, 997 F.2d 1551, 1558 (D.C. Cir. 1993) ("[T]he greatest wisdom may lie with the Fourth Circuit's and Seventh Circuit's instruction to leave to juries the task of deliberating the meaning of reasonable doubt."). The constitutionality of this practice was reaffirmed by the Supreme Court in *Victor v. Nebraska*, 511 U.S. 1, 5–6 (1994). Accordingly, the Seventh Circuit has adopted as a standard that "reasonable doubt" should not be defined by counsel, because any attempt to define the term "presents a risk without any real benefit"—that is, any definition of the term often leans toward "misleading refinements" that "weaken and make imprecise the existing phrase." *United States v. Reynolds*, 64 F.3d 292, 298 (7th Cir. 1995); *see also United States v. Alex Janows & Co.*, 2 F.3d 716, 722–23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury.").

Similarly, First Circuit decisions "hold that reasonable doubt does not require definition. .... Rather, [t]he term reasonable doubt itself has a self-evident meaning comprehensible to the lay juror, and [m]ost efforts at clarification result in further obfuscation of the concept." *United States v. Fields*, 660 F.3d 95, 97 (1st Cir. 2011) (citations and internal quotations omitted). As indicated in the First Circuit Pattern Jury Instructions: "[t]he presumption of innocence until proven guilty means that the burden of proof is always on the government to satisfy you that [defendant] is guilty of the crime with which [he/she] is charged beyond a reasonable doubt. It is a heavy burden, but

the law does not require that the government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict." Pattern Instructions § 3.02. Allowing the defense to argue what they believe the reasonable doubt standard to be in this case would permit them to mislead the jury. The government, therefore, moves this Court to bar this line of argument at defendant's closing argument.

### P. Motion to Preclude Irrelevant Argument in Relation to Search Warrant Date

The United States requests that the Court preclude Defendants from irrelevant argument regarding an error in paragraph 28 of the October 8, 2021, affidavit in support of the search warrant of Baiyewu's residence. The error, which mistakenly stated that Baiyewu was in regular communication with unindicted co-conspirator Collins Eneh rather than Blossom Egaghe, was deemed immaterial and it failed to vitiate the finding of probable cause to search Baiyewu's residence. D.E. 468, Report and Recommendation. This Court denied Baiyewu's objections to the Report and Recommendation and adopted it in full. D.E. 483. This issue is resolved and any further reference to it would only serve to distract the jury from Baiyewu's conduct and place it instead on an individual that is not a part of this trial. Baiyewu has already again raised this error in a recent filing. *See* D.E. 543, at 6–7. But the Court has resolved this issue, and it has no bearing on the allegations Baiyewu faces at trial.

By this motion *in limine,* the government seeks to ensure that the trial is focused on the evidence that does exist, if admitted, and what it proves about a Defendant's guilt or innocence. In *United States v. Patrick*, 248 F.3d 11, 22–23 (1st Cir. 2001), *overruled on other grounds* by *United States v. Salvador-Gutierrez*, 128 F.4th 299 (1st Cir. 2025), the defendant sought admission of certain evidence to show a claimed inadequacy to the underlying investigation. The Court, finding no abuse of discretion by the trial court in excluding the evidence, stated "speculative evidence of

the inadequacy of the police investigation would have ... create[ed] a real danger of unfair prejudice and jury confusion that 'substantially outweighed' the evidence's probative value." *Id.* at 23.

Therefore, the government asks the Court to prevent Baiyewu from attempting to introduce immaterial information that would divert the jury's attention from relevant evidence and only serves as a distraction with the sole purpose pointing the finger at unindicted co-conspirators, instead of the Defendant's guilt. Accordingly, the Court should preclude the Defendants from asking questions to witnesses and/or arguing about the error in search warrant, unless it is tied to the weight that should be afforded to a particular piece of physical evidence.

### Q. Motion to Preclude Argument, Testimony or Evidence about Victim Negligence

The Defendants should be precluded from introducing any testimony, argument or evidence related to any actual or purported negligence, complicity, or intentional disregard by victims, whether individuals or institutions, at trial. *See United States v. Rivera-Izquierdo*, 850 F.3d 38, 51 (1st Cir. 2017) (finding no abuse of discretion in district court's granting government's motion in limine excluding argument or evidence about victim negligence); *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence.").

Victim negligence is not a defense to money laundering, thus any lack of caution or diligence by victims is irrelevant. Without any bearing to the elements of the charged offense, any reference to the same should be excluded by the Court on the grounds that it is irrelevant, likely to confuse the issues, and mislead the jury by inviting them to blame the victims, rather than the Defendants. See FRE 402, 403 (2012).

### R. Motion to Limit Scope of Cross-Examination of Fact Witness

The government moves the Court for an order limiting the scope of cross-examination of

a fact witness, Ms. Williams, Defendant Baiyewu's ex-wife, to the subject matter of the direct examination of the witness and to matters affecting the credibility of the witness. FRE 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."). "It is well-established that the license to cross-examine is not absolute . . . and the district court retains wide latitude to impose reasonable limits on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." *United States v. Hatch*, 514 F.3d 145, 158 (1st Cir. 2008), quoting *United States v. Gonzalez–Vazquez*, 219 F.3d 37, 45 (1st Cir. 2000) (internal quotations and citations omitted). Under FRE 611(a)(3), the court can also limit cross-examination to "protect witnesses from harassment." *See also Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986) (trial court "retain[s] wide latitude to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant").

Ms. Williams alleges she was, on at least one occasion, the victim of domestic violence by Baiyewu. She also alleges Baiyewu filed false police reports alleging she abused Baiyewu after they separated and she moved out of their shared residence. Ms. Williams claims she was unaware of these police reports until she returned to their shared residence to pick up some personal items and it was then Baiyewu alerted the authorities, and Ms. Williams was arrested in front of her minor child. Ms. Williams was never prosecuted for these claims due to Baiyewu's failure to pursue the charges. There is evidence that, because Baiyewu no longer had a path to obtain legal status in the United States through his marriage to Ms. Williams, he filed these police reports to create a record so he could be eligible for a visa to remain in the United States under the Violence Against Women Act.

64

While it is appropriate for cross-examination to address possible bias by a witness, *United States v. Tse*, 375 F.3d 148, 165 (1st Cir. 2004) ("As a general matter, a defendant has the right to cross-examine a prosecution witness about matters that might cause the witness to be biased against the defendant."), a defendant must first lay a proper foundation before evidence of bias is admitted and the district court retains discretion to limit the scope of the bias inquiry. *Id.*; *see also United States v. Martinez-Vives*, 475 F.3d 48, 53–54 (1st Cir. 2007) (court may prohibit unchecked cross-examination on theory of bias). Even then, a court can exclude or limit evidence if the probative value is substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, undue delay, or wasting time. FRE 403; *see United States v. Condron*, 98 F.4th 1, 26–27 (1st Cir. 2024) (no abuse of discretion for district court to limit, under FRE 403, cross-examination of witness to prevent creating "min-trial" on irrelevant issue that would distract jury, especially where probative value of testimony was marginal at best).

Here, there is little probative value for testimony related to conflicting claims of alleged domestic violence by Ms. Williams or Baiyewu. For the witness, Ms. Williams was not charged, let alone convicted, of domestic violence and so attempted impeachment with those allegations would clearly be improper. Since Ms. Williams alleges that she was in fact the victim of domestic violence by Baiyewu, allowing such questions would clearly be calculated to harass her and cause her distress. Further, allowing this line of inquiry would distract the jury from the issues and create a mini-trial within the trial, leading to delay, confusion, and waste of time.

Therefore, the government asks the Court to limit the scope of cross-examination of Ms. Williams to the subject matter of the direct examination of the witness and to matters affecting the credibility of the witness and to preclude the defendants from unchecked cross-examination regarding domestic violence allegations against the witness.

VI.     <u>**CONCLUSION**</u>

For the foregoing reasons, the government respectfully requests that the Court grant the

motions detailed above.


**RESPECFTULLY SUBMITTED,**

In San Juan, Puerto Rico, this 3rd Day of July, 2025.



<u>s/ *Linet Olinghouse*</u>
Linet Olinghouse
Assistant United States Attorney
USDC-PR No. G03009
Torre Chardón, Suite 1201
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
(787) 282-1843
Linet.suarez2@usdoj.gov

<u>s/ *Richard S. Greene IV*</u>
Richard Greene, TN Bar No. 024450
Emily C. Powers, NY Bar No. 5132204
Trial Attorneys
Consumer Protection Branch
United States Department of Justice
450 Fifth St., NW, Suite 6400
Washington, DC 20001
(202) 451-7763
emily.powers@usdoj.gov
richard.s.greene.iv@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to all CM/ECF

participants.

<u>*s/ Richard S. Greene IV*</u>
Richard S. Greene IV
Trial Attorney