**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

**Plaintiff,**

v.

[1] OLUWASEGUN BAIYEWU,

**Defendant.**

**CRIMINAL NO. 21-395-1 (RAM)**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is the Defendant Oluwasegun Baiyewu's ("Defendant" or "Mr. Baiyewu") *Motion for Judgment of Acquittal Pursuant to Rule 29 or for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure* ("*Motion*") and the United States of America's (the "Government") *Response in Opposition*. (Docket Nos. 811 and 818, respectively). For the following reasons, the *Motion* is **DENIED**.

**I.    BACKGROUND**

On October 20, 2021, a grand jury in the District of Puerto Rico returned a single-count *Indictment* charging Mr. Baiyewu with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 5). About a year and a half later, on March 31, 2023, a grand jury returned a single-count *Superseding Indictment* charging Mr. Baiyewu and four co-defendants with conspiracy to commit money laundering, in violation of 18 U.S.C.

Criminal No. 21-395-1 (RAM)                                                2

§§ 1956(h) and 3147. (Docket No. 86). The *Superseding Indictment* alleges numerous schemes supporting the money laundering conspiracy, including business email compromises ("BEC"), romance scams, and unemployment insurance ("UI") fraud. Id. ¶ 21. These charges arose out of events occurring between May 2020 and October 2021. Id. ¶ 19.

On August 25, 2025, a jury in the District of Puerto Rico found Defendant guilty of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 746). Subsequently, Defendant filed his *Motion*. (Docket No. 811). Mr. Baiyewu averred the Government failed to connect him or any of his co-conspirators to the Puerto Rico Glenn International ("G.I.") BEC fraud. Defendant posited the Government fell short of establishing an overt act in furtherance of the conspiracy in Puerto Rico and, consequently, could not to establish proper venue in the District of Puerto Rico. Id. at 2. Defendant also argued the Government presented insufficient evidence to convict him of money laundering conspiracy because it failed to establish a valid conspiracy. Id. at 9. Mr. Baiyewu further maintained the Court erred by admitting co-conspirators statements as evidence at trial, and that there was a variance from the *Indictment*. Id. at 22. Defendant requested a judgment of acquittal under Fed. R. Crim. P. 29(c) ("Rule 29"). Id. at 1.

Alternatively, Defendant requested a new trial pursuant to Fed. R. Crim. P. 33 ("Rule 33"). Id. at 30. Mr. Baiyewu argued the Government used a tool called Relativity to alter the WhatsApp messages extracted from his phone to display Defendant as the number "1." Id. at 31. Defendant maintained the number "1" was intentional, unduly prejudicial and that the limiting instruction the Court provided was insufficient. Id. at 41. Finally, Mr. Baiyewu posited a new trial is warranted due to cumulative error caused by prosecutorial misconduct. Id. at 46.

The Government opposed Defendant's *Motion* and argued that it presented sufficient evidence to demonstrate that Mr. Baiyewu knew of his involvement in a money laundering conspiracy and served as the "hub" to that conspiracy—acting as a broker for three car-buying co-conspirators in Nigeria and buying dirty dollars from his money-supplying co-defendants. (Docket No. 818 at 2). The Government also maintained that it established proper venue in the District of Puerto Rico through evidence of Mr. Baiyewu's involvement with the G.I. BEC fraud funds. Id. at 29. As to the Rule 33 request for new trial, the Government posited Defendant presented his *Motion* over sixty (60) days after the guilty verdict was rendered and that the WhatsApp messages depicting Mr. Baiyewu as number "1" were proffered before trial. Id. at 39. Therefore, the Government argued the WhatsApp messages are not new evidence

Criminal No. 21-395-1 (RAM)                                                                4

and the *Motion* is untimely. Id. at 31. Mr. Baiyewu replied to the Government's opposition. (Docket No. 827).

## II.  DISCUSSION

### A. Rule 29

Rule 29 allows a court to set aside a jury's guilty verdict and enter an acquittal of "any offense for which the evidence is insufficient to sustain a conviction." United States v. Florentino-Rosario, 459 F. Supp. 3d 345, 354 (D.P.R. 2020), aff'd, 19 F.4th 530 (1st Cir. 2021) (citing Fed. R. Crim. P. 29(c)). The defendant must make the requisite showing on a Rule 29 motion and the proffered evidence is considered "in the light most favorable to the prosecution." Id. at 349, 354 (quoting United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999)). Hence, evidentiary conflicts and credibility disputes are solved in favor of the verdict. *See* United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012). A verdict "must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." United States v. Stewart-Carrasquillo, 997 F.3d 408, 417–18 (1st Cir. 2021) (quoting United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010)). Accordingly, courts have recognized that a challenge to the sufficiency of the evidence, such as here, is a "tough sell," an "uphill battle" and "a daunting hurdle."

Criminal No. 21-395-1 (RAM)                                                5

Florentino-Rosario, 459 F. Supp. 3d at 354 (quoting United States

v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011), United States v.

Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010), and United States

v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006)) (cleaned up).

### i. Insufficient evidence

In order to prove a conspiracy, the Government must show "the

existence of a conspiracy, the defendant's knowledge of the

conspiracy, and the defendant's voluntary participation in the

conspiracy." United States v. Rodríguez-Marrero, 390 F.3d 1, 14

(1st Cir. 2004), cert. denied, 544 U.S. 912 (2005); United States

v. Juodakis, 834 F.2d 1099 (1st Cir. 1987) ("[T]he scope of [the

defendant's] agreement must be determined individually from what

was proved as to him" (citation omitted)).

Here, the Government charged Defendant with conspiracy to

engage in two types of money laundering transactions: (1)

concealment money laundering, in violation of 18 U.S.C. §

1956(a)(1)(B)(i); and (2) monetary transaction in criminally

derived property greater than $10,000, in violation of 18 U.S.C.

§ 1957. (Docket 86 at 3). Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i),

the Government has to show that, "knowing that the property

involved in a financial transaction represents the proceeds of

some form of unlawful activity," the defendant conducted a

financial transaction knowing that the transaction was "designed

in whole or in part [. . .] to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of such unlawful activity. *See* United States v. Abbas, 100 F.4th 267 (1st Cir.), cert. denied, 145 S. Ct. 319, 220 L. Ed. 2d 108 (2024). On the other hand, pursuant to 18 U.S.C. § 1957, the Government must prove that the defendant "knowingly engag[ed] ... in a monetary transaction in criminally derived property" exceeding "$10,000 and [. . .] derived from specified unlawful activity." *See* id.[1]

Mr. Baiyewu argues that the evidence presented at trial did not prove an overarching conspiracy, but rather a series of narrower agreements among Defendant and co-defendants. (Docket No. 811 at 10). Defendant avers that he is a businessman who lacked knowledge that a portion of his customers or the cars he sold were involved with or tied to moneys derived from fraud. Id. Mr. Baiyewu further maintains that his mere presence in financial transactions tied to fraud proceeds fails to show knowledge of such fraud. Id. at 13. Defendant contends that far from the "hub and spoke" conspiracy the Government charged, Mr. Baiyewu was part of a "rimless wheel" whereby the spokes have no connection with one

---

[1] "Criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. §§ 1957(f)(2), (f)(3).

another, other than the hub's involvement in each transaction. Id. at 20.

In response, the Government asserts it showed that the members of the money laundering conspiracy shared a common goal—to profit by laundering money from a variety of different schemes, including by converting the dirty money into cars. (Docket No. 734 at 11).[2] The Government claims it proved that Defendant served as the common figure who connected four U.S.-based dollar suppliers with Nigerian customers, Mr. Blossom Engaghe ("Mr. Engaghe") and Mr. Forster Ene ("Mr. Ene"), who bought dollars through sales brokered by Mr. Baiyewu. Id. The Government avers that Defendant's dollar supplier co-conspirators serve as a "rim" to the charged conspiracy because they made purchases sourced with fraud funds to three Copart accounts—the Shipopo account (controlled by Defendant), the Emperor Auto account (controlled by Mr. Engaghe), and the B100 account (controlled by Mr. Ene). Id. Therefore, the Government maintains that Mr. Baiyewu provided the overlap and interdependence required for a money laundering conspiracy.[3]

---

[2] The Government's arguments at Docket No. 734 were incorporated by reference into their response to the *Motion* at Docket No. 818.

[3] The Government argues that the interdependence is a product of the strengthening of the market for "dirty" U.S. dollars and the associated sales of used vehicles shipped to Nigeria attributable to Defendant and cop-defendant's actions.

Criminal No. 21-395-1 (RAM)                                          8

At trial, the Government presented the testimony of Mr. Ifeoluwa Dudubo ("Mr. Dudubo") who stated that he and Mr. Baiyewu had an understanding whereby Mr. Dudubo would: (1) receive requests from Mr. Baiyewu for dollars in the form of money orders, cash, or cashier's checks; (2) reach out to three primary money suppliers who had money from "dealing in illegal activities;"[4] (3) negotiate an exchange rate of U.S. Dollars to Nigerian Naira with the money supplier; and (4) once agreed on a rate, drive to pick up fraud money from his supplier. (Docket No. 717 at 123); *see also* (Docket 718 at 37). Then, Mr. Dudubo testified that Mr. Baiyewu would provide payment instructions at Copart or IAAI,[5] Mr. Dudubo would drive to Copart or IAAI, stand in line and make payment as directed, and Mr. Baiyewu would arrange to transfer the agreed amount of Naira into Mr. Dudubo's Nigerian bank account. (Docket 718 at 37). Mr. Dudubo described how he could tell Mr. Baiyewu knew that the money came from illegal activity because Defendant told him he wanted to avoid creating a paper trail, for example, by avoiding bank transactions, using cash where possible to avoid any connection to an illegal source, and purposefully using Mr. Dudubo as a middle-man to insulate and distance himself from Mr.

---

[4] (Docket No. 717 at 125).

[5] As explained during trial, both Copart and IAAI are online auto auction houses that sell used vehicles. See, e.g., (Docket No. 717 at 102).

Dudubo's suppliers. Id. at 37, 45, 57, and 85. The Government also presented Defendant's communications with other coconspirators such as Mr. Temitope Omatayo ("Mr. Omatayo"), and Mr. Oluwaseun Adelekan ("Mr. Adelekan") to whom he gave orders to deposit funds into several Copart accounts. (Docket No. 758 at 34). Moreover, Defendant's ex-wife Ms. Kelsey Williams ("Ms. Williams") testified that she saw Mr. Temitope Suleiman ("Mr. Suleiman") give cash to Mr. Baiyewu. (Docket 720 at 51). Finally, the Government showed chats that indicate that Mr. Baiyewu coordinated with Mr. Engaghe to wire Naira to pay for funds coming from the G.I. BEC fraud. (Docket No. 756 at 69).

Mr. Dudubo's testimony established the elements of the conspiracy and Mr. Baiyewu's knowledge that its proceeds came from fraud. Mr. Baiyewu's knowledge of the conspiracy can also be inferred from the news accounts on money laundering cases that Defendant shared with co-defendant Temitope Suleiman ("Mr. Suleiman") and others. *See*, e.g., (Docket No. 759 at 80). Mr. Baiyewu's agreement to take part in the conspiracy can be inferred from the communications with co-defendants and unindicted co-conspirators and from the fact that these communications show Defendant actively coordinating and giving orders to co-conspirators related to the object of the conspiracy: money laundering fraud-related funds.

Criminal No. 21-395-1 (RAM)                                              10

As to the conspiracy's underlying unlawful money laundering activities, the Government established the underlying frauds through victim's testimonies and bank records,[6] and traced the money flows from the victims to payments into the Shipopo, Emperor and B-100 Copart accounts. *See*, e.g. (Docket 761 at 23). As Mr. Dudubo testified, these payments were made through intermediate transactions such as the purchase of money orders and cashier's checks. The Government also showed that Mr. Baiyewu and his conspirators knew the property involved in the transactions represented the proceeds of some form of unlawful activity and that the transactions were designed in whole and in part to conceal, and disguise the nature, location, source, ownership, and control of the unlawful activity.[7] The Government presented evidence that showed that Mr. Baiyewu and his conspirators entered in monetary transactions by and through financial institutions, affecting interstate commerce in criminally derived property of a value greater than $10,000 and from unspecified unlawful activity. Specifically, the G.I. BEC and Amitech fraud proceeds exceeded the

---

[6] *See*, e.g., testimony of Mr. Amit Bhagat, Chief Executive Officer of Amitech Solutions, and testimony of Mr. Ricardo Díaz, Chief Financial Officer of Glenn International. (Docket 716 at 98 and 720 at 7, respectively).

[7] With respect to concealment, while money orders are a legitimate form of payment, they are also useful to disguise the original provenance of the funds and thus serve as a concealment mechanism. Moreover, the majority of the money orders deposited into Mr. Baiyewu's Shipopo account during the timeframe of the alleged conspiracy were in sums of $1,000 or less. (Docket No. 761 at 24).

$10,000 and were deposited into banks and subsequently made their way to Copart.

Therefore, the Government presented sufficient evidence that the jury credited and which showed Mr. Baiyewu knowingly conspired with Mr. Dudubo, Mr. Adelekan, Mr. Suleiman, Mr. Omotayo and Mr. Engaghe to conduct financial transactions affecting interstate commerce which transactions involved the proceeds of mail fraud, wire fraud, and access device fraud.

Defendant's *Motion* is therefore **DENIED** as to the request for judgement of acquittal due to insufficient evidence.

### ii.   Venue

Pursuant to Fed. R. Crim. P. 12(b)(3)(A)(i), when venue is challenged, the government bears the burden by a preponderance of the evidence to establish that venue is proper. United States v. Salinas, 373 F.3d 161, 163 (1st Cir. 2004). The Constitution provides that criminal trials "shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, . . . shall be at such Place or Places as the Congress may by Law have directed." U.S. Const. art. III, § 2, cl. 3. Fed. R. Crim. P. 18 further mandates that the government "prosecute an offense in a district where the offense was committed." Courts must honor specific venue provisions in statutes where they exist. Salinas, 373 F.3d at 164.

Under Fed. R. Crim. P. 21, upon the motion of a defendant, the Court may transfer a criminal case to another district for either prejudice or convenience. The Court must transfer a proceeding against a defendant "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). Alternatively, the Court may transfer a proceeding "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed R. Crim. P. 21(b). In this instance, the Court should consider such factors as "the location of the parties, potential witnesses, contested events, relevant documents, and counsel, expense to the parties, overall accessibility of the trial location, and any other special factor." United States v. Dávila-Bonilla, 307 F.Supp.3d 1, 3 (D.P.R. 2018) (citing United states v. Quiles-Olivo, 684 F.3d 177, 185 (1st Cir. 2012) and Platt v. Minn. Mining & Mfg. Co., 376 U.S. 240, 243-44 (1964)). Notably, "Rule 21(b) links the two requirements – convenience and the interest of justice – and when a rule lists two requirements in the conjunctive, both must be satisfied." United States v. Walker, 665 F.3d 212, 224 (1st Cir. 2011). Here, Defendant is charged with money laundering conspiracy in violation of 18 U.S.C. § 1956(h). Congress has provided that venue for prosecutions under Section 1956(h) "may be brought in

the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2).

Defendant correctly cites to United States v. Abbas as applicable First Circuit precedent regarding venue for money laundering conspiracy. 100 F.4th 267 (1st Cir. 2024). The Abbas panel affirmed a conviction for money laundering conspiracy when the jury decided by a preponderance of the evidence that at least part of the conspiracy took place in the district where the trial was held, namely the District of Massachusetts. Id. at 290. Overt acts in furtherance of the conspiracy included emails sent into Massachusetts to induce a romance scam victim to wire funds outside of the district. The First Circuit explained that the "emails were overt acts that furthered the conspiracy because the steps a conspirator takes to produce the proceeds [that are] subsequently laundered furthers a money laundering conspiracy." Id.

Here, the Government alleged in the *Superseding Indictment* that a Puerto Rican company, G.I., was the victim of a business email compromise scam. (Docket No. 86 ¶ 26). G.I., like the victim in Abbas, received an email from scammers and initiated a payment originating from an account within the district to an account outside of the district. Id. ¶ 27. This payment allegedly

Criminal No. 21-395-1 (RAM)                                      14

constituted proceeds that were eventually laundered by unindicted co-conspirators and Mr. Baiyewu. Id. ¶¶ 28-30.

At trial, the Government presented evidence, which the jury credited, that connected Mr. Baiyewu and his co-conspirators to the G.I. BEC fraud and its proceeds. The Government showed that the G.I. BEC fraud proceeds were deposited into a Chase bank account held by Ms. Angélica Rodríguez ("Ms. Rodríguez") in California. (Docket No. 720 at 140). As the Government showed, Ms. Rodríguez then drew a $31,126 cashier's check which Mr. Michael Crosby ("Mr. Crosby") deposited into Mr. Engaghe's Emperor Auto Copart account to purchase two vehicles—a 2006 Toyota Sienna with a VIN number ending in 3592 and a 2014 Range Rover with a VIN number ending in 5699. Id. at 144. The Government then presented evidence in the form of chats between Mr. Baiyewu and Mr. Engaghe that showed that Mr. Baiyewu coordinated with Mr. Engaghe to wire pay Naira to pay for the G.I. fraud's dirty dollars. (Docket No. 756 at 69). Specifically, on October 28, 2020, the day after the G.I. BEC fraud, Mr. Baiyewu and Mr. Engaghe exchanged the following messages:

> Mr. Engaghe: Yes oo another guy just got back to us like around 1 a.m. here. He has 70K. You may be interested.
> Mr. Baiyewu: What do you want to do sir.
> Mr. Engaghe: He is well-known. I want to send to him directly.
> Mr. Baiyewu: Do you want to give me his account.
> Mr. Engaghe: Okay let me get it.
> Mr. Baiyewu: Okay waiting.
> Mr. Engaghe: Forster ENE 1009098760 keystone.

Criminal No. 21-395-1 (RAM)                                              15

Mr. Baiyewu: How much am I sending?
Mr. Engaghe: All but the $30.
Mr. Baiyewu: So can you check that in naira?
Mr. Engaghe: Or leave it. Add it to the shipping. Which shipping is due now?
Mr. Baiyewu: No dollar is the problem.
Mr. Engaghe: Let me check. How can this guy assist you? Can they mail it to you.
Mr. Baiyewu: What state is the guy.
Mr. Engaghe: I will ask.
Mr. Baiyewu: How much from the money do you need?
Mr. Engaghe: I need everything. It's payment for the "range over."
Mr. Baiyewu: This is what you can do. Can he wire like 32K to your Copart account first and you talk to Copart to help you reverse the car. That money can take care of your "range over" and Sienna. Confirm his state and I can know what to do about how to get the rest of the money.
Mr. Engaghe. Okay boss.
Mr. Baiyewu: I will make arrangement to wire back naira to the account, right?
Mr. Engaghe: Sir he is in California. He can sort the Copart payment himself. If you also need cash he can FedEx it to you. Can u use money order for your shipping payment?
Mr. Baiyewu: No cash alone.
Mr. Engaghe: Okay. Sir you have sent the money. They want to send the evidence of payment. Guess stop too early.
Mr. Baiyewu: Okay let me make arrangement.
Mr. Engaghe: Okay boss.
. . .
Mr. Engaghe: Boss, I salute you sir.
Mr. Baiyewu: How far.
Mr. Engaghe: my oga kindly assist with the pick up of 2 cars. paying at California now.
Mr. Baiyewu: Has it been sorted? Your guy no gree sell for me. Ask if he can Zelle.
Mr. Engaghe: bros me they suspect those people oo.
Mr. Baiyewu: hmm, okay oo, Abeg oo. I no get power oo.
Mr. Engaghe: He didn't have any cash. Next minute he has 70K.
Mr. Baiyewu: yup.
Mr. Engaghe: Bro I even paid for more but now I am hearing stories. I have had asked for refund on other payments I made. Please help me schedule pickup for both cars. I don't really have any means for dollar for storage. Be glad if you can help sir.
Mr. Baiyewu: Which did they pay?
Mr. Engaghe, both. On Copart. I had another on iaai and mannheim. They have now refused to make those saying the money is finished. Said they may have another funds for tomorrow but i doubt. just trying to console me.
Mr. Baiyewu: na wahoo.
Mr. Engaghe: meanwhile rates are dropping in nija.
Mr. Baiyewu: Send me receipts for the two cars.

Id. According to the Government, these communications indicated that Defendant and Mr. Engaghe were coordinating the "transfers of monies between U.S. Dollars and naira [in] the form of a vehicle that was purchased and then shipped later on." Id. at 75. The Government also showed that Mr. Baiyewu coordinated the transportation of both cars purchased with the G.I. BEC fraud funds to Nigeria. Id. at 35.

Mr. Baiyewu alleges that he cannot be tied to the G.I. fraud because he never communicated with Ms. Rodríguez or Mr. Crosby. (Docket 811 at 4). However, for venue to be proper in a money laundering conspiracy case, 18 U.S.C. § 1956(i)(2) requires only that an act in furtherance of the attempt or conspiracy take place in such venue. It does not specify which person within the conspiracy must perpetrate that act, only that it occurs. In fact, the Government charged a hub-and-spoke conspiracy and proceeded to persuade the jury that such conspiracy existed. *See* United States v. Abdelaziz, 68 F.4th 1, 48-49 (1st Cir. 2023) (describing hub-and-spoke structure and charging requirements). Venue remains proper where at least part of conspiracy occurred, even if "there was no evidence that the defendant had entered that district or that the conspiracy was formed there." United States v. Rodriguez-Moreno, 526 U.S. 275, 281-82 (1999) (quoting Hyde v. United States, 225 U.S. 347, 356-57 (1912)); *see also* United States v.

Approximately $659,990.83, 2008 WL 794538, at *6 (E.D. Wis. 2008) (finding venue proper in district where some overt acts in furtherance of a hub-and-spoke conspiracy occurred). Here, Mr. Baiyewu did not personally carry out the fraud that produced the G.I. funds. He also, according to the evidence, did not communicate directly with Ms. Rodríguez or Mr. Crosby. Mr. Baiyewu did, nevertheless, assist in cleaning the dirty dollars produced by the G.I. fraud. He did so by supplying the naira to help pay for the dirty dollars and coordinating the shipments of the two cars bought with them.

Therefore, as the Court ruled on Mr. Baiyewu's previous Rule 29 motion,[8] and having reviewed the parties' present arguments, the Court finds that a rational jury could find that the Government established venue under the preponderance of the evidence standard that applies to venue determinations. Defendant is charged with money laundering conspiracy and an act in furtherance of the alleged conspiracy took place in Puerto Rico. A reasonable juror could infer a conspiracy between Mr. Baiyewu and Mr. Engaghe from their communications, from Mr. Baiyewu's deposits into the Emperor Auto Copart account, and from Mr. Baiyewu's efforts to coordinate transport for the vehicles purchased with the stolen G.I. funds to

---

[8] (Docket No. 762 at 4).

Nigeria. Hence, venue for the money laundering conspiracy in Puerto Rico is proper since at least part of the conspiracy occurred in the District of Puerto Rico.

Defendant's *Motion* is therefore **DENIED** as to the request for judgement of acquittal due to improper venue.

### iii.    Co-conspirator statements

Fed. R. Evid. 801(d)(2)(E) allows the Court to admit out-of-court statements by a party's co-conspirator if made during and in furtherance of that conspiracy. First Circuit precedent requires that parties seeking to introduce a statement under this rule must prove by a preponderance of the evidence that: "(1) when the statement was made, the declarant was a member of a conspiracy, (2) the defendant was also (or later became) a member of the same conspiracy, and (3) the statement was made in furtherance of that conspiracy." United States v. Weadick, 15 F.4th 1, 8 (1st Cir. 2021); *see also* United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). The Court may provisionally admit the statement when introduced and defer a final ruling on whether a proponent has satisfied this burden until the close of evidence. Id. If the Court decides "at the close of evidence that one or more provisionally admitted statements is inadmissible, the court must 'give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to

cure any prejudice.'" Id. at 8-9. (quoting United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980).

Before trial, the Government sought to introduce text and WhatsApp messages between unindicted co-conspirators that showed: (a) requests for Mr. Baiyewu's assistance in buying U.S. dollars, exchanging currency, and bidding on, shipping, and transporting cars to Nigeria; and (b) coordination between money launderers and money men to facilitate fraudulent fund transactions. (Docket No. 579 at 46-47). On August 1, 2025, the Court conditionally admitted the statements by un-indicted coconspirators that complied with Rule 801(d)(2)(E). (Docket No. 687 at 41). The Court found the Government intended to provide adequate extrinsic evidence to corroborate the conspiracy's existence and membership.

At trial, the Government did in fact provide such extrinsic evidence, and the jury credited that evidence. Therefore, and to the extent Defendant does not elaborate his pleading on this matter,[9] the Court finds that the co-conspirator statements were properly admitted as evidence.

---

[9] Defendant merely states that "[t]here was insufficient evidence of the conspiracy to admit hearsay statements by indicted and/or unindicted co-conspirators against Mr. Baiyewu." (Docket 811 at 23).

Criminal No. 21-395-1 (RAM)                                              20

Defendant's *Motion* is therefore **DENIED** as to the request for judgement of acquittal due to improper admission of co-conspirator statements.

### iv.   Variance from the *Indictment*

A "variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011) (quoting United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009)). A variance is grounds for reversal if it "affected the defendant's substantial rights—i.e., the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense." United States v. Fisher, 3 F.3d 456 (1st Cir. 1993).

Mr. Baiyewu avers that the Government should not have been allowed to present: (1) his taxes going back to 2019; (2) Ms. Williams testimony about the filing of a joint tax return for the year 2019; and (3) e-mails dated January 5, 2019, forwarded by Mr. Suleiman to oluwasegunbaiyewu@yahoo.com. (Docket 811 at 24). Defendant argues that the charge in the indictment placed Mr. Baiyewu on notice that he was being charged solely with conspiring to commit money laundering from May 2020 until October of 2021, and not with tax evasion relating to 2018 or 2019. Id. Defendant

further argues that the 2019 emails have little probative value and occurred outside of the dates charged in the indictment. Id. Mr. Baiyewu posits that such evidence was extraordinarily prejudicial as it allowed the Government to use irrelevant and highly prejudicial evidence to associate and implicate Mr. Baiyewu with fraud by the mere forwarding of an e-mail. Id. Finally, Mr. Baiyewu maintained that the Court's instruction failed to cure the unfair prejudice. Id. In response, the Government avers that it did not attempt to prove Mr. Baiyewu engaged in tax evasion but rather show Baiyewu's Copart business was "part and parcel" of the money laundering scheme, and the inclusion of his 2019 tax return was simply to set a baseline in comparison to the timeframe of the charged conspiracy that began in 2020. (Docket 761 at 16). The Government also maintained that the Court has addressed all of Mr. Baiyewu's arguments in previous rulings. (Docket 818 at 37). At trial, Mr. Baiyewu objected to the tax information on the grounds of relevance as well as being misleading, but the Court allowed the testimony. (Docket No. 761 at 13). The Court also allowed the e-mails forwarded by Mr. Suleiman to oluwasegunbaiyewu@yahoo.com because, while the timeframe of those emails was from a timeframe that precedes the alleged conspiracy, they are relevant insofar as Mr. Baiyewu has been in the business of buying and selling and transporting cars since 2013. (Docket 756 at 12). Hence, the Court

found that, to the extent that he was already in the car business and those emails repeatedly show notice that the deposit of stolen funds would result in suspicion of a Copart account, they are relevant and admissible. Id. However, the Court imparted a limiting instruction as to those emails.[10]

Mr. Baiyewu's arguments as to a purported variance from the *Indictment* are unfounded and repetitive. As the Court has established, Mr. Baiyewu's tax information for 2019 and the forwarded emails were admitted for discreet purposes. Their narrow use did not in any way introduce facts not alleged in the *Indictment* nor did it constitute unfair surprise. Defendant's arguments do not meet the high bar required to set aside a verdict reached by the jury after 14 days of testimony and evidence.

Defendant's *Motion* is therefore **DENIED** as to the request for judgement of acquittal due to a variance from the *Indictment*.

### B. Rule 33

Rule 33 states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Rule 33 requires that the motion for new

---

[10] The Court's limiting instruction was: Exhibits 26(c) and 26(f) were admitted by me for a limited purpose and that limited purpose is to show, according to the Government's theory of the case, you are ultimately the judges of the fact as you know, but for the limited purpose of showing that Mr. Baiyewu was on notice that payment with the use of stolen funds violated Copart policies. That's the reason why these emails from 2019 were admitted. They were admitted for a limited purpose and none other. (Docket 756 at 46).

trial be filed: (1) within 3 years after the verdict or finding of guilty if grounded on newly discovered evidence, or (2) within 14 days after the verdict or finding of guilty grounded on any reason other than newly discovered evidence. These types of motions "are directed to the discretion of the trial court." United States v. Villa-Guillén, 490 F.Supp.3d 470, 473 (D.P.R. 2019) (quotation omitted). While a defendant may base their new trial motion on newly discovered evidence or other grounds, it is still a remedy to be granted "sparingly," and "only where there would be 'a miscarriage of justice and where the evidence preponderates heavily against the verdict.'" United States v. González-Pérez, 778 F.3d 3, 17 (1st Cir. 2015) (quoting United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010)).

### i.   Number "1"

On August 5, 2025, after *voir dire* but prior to opening arguments, Mr. Baiyewu argued that replacing his image and putting the number "1" instead of the original "Shipopo" in the chats in Government Exhibits 5B, 5C, and 5F altered the conversation by making the exhibits unreliable, suggestive, prejudicial, and untruthful. *See* (Docket No. 717). The Court held a Rule 104 hearing to address the matter. Id. at 25. There, Defendant asserted that the Exhibit 5 conversations that were initially discovered to them were in Cellebrite format, and that they "were never provided with

the Relativity data or with that format" until a few days before trial. Id. The Government stated that the extraction was provided in discovery back in 2021, and that it produced copies of all the extractions the week prior to trial "as the form of the evidence to be provided." Id. at 26.

At that time, the Court addressed the timeliness issue with Defendant's motion:

> The problem I have with this is we started trial already and you got this discovery last week, and if there was an issue with the format in which discovery was produced, or some other deficiency, it should have been raised before we started trial. Now we are in the middle of trial.

Id. at 26. The Rule 104 hearing continued with the testimony of Agent Ramos, followed by the parties' arguments. Id. at 28-64. The Government reiterated its stance that the parser tool Relativity generated the report and "automatically puts 1 for the primary user of the phone in the way that it formats and displays data that it reads from the extraction file." Id. at 60-61. Defendant highlighted his objection that the agent who did the extraction was not present to provide an explanation, and that by using the number 1, the Government is making the identification unfair and unreliable by suggesting to the jury that Mr. Baiyewu is the leader. Id. at 61-62. Furthermore, Mr. Baiyewu highlighted that reports containing the names of other individuals while only

showing Baiyewu appearing as the number 1 were dehumanizing and prejudicial. Id. The Court held that the Government met its burden for admitting the exhibits, but it agreed to issue a limiting instruction because the use of the number 1 to identify Baiyewu could be prejudicial. Id. at 63-64.

The Court crafted the following curative limiting instruction to be given to the jury whenever relevant exhibits were presented:

> Ladies and gentlemen of the jury, you will be shown evidence consisting of reports from a computer program displaying WhatsApp chats. Mr. Baiyewu is identified in the reports by the number 1. He did not identify himself that way in the chats. Therefore, it would be improper for you to conclude that he hid his identity in the chats.

(Docket No. 717 at 64, 68-69 (noting "the idea is to forestall any adverse inference from the number 1")). When Defendant asked for a reconsideration (that the Government change the number 1 to his initials, his name, or his phone number), the Court iterated that:

> [T]he institution of trial by jury is built on the premise that jurors follow instructions. I will be happy to repeat this instruction from time to time. In fact, if you remind me about the limiting instruction every time a new block exhibit comes in, I will be happy to reiterate that instruction.

(Docket No. 717 at 65).

Throughout trial, the Court repeated the curative instruction as needed, or some iteration of it, when the Government published exhibits to the jury where excerpts of WhatsApp chat reports

identified Baiyewu by the number 1. (*See* Docket No. 718 at 25, 34, 50, 52, 64, 68, 84, 94). Additionally, the following limiting instruction for Government Exhibits 5B and 5C was included in the final jury instructions as well:

> You have been shown evidence consisting of reports from a computer program displaying WhatsApp chats.  Mr. Baiyewu is identified by the number "1" in those reports. He did not identify himself that way in the chats. Therefore, it would be improper for you to conclude that he hid his identity in the chats.

(Jury Instruction # 13).

Defendant offers little more than speculative theory that the Government parser omitted data from the original application when producing the WhatsApp chat reports used as trial exhibits, and the Court already addressed similar arguments at the Rule 104 hearing. *See* United States v. Goris, 876 F.3d 40, 44 (1st Cir. 2017). Moreover, Defendant fails to adequately explain why the limiting instruction, repeated multiple times to the jury throughout trial, would not suffice to cure any potential prejudice. United States v. Armenteros-Chervoni, 133 F.4th 8, 28 (1st Cir. 2025). Furthermore, Defendant offers no adequate explanation for why he brings this *Motion* over fourteen (14) days after the close of trial when he had access and knowledge of this matter before trial. Therefore, Defendant's *Motion* is untimely.

Criminal No. 21-395-1 (RAM)                                              27

Defendant's *Motion* is therefore **DENIED** as to the request for new trial due to the number "1" in Government's Exhibit 5.

### ii.   Cumulative Error

The cumulative error doctrine holds that errors not individually reversible can become so cumulatively. *See*, e.g., United States v. Baptiste, 8 F.4th 30 (1st Cir. 2021). That is because "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect" and thus add up to prejudice. United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). "In other words, a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." Id. at 1161.

Mr. Baiyewu states that his case was plagued by myriad instances of prosecutorial misconduct such as misrepresentation of the evidence and delay in disseminating discovery. (Docket 811 at 48). Defendant cites to Glossip v. Oklahoma where the Supreme Court granted a new trial based on the cumulative effect of various acts of prosecutorial misconduct which strengthened the appellant's argument of actual prejudice. Glossip v. Oklahoma, 604 U.S. 226 (2025). However, Defendant fails to explain why he filed his Motion over the fourteen (14) day deadline Rule 33 requires. Therefore, Defendant's *Motion* is untimely.

Criminal No. 21-395-1 (RAM)                                                    28

Defendant's *Motion* is therefore **DENIED** as to the request for new trial due to cumulative error.

### III. CONCLUSION

For the foregoing reasons, Defendant Oluwasegun Baiyewu's *Motion for Judgment of Acquittal Pursuant to Rule 29 or for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure* at Docket No. 811 is hereby **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of April 2026.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE