**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>[1] OLUWASEGUN BAIYEWU,<br>Defendant. | **CRIMINAL NO. 21-395 (RAM)** |

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Oluwasegun Baiyewu's ("Defendant" or "Mr. Baiyewu") *Objections to the Third Amended Presentence Investigation Report* (the "*Objections*"), his *Sentencing Memorandum*, and the United States' (the "Government") *Sentencing Memorandum*. (Docket No. 896, 936, and 926, respectively). For the reasons set forth below, the Court **DENIES IN PART** and **GRANTS IN PART** the *Objections*.

## I. BACKGROUND

On October 20, 2021, a grand jury in the District of Puerto Rico returned a single-count *Indictment* charging Mr. Baiyewu with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 5). About a year and a half later, on March 31, 2023, a grand jury returned a single-count *Superseding Indictment* charging Mr. Baiyewu and four co-defendants with conspiracy to commit money laundering, in violation of 18 U.S.C.

§§ 1956(h) and 3147. (Docket No. 86). The *Superseding Indictment* alleged numerous schemes supporting the money laundering conspiracy, including business email compromises ("BEC"), romance scams, and unemployment insurance ("UI") fraud. Id. ¶ 21. These charges arose out of events occurring between May 2020 and October 2021. Id. ¶ 19.

On August 25, 2025, a jury in the District of Puerto Rico found Defendant guilty of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 746). On October 20, 2025, the United States Probation Office ("USPO") disclosed the Presentence Investigation Report ("PSR") for Defendant. (Docket No. 802). On December 23, 2025, the USPO disclosed an Amended PSR. (Docket No. 830). On February 3, 2026, Defendant filed objections to the Amended PSR. (Docket No. 844). On February 25, 2026, the USPO disclosed a Second Amended PSR. (Docket No. 850). On May 15, 2026, Defendant filed his formal *Objections* to the Second Amended PSR.[1] (Docket No. 896). Three Addenda to the PSR containing the Government's and Defendant's objections and the responses of the assigned Probation Officer ("PO") were filed. (Docket Nos. 831, 884 and 919). The Government and Defendant each

[1] Defendant mistakenly refers to the current version of the PSR as the "Third Amended PSR" in the title of his *Objections*. (Docket No. 896). The current version of the PSR is the Second Amended PSR. (Docket No. 850).

filed sentencing memoranda. (Docket No. 926 and 936, respectively). Sentencing is currently scheduled for August 27, 2026. (Docket No. 930).

## II. ANALYSIS

### A. Factual Objections

A PSR generally "bears sufficient indicia of reliability to permit the district court to rely on it at sentencing." United States v. Carrion-Melendez, 26 F.4th 508 (1st Cir. 2022) (citing United States v. Miranda-Díaz, 942 F.3d 33, 40 (1st Cir. 2019) (citations omitted)). But, where an objection has been raised, the "mere inclusion in the PSR" of factual allegations "does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing." Id. (citing United States v. Harris, 702 F.3d 226, 230 n.2 (5th Cir. 2012)).

In his *Objections*, Mr. Baiyewu objected to various statements of fact included in paragraphs 12, 14, 17 and 24 of the Second Amended PSR's Offense Conduct section. (Docket No. 896 at 8). Specifically:

1. Defendant averred that Paragraph 12's bucket analysis of the payments Mr. Baiyewu made into the Shipopo Autos, B-100 Energy Nigeria, and Emperor Auto Advantage accounts does not indicate the source of each payment, the victim

associated with each payment, each transaction's connection to Mr. Baiyewu, or whether each payment was within the scope of Mr. Baiyewu's alleged jointly undertaken criminal activity. Id. Defendant argued paragraph 12 cannot support the Second Amended PSR's $4,053,739.95 laundered-funds figure. Id. At trial, Ms. Graf's testimony described the total amounts deposited into the into the Shipopo Autos, B-100 Energy Nigeria, and Emperor Auto Advantage accounts during the conspiracy--$2,600,000 for Shipopo Autos, $282,000 for B-100 Energy Nigeria, and $258,000 Emperor Auto Advantage. (Docket No. 761 at 43-47). Government exhibits also showed Mr. Baiyweu personally deposited $201,000 to the Shipopo Auto account; $30,088 to the Emperor Auto account; and $65,224 to the B-100 Energy Nigeria Account. *See* Government exhibits 78, 79 and 80. Therefore, this section of paragraph 12 will be modified to better reflect Ms. Graf's testimony.

2. Defendant posited that Paragraph 12 inaccurately states Ms. Graf testified that the numbers provided were conservative. (Docket No. 896 at 16). Ms. Graf testified that the numbers "would most likely be a conservative estimate." (Docket No. 761 at 36). Accordingly, this

section of paragraph 12 will be modified to reflect Ms. Graf's testimony more accurately.

3. Defendant further argued that Paragraph 12 inaccurately states that Ms. Graf reviewed the taxes from 2019 to 2021 for Mr. Baiyewu as provided by the Internal Revenue Service which revealed reported wages, salaries, tips, etc. of $10,314 for 2019, of $16,434 for 2020, and of $49,000 for 2021. (Docket No. 869 at 15). According to Defendant, in 2021, Mr. Baiyewu reported income of $208,051, as shown in his income tax return for that year. Id. However, the $208,051 figure appears in the *Income* section of Mr. Baiyewu's *Schedule C (Form 1040) Profit of Loss From Business* form for his 2021 tax return and was referenced during cross-examination of Ms. Graf without context and without further information to conclude that her prior testimony was inaccurate. (Docket No. 762 at 59); *see* also (Government's Exhibit 62(a) at 49). The Court finds that, for the year 2021, Mr. Baiyewu's reported wages, salaries, tips, etc. were $49,000. (Docket 761 at 31); *see* also (Government's Exhibit 62(a) at 35). Accordingly, this section of paragraph 12 is an accurate representation of Ms. Graf's testimony and will not be modified.

4. Defendant contended that Paragraph 14 inaccurately states that Postal Inspector Bracken ("Mr. Bracken") identified a total of 188 money orders purchased with Green Dot cards out of which a little over 50 were deposited into the OLAD Trading account and then paid to the Shipopo Autos Copart account. (Docket No. 896 at 16). Defendant alleges Mr. Bracken never testified that over 50 money orders paid into OLAD account were then paid to the Shipopo Autos' Copart account. Id. Mr. Bracken testified that "there were approximately 188 money orders that had been purchased with the Green Dot cards that [he] identified that were used to purchase the other, out of that subset there were roughly a little over 50 deposited into OLAD Trading." (Docket No. 759 at 8). Mr. Bracken further testified that "these represent money orders that had been from that 188 paid to the Shipopo Auto account at Copart." Id. This segment of Mr. Bracken's testimony is not a bastion of clarity. However, in his prior testimony, Mr. Bracken stated that "[o]ut of those 188 [money orders], [he] saw several getting deposited into OLAD Trading account and this is showing another set of those same money orders that were purchased were getting paid into the Shipopo Auto account." (Docket No. 758 at 33-34). Mr. Bracken also testified that

"out of the 188 [money orders] purchased, there were numerous that were made payable to Copart and then those were used as payment, at Copart, on the Shipopo Autos account." Id. at 31. Therefore, to reflect Mr. Bracken's testimony more accurately, this section of paragraph 14 will be modified.

5. Defendant asserted that Paragraph 17 provides an inaccurate explanation of Mr. Baiyewu's testimony that he had limited time to make payments for people at the vehicle auction therefore the only option he had was the informal market to make payment with Nigerian Naira. (Docket No. 896 at 16). However, Mr. Baiyewu testified exactly that—"[w]hat I meant I testified was I had limited time to make payments for people at the auction. . . [t]he only option that I had was the informal market that was testified to yesterday by Mr. Eze to make payment with the Nigerian naira.". (Docket No. 764 at 122). Defendant's foundation for his objection lies in Mr. Uzoma Alexander Eze's ("Mr. Eze") testimony of the existence of an informal market. (Docket No. 762 at 38-40). The Court finds this section of paragraph 17 is an accurate representation of Mr. Baiyewu's testimony and will not be modified.

6. Defendant argued that Paragraph 24 inaccurately states that when asked if Mr. Baiyewu was aware that more than 2 million dollars that went into his Copart account from May 2020 through October 2021 were sourced from fraud, he indicated that he was not aware of this.[2] (Docket No. 896 at 17). Defendant avers that, at trial, there was no evidence that 2 million or more were the amount of the frauds. Id. According to trial transcripts, counsel stated:

> we have seen that from the period of May 2020 until October of 2021, approximately $2 million went into your account at Copart . . . it is evidence that into your Copart account between May of 2020 until October of 2021, more than $10 million went in. My question is were you aware that any of those payments were sourced from fraud?

(Docket No. 764 at 98). Defendant answered that "[w]ithin a period of May 2020 to 2021, [he] was not aware that any of the payments were sourced from fraud." Id. To more accurately reflect Mr. Baiyewu's testimony, paragraph 24 will be modified.

Accordingly, the Court **DENIES IN PART** and **GRANTS IN PART** Mr. Baiyewu's objections to paragraphs 12, 14, 17, and 24 and adopts

---

[2] Defendant mistakenly refers to paragraph 17 in his objection, but the statement he objects to is part of paragraph 24.

these paragraphs of the Second Amended PSR as factual findings for purposes of sentencing, except that:

1. Paragraph 12 will be modified to state that:

   Amanda Graf who is an investigator for the Department of Justice Consumer Protection branch testified that according to the data provided by Copart there were three accounts, Shipopo Autos, B-100 Energy Nigeria and Emperor Auto Advantage, in which the defendant made payments. She conducted a bucket analysis of the accounts and observed that the largest number of payments made by the defendant to these accounts were in denominations of $1,000 or less. The payments the defendant made at Copart were in person. During the time frame of the conspiracy defendant paid $201,000 to the Shipopo Auto account; $30,088 to the Emperor Auto account; and $65,224 to the B-100 Energy Nigeria Account. During the time frame of the conspiracy, the total amounts deposited into the accounts were: $2,600,000 for Shipopo Autos, $282,000 for B-100 Energy Nigeria, and $258,000 Emperor Auto Advantage. (Docket No. 761 at 43-47).

2. Paragraph 12 will be modified to state that "the data provide by Customs and Border Protection did not include exportation date for approximately 220 additional vehicles therefore the numbers would most likely be a conservative estimate."

3. Paragraph 14 will be modified to state that Mr. Bracken "identified a total of 188 money orders purchased with Green Dot cards out of which several were deposited into the OLAD Trading account and another set was paid to the Shipopo Autos Copart account."

4. Paragraph 24 will be modified to state "[w]hen asked if Mr. Baiyewu was aware if any of the dollars that went into his Copart account from May 2020 to October 2021 were sourced from fraud, he indicated that he was not aware that any of the payments were sourced from fraud."

Defendant also objects to certain wording and characterizations contained in paragraphs 5, 7, and 8 of the Offense Conduct section of the Second Amended PSR, including the use of terms such as "funds," "daily," "exchange," and the characterization that Mr. Ifeoluwa Dudubo ("Mr. Dudubo") and Mr. Baiyewu "did not see each other frequently" and the manner in which Mr. Dudubo received instructions from Mr. Baiyewu. (Docket No. 896 at 9-13). Rule 32(i)(3) does not require the Court to make findings of fact concerning every disputed statement in a PSR. Where a disputed matter will not be taken into account in determining the sentence, the Court need not resolve the dispute. Fed. R. Crim. P. 32(i)(3)(B). The Court finds that these objections do not present material factual disputes requiring resolution under Federal Rule of Criminal Procedure 32(i)(3). The challenged terminology and characterizations do not affect the calculation of the advisory Guidelines range, alter the Court's understanding of the conduct relevant to sentencing, and are not otherwise material to the

sentence imposed. Accordingly, the Court **DENIES AS IMMATERIAL** the objections to paragraphs 5, 7, and 8 of the Second Amended PSR.

Finally, Mr. Baiyewu objects to paragraph 28 of the Offense Conduct section of the Second Amended PSR which states that, according to trial exhibits 8(a), 9(a) and 10(a), the loss amount is $4,053,739.95.[3] The Court discusses this objection below.

**B. Offense Level Computation**

**1. Business of Money Laundering**

The money-laundering Guidelines set forth in U.S.S.G. § 2S1.1 begin by laying out two different methods for calculating the base offense level. United States v. Lucena-Rivera, 750 F.3d 43, 51 (1st Cir. 2014). Guideline § 2S1.1(a)(1) applies where the defendant committed the underlying offense or would be accountable for the underlying offense as relevant conduct. United States v. Aguasvivas-Castillo, 668 F.3d 7, 14 (1st Cir. 2012). Guideline § 2S1.1(a)(2) applies where the defendant did not commit the underlying offense, or where the defendant did commit the underlying offense, "but the offense level for the underlying

[3] The loss amount stated in the original PSR was $3,934,0027. (Docket No. 802 at ¶28). This amount was changed to $4,053,739.95 without explanation when the PSR was amended. (Docket No. 830 and 850 at ¶28). However, no changes were made to the guideline calculations as the amended amount falls within the same offense level as the original amount.

offense is impossible or impracticable to determine." Id. (citing § 2S1.1 cmt. n. 3(A)).

Where, as here, Guideline § 2S1.1(a)(2) applies, a four-level enhancement may be imposed if the defendant "was in the business of laundering funds." Id. (citing § 2S1.1(b)(2)(C)). "The Commission determined that, similar to a professional 'fence', *see* § 2B1.1(b)(4)(B), defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct." Id. (citing U.S.S.G. app. C, vol. II, at 223 (2003)).

The application of the enhancement requires the district court to examine the totality of the circumstances to decide whether a defendant was "in the business of laundering funds." *See* U.S.S.G. § 2S1.1 cmt. n.4. The Application Note to the Guideline directs the court to consider the following non-exhaustive list of factors: (i) the defendant regularly engaged in laundering funds; (ii) the defendant engaged in laundering funds during an extended period of time; (iii) the defendant engaged in laundering funds from multiple sources; (iv) the defendant generated a substantial amount of revenue in return for laundering funds; (v) at the time the defendant committed the instant offense, the defendant had one or more prior convictions related to money laundering or

international financial transactions; and (vi) during the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in subdivisions (i) through (iv). Lucena-Rivera, 750 F.3d at 52 (citing U.S.S.G. § 2S1.1 cmt. n.4).

Mr. Baiyewu objected to the application of the four-level enhancement for being in the business of money laundering. (Docket No. 896 at 23). Mr. Baiyewu averred that U.S.S.G. §2S1.1(b)(2)(C) applies only when the defendant was in the business of laundering funds on behalf of others, thus gaining financially from engaging in such transactions. (Docket No. 896 at 24). Defendant alleged that, according to the Second Amended PSR, Mr. Baiyewu earned $100–$150 per vehicle as a brokerage fee for his car export business. (Docket No. 850 at ¶21). As such, Defendant posited he does not satisfy the standard to qualify for such enhancement. The Government alleged Defendant's business was helping people launder their ill-gotten gains through the purchase of cars then shipped to Nigeria. (Docket No. 926 at 3). The Government posited that, to do so, Defendant established a Copart account and at least one corporate entity, Shipopo LLC, and earned commissions by serving as a money broker and transporter-shipper; he also generated profits by serving as a black-market currency-exchange. Id.

Here, both sides agree Mr. Baiyewu did not commit the underlying offense of fraud and that, therefore, U.S.S.G. § 2S1.1(a)(2) applies. The Court, then, turns to whether the evidence presented at trial supports the application of the "in the business of laundering funds" enhancement according to non-exhaustive the factors set forth in U.S.S.G. § 2S1.1 cmt. n.4.

At trial, the Government presented the testimony of Mr. Dudubo who stated that he and Mr. Baiyewu had an understanding whereby Mr. Dudubo would: (1) receive requests from Mr. Baiyewu for dollars in the form of money orders, cash, or cashier's checks; (2) reach out to three primary money suppliers who had money from "dealing in illegal activities;"[4] (3) negotiate an exchange rate of U.S. Dollars to Nigerian Naira with the money supplier; and (4) once a rate was agreed upon, drive to pick up fraud money from his supplier. (Docket No. 717 at 123); *see also* (Docket 718 at 37). Then, Mr. Dudubo testified that Mr. Baiyewu would provide payment instructions at Copart or IAAI,[5] Mr. Dudubo would drive to Copart or IAAI, stand in line and make payment as directed, and Mr. Baiyewu would arrange to transfer the agreed amount of Naira into Mr. Dudubo's Nigerian bank account. (Docket 718 at 37). Mr. Dudubo

---

[4] (Docket No. 717 at 125).

[5] As explained during trial, both Copart and IAAI are online auto auction houses that sell used vehicles. See, e.g., (Docket No. 717 at 102).

described how he could tell Mr. Baiyewu knew that the money came from illegal activity because Defendant told him he wanted to avoid creating a paper trail, for example, by avoiding bank transactions, using cash where possible to avoid any connection to an illegal source, and purposefully using Mr. Dudubo as a middle-man to insulate and distance himself from Mr. Dudubo's suppliers. Id. at 37, 45, 57, and 85. The Government also presented Defendant's communications with other coconspirators such as Mr. Temitope Omatayo ("Mr. Omatayo"), and Mr. Oluwaseun Adelekan ("Mr. Adelekan") to whom Defendant gave orders to deposit funds into several Copart accounts. (Docket No. 758 at 34). Moreover, Defendant's ex-wife Ms. Kelsey Williams testified that she saw Mr. Temitope Suleiman ("Mr. Suleiman") give cash to Mr. Baiyewu. (Docket 720 at 51). Finally, the Government showed chats that indicate that Mr. Baiyewu coordinated with Mr. Blossom Engaghe ("Mr. Engaghe") to wire Naira to pay for funds coming from the Glenn International ("G.I.") BEC fraud. (Docket No. 756 at 69).

This evidence established that: (i) Defendant regularly engaged in laundering funds by sourcing dirty dollars from Mr. Dudubo and others; (ii) Defendant engaged in laundering funds during at least May 2020 to October 2021, as charged in the *Superseding Indictment*; and (iii) Defendant engaged in laundering funds from multiple sources including the various sources Mr.

Dudubo connected him to. As to revenue, Defendant testified that he charged a fee per automobile bid at Copart. (Docket No. 764 at 86). While Defendant does not satisfy every U.S.S.G. § 2S1.1 cmt. n.4 factor, those factors are non-exhaustive and district courts must consider the totality of the circumstances in determining whether a defendant was "in the business of laundering funds." Lucena-Rivera, 750 F.3d at 51–53. Here, the record as a whole establishes that Defendant's laundering activity was sufficiently regular, extensive, and purposeful to constitute a business rather than an isolated or incidental transaction. Defendant was not merely a participant in a discrete money-laundering transaction, but engaged in laundering funds as a sustained commercial activity. Accordingly, considering the totality of the circumstances, Defendant was "in the business of laundering funds," and the four-level enhancement under § 2S1.1(b)(2)(C) is warranted. Accordingly, the Court **DENIES** Mr. Baiyewu's objection to the "in the business of laundering funds" enhancement.

Defendant further objected to footnote 9 of the Second Amended PSR. (Docket No. 896 at 24). Specifically, Defendant objects that footnote 9 states that "defendant was in the business of laundering funds during the span of the conspiracy as he obtained money from illicit sources such as romance scams, unemployment insurance fraud and cybercrimes." Id. Since the Court has found that

Defendant was in the business of laundering funds, the objection as to footnote 9 is **DENIED**.

**2. Leadership Role**

In order to invoke § 3B1.1(a), a district court must make a finding as to scope—that the criminal activity involved five or more participants or was otherwise extensive—and a finding as to status—that the defendant acted as an organizer and leader of the criminal activity. United States v. Arbour, 559 F.3d 50, 53 (1st Cir. 2009) (citing United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir.1995)). The district court's findings must satisfy the preponderance of the evidence standard. *See* United States v. Pierre, 484 F.3d 75, 89 (1st Cir. 2007).

As to scope, for § 3B1.1(a) to apply, the criminal activity that the defendant led or organized must have involved five or more participants or been extensive, despite not involving five or more participants. Id. cmt. n. 3 ("In assessing whether [a criminal activity] is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); *see* also United States v. Laboy, 351 F.3d 578, 585 n. 10 (1st Cir.2003) ("The 'five or more participants' and 'otherwise extensive' elements are alternative means of finding the required scope under

§ 3B1.1.”). When determining whether a criminal activity is extensive, we have noted that courts should consider “the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.” Arbour, 559 F.3d at 54 (citing United States v. Pierre, 484 F.3d 75 (1st Cir. 2007) (quotation omitted)).

As to status, to qualify for an enhancement under § 3B1.1(a), a defendant must have either organized or led the criminal activity. The guideline commentary provides a non-exhaustive list of factors that include: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. Id. (citing § 3B1.1(a), cmt. n. 4). “There need not be proof of each and every factor before a defendant can be termed an organizer or leader.” Tejada-Beltran, 50 F.3d at 111. “[T]he term leader implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands.” Id. Moreover, “[o]ne may be classified as an organizer,

though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." Id.

Regardless of whether the criminal activity involved five or more participants or was otherwise extensive, the guideline commentary makes plain that a defendant needs only to have led or organized one criminal participant, besides themselves of course, to qualify as a leader or organizer under § 3B1.1(a). Arbour, 559 F.3d at 56 (citing § 3B1.1(a), cmt. n. 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.")).

Here, Mr. Baiyewu averred the evidence at trial simply showed coordinated between himself and his four co-defendants. (Docket No. 896 at 42). Defendant argued the evidence does not establish decision-making authority between the participants and that Mr. Baiyewu did not occupy a leadership role. Id. The Government posited Mr. Baiyewu played a central role in the money laundering conspiracy, serving as a middleman between his Nigerian customers, including Mr. Egaghe and Mr. Forster Ene ("Mr. Ene") and his dirty dollar suppliers, Mr. Adelekan, Mr. Dudubo, Mr. Temitope Omotayo, and Mr. Suleiman. (Docket No. 926 at 3).

At trial, the Government presented evidence, through the testimony of Mr. Dudubo, that Defendant reached out to Mr. Dudubo

and instructed him to find dollars in the form of money orders, cash, or cashier's checks—-this work included negotiating an exchange rate and driving to pick up the dollars. (Docket No. 717 at 123); *see also* (Docket 718 at 37). Then, Mr. Dudubo testified that Mr. Baiyewu would provide payment instructions at Copart or IAAI,[6] Mr. Dudubo would drive to Copart or IAAI, stand in line and make payment as directed, and Mr. Baiyewu would arrange to transfer the agreed amount of Naira into Mr. Dudubo's Nigerian bank account. (Docket 718 at 37). The Government also presented evidence in the form of chats between Mr. Baiyewu and Mr. Engaghe that showed that Mr. Baiyewu coordinated with Mr. Engaghe to wire Naira to pay for the G.I. fraud's dirty dollars. (Docket No. 756 at 69). Specifically, on October 28, 2020, the day after the G.I. BEC fraud, Mr. Baiyewu and Mr. Engaghe exchanged the following messages:

> Mr. Engaghe: Yes oo another guy just got back to us like around 1 a.m. here. He has 70K. You may be interested.
> Mr. Baiyewu: What do you want to do sir.
> Mr. Engaghe: He is well-known. I want to send to him directly.
> Mr. Baiyewu: Do you want to give me his account.
> Mr. Engaghe: Okay let me get it.
> Mr. Baiyewu: Okay waiting.
> Mr. Engaghe: Forster ENE 1009098760 keystone.
> Mr. Baiyewu: How much am I sending?
> Mr. Engaghe: All but the $30.
> Mr. Baiyewu: So can you check that in naira?
> Mr. Engaghe: Or leave it. Add it to the shipping. Which shipping is due now?
> Mr. Baiyewu: No dollar is the problem.

---

[6] As explained during trial, both Copart and IAAI are online auto auction houses that sell used vehicles. See, e.g., (Docket No. 717 at 102).

> Mr. Engaghe: Let me check. How can this guy assist you? Can they mail it to you.
> Mr. Baiyewu: What state is the guy.
> Mr. Engaghe: I will ask.
> Mr. Baiyewu: How much from the money do you need?
> Mr. Engaghe: I need everything. It's payment for the "range over."
> Mr. Baiyewu: This is what you can do. Can he wire like 32K to your Copart account first and you talk to Copart to help you reverse the car. That money can take care of your "range over" and Sienna. Confirm his state and I can know what to do about how to get the rest of the money.
> Mr. Engaghe. Okay boss.
> Mr. Baiyewu: I will make arrangement to wire back naira to the account, right?
> Mr. Engaghe: Sir he is in California. He can sort the Copart payment himself. If you also need cash he can FedEx it to you. Can u use money order for your shipping payment?
> Mr. Baiyewu: No cash alone.
> Mr. Engaghe: Okay. Sir you have sent the money. They want to send the evidence of payment. Guess stop too early.
> Mr. Baiyewu: Okay let me make arrangement.
> Mr. Engaghe: Okay boss.
> . . .
> Mr. Engaghe: Boss, I salute you sir.
> Mr. Baiyewu: How far.
> Mr. Engaghe: my oga kindly assist with the pick up of 2 cars. paying at California now.
> Mr. Baiyewu: Has it been sorted? Your guy no gree sell for me. Ask if he can Zelle.
> Mr. Engaghe: bros me they suspect those people oo.
> Mr. Baiyewu: hmm, okay oo, Abeg oo. I no get power oo.
> Mr. Engaghe: He didn't have any cash. Next minute he has 70K.
> Mr. Baiyewu: yup.
> Mr. Engaghe: Bro I even paid for more but now I am hearing stories. I have had asked for refund on other payments I made. Please help me schedule pickup for both cars. I don't really have any means for dollar for storage. Be glad if you can help sir.
> Mr. Baiyewu: Which did they pay?
> Mr. Engaghe, both. On Copart. I had another on iaai and mannheim. They have now refused to make those saying the money is finished. Said they may have another funds for tomorrow but i doubt. just trying to console me.
> Mr. Baiyewu: na wahoo.
> Mr. Engaghe: meanwhile rates are dropping in nija.
> Mr. Baiyewu: Send me receipts for the two cars.

Id. According to the Government, these communications indicated that Defendant and Mr. Engaghe were coordinating the "transfers of monies between U.S. Dollars and naira [in] the form of a vehicle

that was purchased and then shipped later on." Id. at 75. The Government also presented Defendant's communications with other coconspirators such as Mr. Omatayo and Mr. Adelekan to whom Defendant gave orders to deposit funds into several Copart accounts. (Docket No. 758 at 34).

In this case, the numerosity prong of the scope inquiry is satisfied not only because Mr. Baiyewu was indicted along with four co-conspirators and the conspiracy included at least two other members, Mr. Ene and Mr. Engaghe, in Nigeria; but also, because the evidence at trial showed Defendant actively coordinated with Mr. Engaghe, Mr. Dudubo, Mr. Adelakan and Mr. Omatayo. The status inquiry is also satisfied because the evidence showed Mr. Baiyewu had decision-making authority over at least Mr. Dudubo who would source dirty dollars, accept or reject an exchange rate, and make payments at Copart or IAAI at Defendant's instruction. Mr. Baiyewu bought dirty dollars, he made or instructed others to make transactions at Copart, and he coordinated transport for the vehicles purchased with dirty dollars. Defendant also recruited Mr. Dudubo to join the conspiracy. (Docket No. 717 at 123). Therefore, Defendant may be classified at least as an organizer, though perhaps not as a leader, because he coordinated others, such as Mr. Dudubo and Mr. Adelakan, so as to facilitate the commission of criminal activity.

Accordingly, for purposes of § 3B1.1, the scope of Mr. Baiyewu's criminal activity and the fact that he led or organized one or more of the five or more individuals involved in his criminal activity, he qualifies as a leader or organizer. Therefore, the Court **DENIES** Mr. Baiyewu's objection to the § 3B1.1(a) enhancement. Pursuant to the application of this enhancement, Defendant is ineligible for a 2-level reduction under USSG §4C1.1(a)(10).

Defendant further objected to footnote 10 of the Second Amended PSR. (Docket No. 896 at 24). Specifically, Defendant objects that footnote 10 states that Defendant "recruited at least one of the co-defendants to the conspiracy." Id. at 25. There is evidence that Mr. Baiyewu recruited at least one co-conspirator, Mr. Dudubo, who stated that "some time in 2020, Mr. Baiyewu Shipopo reached out to [him] and asked [him] to get some source for funds." (Docket No. 717 at 123). As such, Defendants objection to footnote 10 of the Second Amended PSR is **DENIED**. Accordingly, footnote 10 of the Second Amended PSR will be modified to state: "recruited Mr. Dudubo to the conspiracy.".

**3. Loss amount**

Section 2B1.1(b)(1) calls for a sentencing court to increase an offender's offense level in theft and fraud cases according to the amount of loss resulting from the offense. A defendant in a

jointly undertaken criminal activity is liable for the loss resulting from acts directly attributable to him and for the loss resulting from the reasonably foreseeable acts of others taken in furtherance of the jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)-(3); United States v. Pizarro-Berrios, 448 F.3d 1, 6 (1st Cir. 2006). The government bears the burden of proving a victim's losses by a preponderance of the evidence.[7] United States v. Acosta, 303 F.3d 78, 82 (1st Cir.2002). However, the government need not prove that all the money laundered through illegal transactions "constituted the proceeds of ... fraud."

---

[7] Under U.S.S.G. § 2B1.1:

> (A) Loss.—Loss is the greater of actual loss or intended loss.
>
> (B) Gain.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.
>
> (C) For purposes of this guideline—
>
> (i) "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> (ii) "Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
>
> (iii) "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.
>
> (iv) "Reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

United States v. Abbas, 100 F.4th 267 (1st Cir.), cert. denied, 145 S. Ct. 319 (2024) (citing United States v. McGauley, 279 F.3d 62, 71 (1st Cir. 2002)). That would "eviscerate" § 1957, "permitting one to avoid its reach simply by commingling proceeds of unlawful activity with legitimate funds." Id. The First Circuit has upheld a money-laundering conviction where the jury could have found that the laundering transactions "included proceeds" of fraud. Id.; *see also* United States v. George, 761 F.3d 42, 53-54 (1st Cir. 2014); United States v. Rivera-Izquierdo, 850 F.3d 38, 47 (1st Cir. 2017) ("[T]he government needed to prove only that the money ... constituted property 'derived from' the fraud's 'proceeds.'"). Notwithstanding, when a transaction results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection §2S1.1(a)(2), is the amount of the criminally derived funds, not the amount of the commingled funds, if the defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process. §2S1.1 n. 3. **If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of this subsection, is the total amount of the commingled funds.** Id.

In calculating loss amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct. United States v. Flores-Seda, 423 F.3d 17, 20-21 (1st Cir.2005). A court may base a loss estimate on factors including "[t]he approximate number of victims multiplied by the average loss to each victim" and on "[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations." U.S.S.G. § 2B1.1, cmt. n. 3(B)(iv) and (vi) (2025). "[T]he district court may rely on the PSR, affidavits, documentary exhibits, and submissions of counsel." United States v. Ranney, 298 F.3d 74, 81 (1st Cir. 2002) (citation omitted).

Here, Defendant averred the $4,053,739.95 loss amount calculation is not supported by the evidence. (Docket No. 896 at 19). Mr. Baiyewu alleged that: (1) the Second Amended PSR does not specify which fraud caused which loss amount; (2) not every Copart payment is a laundering transaction, only a fraud-funded subset qualifies; (3) the Second Amended PSR does not inquire into Defendant's agreed upon scope and merely calculates his foreseeability; and (4) the Second Amended PSR lists victims without establishing proximate causal nexus to Mr. Baiyewu. Defendant argued the maximum figure derivable from the Second Amended PSR is $741,000—the addition of all of Mr. Baiyewu's deposits into the Shipopo Autos, B-100 Energy Nigeria and Emperor

Auto Advantage accounts. (Docket No. 850 at ¶12). Alternatively, Mr. Baiyewu provided a transaction-by-transaction loss calculation that includes the confirmed fraud-linked payments to the Shipopo Autos account of $12,816 (Docket No. 850 at ¶¶14-15) and Ms. Janet McHard's 6.05% fraud linked analysis which yielded a total of $123,360 out the $2,039,000 in 2020 Copart purchases. (Docket No. 764 at 27).

The Government alleged $4,053,739.95 is a reasonable estimate of actual loss because it reflects the types of structured, money laundering payments fitting the conspirators' *modus operandi*, and made by the members of the charged conspiracy toward the Copart accounts. (Docket No. 926 at 6). Specifically, the Government posited the $4,053,739.95 is the sum total of the following amounts: (1) $3,785,384.38 for the cash, cashier's check, and money order payments that Copart records reflect were made to benefit the Defendant's Copart account during the period of activity from January 2019 through October 2021; (2) $131,598, which is the total of money order and cashier's check payments made or arranged by the Defendant toward Mr. Engaghe's Copart account; and (3) $136,757.57, which is the total of money order and cashier's check payments made or arranged by the Defendant toward Mr. Ene's Copart account.

However, the Government itself admitted that it is counting deposits from before the time of the conspiracy and that agent testimony and their exhibits traced only the following funds from victims to the Defendant's or his co-defendants' Copart accounts: (1) "some of" the approximately $400,000 stolen from victim D.L.; (2) "some of" approximately $117,000 from victim G.I. which was funneled, to Mr. Egaghe; (3) $20,000 of approximately $312,000 stolen from victim Amitech Solutions ("A.S.") which was funneled to Baiyewu's Copart account; (4) at least $50,000 of the $1,191,526 fraudulently paid out in the names of 92 victims of Illinois unemployment insurance fraud which was funneled to Mr. Baiyewu's, Mr. Eghaghe's, and Mr. Ene's Copart accounts; (5) at least $16,000 of the $265,563 fraudulently paid out in the names of 16 victims of Nevada unemployment insurance fraud which was funneled to Mr. Baiyewu's, Mr. Eghaghe's, and Mr. Ene's Copart accounts; and (6) at least $1,640 of $3,760 fraudulently paid out in the names of 3 victims of Washington unemployment insurance fraud which was funneled to Baiyewu's Copart account. (Docket No. 926 at n. 4).

In this case, Mr. Baiyewu is liable for the loss resulting from acts <u>directly attributable to him</u> and for the loss resulting from the <u>reasonably foreseeable</u> acts of others taken in furtherance of the jointly undertaken criminal activity, but the government bears the burden of proving a victim's losses by a preponderance

of the evidence. Acosta, 303 F.3d at 82. Conclusory statements averring that deposits outside of the time-frame of the conspiracy constitute relevant conduct for the loss calculation do not meet that burden. The sentencing court has considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss. United States v. Flete-Garcia, 925 F.3d 17, 28 (1st Cir. 2019). Although the Court need not determine the loss with mathematical precision and may make a reasonable estimate based on the available evidence, the loss calculation must nevertheless be grounded on evidence from a dependable source of information. *See* id.

Here, the evidence does not provide a sufficient basis for attributing the Government's proposed amount of $4,053,739.95 to Defendant. The Court therefore declines to adopt that figure. At trial, Government exhibits showed Mr. Baiyewu personally deposited $201,000 to the Shipopo Auto account, $30,088 to the Emperor Auto account, and $65,224 to the B-100 Energy Nigeria Account in denominations of $1,000 or less. *See* Government exhibits 78, 79 and 80. With respect to concealment, trial testimony showed that, while money orders are a legitimate form of payment, they are also useful to disguise the original provenance of the funds and thus serve as a concealment mechanism. (Docket No. 761 at 24). Mr. Baiyewu's deposits into the three accounts during the time of the

conspiracy reflect such a practice. The Government also presented evidence, through Ms. Graf's testimony, that the total amounts deposited into the Shipopo Autos, B-100 Energy Nigeria, and Emperor Auto Advantage accounts during the conspiracy were: $2,600,000 for Shipopo Autos, $282,000 for B-100 Energy Nigeria, and $258,000 Emperor Auto Advantage. (Docket No. 761 at 43-47).

Defendant places great stock in the testimony of Ms. Janet McHard ("Ms. McHard") when her opinions do not account for the money laundered through the Shipopo account. (Docket No. 764 at 27). Ms. McHard admitted that she did not trace the provenance of the moneys deposited into the Shipopo account and she did not even examine the deposits into the Emperor Auto and B-100 accounts. Id. at 52-53. McHard's testimony does not credibly provide sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process because that was not within the scope of her analysis. Accordingly, the value of the laundered funds is the total amount of the commingled funds—here, the total amount that flowed through the Shipopo, Emperor Auto and B-100 accounts. *See* United States v. Baker, 227 F.3d 955, 965 (7th Cir. 2000) ("the 'clean' money was also 'involved in' the conspiracy in that [. . .] it helped further and facilitate the operation"); United States v. Tencer, 107 F.3d 1120, 1134 (5th Cir.1997) (because "clean" money that is commingled

with "unclean" money facilitates the money laundering operation, the "clean" money is "involved" in the offense and is therefore forfeitable). "To determine the value of funds, the government need not trace each dollar of income by the means of payment, and it need not trace each dollar to a specific instance of laundering." Baker, 227 F. 3d at 966.

Consequently, the Court finds, based on the evidence before it, that the appropriate estimate of the value of laundered funds is $3,140,000—-the sum of all the deposits into the Shipopo Autos, B-100 Energy Nigeria and Emperor Auto Advantage accounts during the time of the conspiracy. The Court **GRANTS IN PART** Mr. Baiyewu's objection to the value of the laundered funds calculation and pursuant to §2B1.1 (b)(1)(H), Defendant's offense level will be increased by 16 levels instead of the 18 levels provided by the Second Amended PSR.

**C. Restitution and Victim Impact**

Mr. Baiyewu objected to the inclusion of a Victim Impact section in the Second Amended PSR because he averred none of the included victims' losses can be reasonably related Defendant. (Docket No. 896 at 44). Defendant posited that, for restitution purposes, the Government could not demonstrate a "proximate, but-for causal nexus" between Mr. Baiyewu's offense and those victims' losses. Id. Mr. Baiyewu argued the specific loss for each victim

was caused by others acting on their own. Id. The Government alleged Mr. Baiyewu should be held responsible for the restitution of: (1) $312,893.20 for victim A.S.; and (2) $112,129.53 for victim G.I. (Docket No. 926 at 10). The Government argues this amount was "reasonably foreseeable" to Defendant because he knew these dirty dollars moved through Mr. Baiyewu or his co-conspirators' Copart accounts. Id.

The Court will leave the record open on the matter of restitution for a period of 90 days from the date of sentencing. As such, these objections need not be resolved at this time.

## III. CONCLUSION

For the foregoing reasons, the Court **DENIES IN PART** and **GRANTS IN PART** Defendant's *Objections* at Docket No. 896. Mr. Baiyewu has a total offense level of 32 with a criminal history category I and an applicable guideline sentencing range of 121-151 months of imprisonment and a fine range of $35,000 to $350,000.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of August 2026.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE